# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Flower Factory, Inc., | ) | Case No. |
| | ) | |
| Debtor. | ) | |
| | ) | Judge Russ Kendig |
| An Ohio Corporation | ) | |
| (Employer Tax I.D. No. 34-1367341) | ) | |
| _____ | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Flower Factory Online, Inc., | ) | Case No. |
| | ) | |
| Debtor. | ) | |
| | ) | Judge Russ Kendig |
| An Ohio Corporation | ) | |
| (Employer Tax I.D. No. 86-1127311) | ) | |
| _____ | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FF North Canton, Inc., | ) | Case No. |
| | ) | |
| Debtor. | ) | |
| | ) | Judge Russ Kendig |
| An Ohio Corporation | ) | |
| (Employer Tax I.D. No. 20-0505283) | ) | |
| _____ | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| F.F. Aurora, Inc. (f/k/a F.F. Florence, Inc.), | ) | Case No. |
| | ) | |
| Debtor. | ) | |
| | ) | Judge Russ Kendig |
| An Ohio Corporation | ) | |
| (Employer Tax I.D. No. 20-5837777) | ) | |
| _____ | ) | |

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| F.F./Cleveland, Inc., | ) Case No. |
| | ) |
| Debtor. | ) |
| | ) Judge Russ Kendig |
| An Ohio Corporation | ) |
| (Employer Tax I.D. 34-1909867) | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| FF Greenwood, Inc., | ) Case No. |
| | ) |
| Debtor. | ) |
| | ) Judge Russ Kendig |
| An Ohio Corporation | ) |
| (Employer Tax I.D. No. 20-5108220) | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| F.F. Mansfield, Inc., | ) Case No. |
| Debtor. | ) |
| | ) |
| An Ohio Corporation | ) Judge Russ Kendig |
| (Employer Tax I.D. No. 26-1114065) | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| ALEMIT Properties, LLC, | ) Case No. |
| | ) |
| Debtor. | ) |
| | ) Judge Russ Kendig |
| An Ohio Limited Liability Company | ) |
| (Employer Tax I.D. No. 20-1422875) | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| Mulqueen Importers, LLC, | ) Case No. |
| d/b/a Creative Resources | ) |
| | ) |
| Debtor. | ) Judge Russ Kendig |
| | ) |
| An Ohio Limited Liability Company | ) |
| (Employer Tax I.D. No. 34-1929284) | ) |
| | ) |

2

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Mulqueen & Sons, LLC, | ) | Case No. |
| | ) | |
| Debtor. | ) | |
| | ) | Judge Russ Kendig |
| An Ohio Limited Liability Company | ) | |
| (Employer Tax I.D. No. 34-1824582) | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Denbar, Inc., | ) | Case No. |
| | ) | |
| Debtor. | ) | |
| | ) | Judge Russ Kendig |
| An Ohio Corporation | ) | |
| (Employer Tax I.D. No. 34-1824581) | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Mulden, Inc., | ) | Case No. |
| | ) | |
| Debtor. | ) | |
| | ) | Judge Russ Kendig |
| An Ohio Corporation | ) | |
| (Employer Tax I.D. No. 34-1860156) | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Mulqueen Holdings, Inc., | ) | Case No. |
| | ) | |
| Debtor. | ) | |
| | ) | Judge Russ Kendig |
| An Ohio Corporation | ) | |
| (Employer Tax I.D. No. 20-8378727) | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| RAM Trucking, LLC, | ) | Case No. |
| | ) | |
| Debtor. | ) | |
| | ) | Judge Russ Kendig |
| An Ohio Limited Liability Company | ) | |
| (Employer Tax I.D. No. 34-1939572) | ) | |
| | ) | |

**MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105(A), 361, 362, 363 AND 364 AND FEDERAL BANKRUPTCY RULES 2002, 4001 AND 9014; (I) AUTHORIZING DEBTORS TO OBTAIN SECURED POST-PETITION FINANCING AND USE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) MODIFYING THE AUTOMATIC STAY; (IV) SETTING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Flower Factory, Inc. ("**FFI**"), FF North Canton, Inc. ("**FF North Canton**"), F.F. Aurora, Inc. ("**FF Aurora**"), F.F./Cleveland, Inc. ("**FF Cleveland**"), FF Greenwood, Inc. ("**FF Greenwood**"), F.F. Mansfield, Inc. ("**FF Mansfield**"), Mulden, Inc. ("**Mulden**"), Denbar, Inc. ("**Denbar**"), ALEMIT Properties, LLC ("**Alemit**"), Mulqueen & Sons, LLC ("**M&S**"), Flower Factory Online, Inc. ("**FF Online**"), Mulqueen Importers, LLC ("**Mulqueen Importers**"), RAM Trucking, LLC ("**RAM**") and Mulqueen Holdings, Inc. ("**Mulqueen Holdings**") (each a "**Debtor**" and collectively, the "**Debtors**") in the above-captioned Chapter 11 cases (the "**Cases**"), hereby submit this motion (the "**Motion**") for entry of an order pursuant to sections 105, 361, 362, 363 and 364 of Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") (i) authorizing Debtors to obtain post-petition secured financing and use cash collateral; (ii) granting adequate protection (iii) modifying the automatic stay, (iv) setting final hearing and (v) granting related relief. In support of the Motion, the Debtors respectfully state as follows:

## Bankruptcy Rule 4001 Concise Statement

1. By this Motion, the Debtors request entry of the proposed interim order substantially in the form attached hereto as Exhibit "A" (the "**Interim Order**") and a final order (the "**Final Order**") (i) authorizing the Debtors to enter into postpetition financing with Wells Fargo Bank, National Association (the "**DIP Lender**") pursuant to sections 105(a), 361, 362, 363 and 364(c) of the Bankruptcy Code, (ii) granting adequate protection (iii) modifying the automatic stay, (iv) setting final hearing and (v) granting related relief.

4

2.     Pending the Final Hearing and entry of the Final Order, the Debtors will enter into, and implement on an interim basis, the DIP Credit Facility (as defined below) in accordance with the terms conditions of the Budget (as defined below) Interim Order, that certain Debtor in Possession Credit and Security Agreement (the "**DIP Loan Agreement**"). Copies of the Budget and the DIP Loan Agreement (exclusive of the exhibits) are attached hereto as Exhibits "B" and "C",[1] respectively. Pursuant to Bankruptcy Rule 4001, the following are the material provisions of the DIP Loan Agreement and the Interim Order.[2]

| **Borrowers**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Flower Factory, Inc., FF North Canton, Inc., F.F. Aurora, Inc., F.F./Cleveland, Inc., FF Greenwood, Inc., F.F. Mansfield, Inc., Mulden, Inc., Denbar, Inc., ALEMIT Properties, LLC, Mulqueen & Sons, LLC, Flower Factory Online, Inc., Mulqueen Importers, LLC, RAM Trucking, LLC and Mulqueen Holdings, Inc. |
| --- | --- |
| **DIP Lender**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Wells Fargo Bank, National Association |
| **Term**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The maturity shall be the earliest of<br><br>(a) June 1, 2011, (b) the date the Debtors repay the Indebtedness in full and terminate the DIP Credit Facility, or (iii) the date the Lender demands payment of the Obligations, following an Event of Default, pursuant to Section 7.2. of the DIP Loan Agreement<br><br>(DIP Loan Agreement § 7.2) |
| **Loan Commitment**<br>*Bankruptcy Rules 4001(c)(1)(B)* | (a) $3,900,000 from the Closing Date through March 24, 2011 and (b) $3,400,000 from March 25, 2011 and thereafter, unless either of such amounts is reduced pursuant to Section 2.12 of the DIP Loan Agreement, in which event it means such lower amount.<br><br>(DIP Loan Agreement p. 13) |

---

[1] The DIP Loan Agreement is voluminous. Accordingly, while a copy of the DIP Loan Agreement is being filed with the Bankruptcy Court, a copy will not be served with this Motion. Copies of the DIP Loan Agreement are available from undersigned counsel upon request.

[2] The summaries and descriptions of the terms and conditions of the DIP Loan Agreement and the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Loan Agreement and the Interim Order. In the event there is a conflict between this Motion and the Interim Order or DIP Loan Agreement, the Interim Order or DIP Loan Agreement, as applicable, shall control in all respects.

| | |
|---|---|
| **Interest Rates**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Annual interest rate equal to Daily Three Month LIBOR plus six percent (6.00%), which interest rate shall change whenever the Daily Three Month LIBOR changes (the "Floating Rate").<br><br>(DIP Loan Agreement p. 9)<br><br>The Default Interest Rate shall be equal to two percent (2%) over the applicable Floating Rate, as such rate may change from time to time.<br><br>(DIP Loan Agreement § 2.8(d)) |
| **Fees**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | $78,000 Facility Fee and a $3,000 monthly Monitoring Fee.<br><br>(DIP Loan Agreement § 2.9). |
| **Use of Proceeds**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The proceeds shall be used for the purpose of funding post-petition operations in accordance with the Budget<br><br>(DIP Loan Agreement § 2.15) |
| **Liens and Priorities**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(i)* | Subject to the Carve Out (as hereinafter defined), all loans and all other obligations under the DIP Credit Facility will be<br><br>(a) entitled to superpriority administrative claim in accordance with section 364(c)(1) of the Bankruptcy Code, having a priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors (including, but not limited to, the Pre-Petition Obligations, which for avoidance of doubt are not entitled to treatment as an ordinary or superpriority administrative claim except to the extent of any Adequate Protection Claim for diminution in value or as adequate protection for priming by the DIP Credit Facility), now in existence or hereafter incurred by the Debtors and over any and all administrative expenses or priority claims of any kind including as specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 502(d), 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, whether arising in the Cases or in any superseding chapter 7 cases concerning the Debtors, and<br><br>(b) secured by a first priority perfected security interest in and lien on the Post-Petition Collateral (as defined below), pursuant to Sections 364(c)(2) and (3) and (d) of the Bankruptcy Code, senior in priority to all other security interests and liens with the exception of the Naples Priming Lien (as hereinafter defined).<br><br>The Collateral will not be charged pursuant to Section 506(c) of the Bankruptcy Code. |

11-60406-rk    Doc 16    FILED 02/15/11    ENTERED 02/15/11 18:31:18    Page 6 of 48

| | |
|---|---|
| | (DIP Loan Agreement §§ 3.1, 3.3; Interim Order at ¶ 9) |
| **Carve Out**<br><br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The term "*Carve Out*" shall mean<br><br>(i) allowed professional fees and disbursements incurred by attorneys, accountants, and other professionals retained by the Borrowers and the creditors' committee in the Chapter 11 Case ("Case Professionals"), which fees and expenses have been or subsequently are approved by a final order of the Court pursuant to sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Professional Fees"), if any, (ii) quarterly fees required to be paid to the Office of the United States Trustee pursuant to 28 U.S.C. Section 1930(a)(6), and (iii) any fees payable to the Clerk of the Bankruptcy Court; provided, however, in no event shall the Carveout exceed as of any date of determination the sum of (1) $250,000 plus (2) an amount, determined as of the Petition Date, equal to the Professional Fees set forth on the Budget which are scheduled to be paid during the month of February, 2011, plus (3) an amount, determined as of Monday of each calendar week (commencing February 28, 2011), equal to the Professional Fees set forth on the Budget which are scheduled to be paid during such calendar week, plus (4) the amount of all Professional Fees which were scheduled to be paid pursuant to the Budget from the Petition Date through the date of determination (to the extent not included in  Professional Fees paid by the Borrowers as of any date of determination, less (6) the unused portion of any retainer, as reported by the Borrowers pursuant to Section 6.1(w) of the  Agreement, held by Case Professionals from time to time, which amount as of the Closing Date includes approximately $90,000 held by Brouse McDowell; provided, further, however, that the foregoing reserve for the payment of Professional Fees shall not include any Professional Fees or any related fees or expenses incurred in the prosecution of any litigation or the assertion of any claims raised against or with respect to the Lender or the Collateral. Notwithstanding anything herein to the contrary, to the extent that any of the Case Professionals apply the retainers to accrued and unpaid fees, the Lender shall not be required to replenish such retainers to the extent (i) such fees and expenses are not provided for in the Budget and (ii) the Borrowers do not have sufficient Availability for Lender to increase its reserves by such amount. In the event the Lender is not able to increase its reserves, then the amount of subsection (6) above shall be deemed to be the full amount of all used and unused retainers paid by the Debtors to the Case Professionals without regard to any reductions for portions that were used. |

7

| | (DIP Loan Agreement p. 4; Interim Order at ¶ 11) |
|---|---|
| **Waivers of Rights**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(viii)* | The Debtors waive the Debtors' right to contest the validity, non-enforceability and non-avoidability of the Pre-Petition Liens the obligations related thereto. The Debtors further waive their rights to surcharge the Collateral under 506(c) of the Bankruptcy Code.<br><br>(DIP Loan Agreement §§ 2.21, 2.22; Interim Order at ¶ 24) |
| **Adequate Protection for Pre-Petition Lender**<br>*Bankruptcy Rules*<br>*4001(c)(1)(B)(ii)* | The Pre-Petition Lender will be given a replacement lien junior to the Post-Petition Lien, and superpriority administrative expense claim, junior to the superpriority claim of the DIP Lender.<br><br>(Interim Order at ¶ 10) |
| **Events of Default**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Usual and customary for debtor in possession facilities of this size and type (subject to exceptions and grace periods customary for debtor in possession facilities of this size and type).<br><br>(DIP Loan Agreement § 7.1) |
| **Waiver or Modification of the Automatic Stay**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(iv)* | Subject to the time limitations set forth in the Interim Order, the automatic stay is <u>modified to the extent necessary to permit all acts, actions and transfers, relating to perfection of interests contemplated therein.</u><br><br>(Interim Order at ¶ 17) |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(viii)* | All Post-Petition Liens granted for the benefit of the DIP Lenders shall be valid, enforceable and deemed perfected, effective upon entry of the Interim Order, and no further action shall be required to effect such perfection.<br><br>(Interim Order at ¶ 23) |
| **Conditions to Borrowing**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The obligation to provide the extension of credit under the DIP Loan Agreement shall be subject to the satisfaction of usual and customary conditions for debtor in possession facilities of this size and type.<br><br>(DIP Loan Agreement at § 4.1) |

8

| | |
|---|---|
| **Indemnification**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(ix)* | The Debtors agree to indemnify, defend and hold harmless the DIP Lender, and any of its participants, parent corporations, subsidiary corporations, affiliated corporations, successor corporations, and all present and future officers, directors, employees, attorneys and agents of the foregoing (the "**Indemnitees**") from and against any of the following (collectively, "**Indemnified Liabilities**"):<br><br>(a) Any and all transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution and delivery of the Loan Documents or the making of the Advances;<br>(b) Any claims, loss or damage to which any Indemnitee may be subjected if any representation or warranty contained in Section 5.14 of the DIP Loan Agreement proves to be incorrect in any respect or as a result of any violation of the covenant contained in Section 6.12(b); and<br>(c) Any and all other liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel) in connection with the foregoing and any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to or arising out of or in connection with the making of the Advances and the DIP Loan Documents or the use or intended use of the proceeds of the Advances. If any investigative, judicial or administrative proceeding arising from any of the foregoing is brought against any Indemnitee, upon such Indemnitee's request, the Debtors, or counsel designated by the Debtors and satisfactory to the Indemnitee, will resist and defend such action,suit or proceeding to the extent and in the manner directed by the Indemnitee, at the Debtors' sole cost and expense. Each Indemnitee will use its best efforts to cooperate in the defense of any such action, suit or proceeding. If the foregoing undertaking to indemnify, defend and hold harmless may be held to be unenforceable because it violates any law or public policy, the Debtors shall nevertheless make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.<br><br>(DIP Loan Agreement § 8.6) |

3.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

5.     On February 15, 2011 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code. The Debtors have requested that the cases be jointly administered for procedural purposes only.

6.     The Debtors are operating their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee of unsecured creditors has been appointed.

### *Summary of Capital Structure and Current Business Operations*

7.     FFI is a corporation formed under the laws of the State of Ohio and is headquartered in North Canton, Ohio.  FFI operates the corporate office and is the central buyer and distributor for retail stores operated by FF North Canton, FF Aurora, FF Cleveland, FF Greenwood, FF Mansfield, Denbar, and Mulden (each a "**Retail Store**" and collectively the "**Retail Stores**").  Each of the Retail Stores operates under the trade name "Flower Factory." FFI orders, transfers and distributes to the Retail Stores various products including, but not limited to, home décor, crafts, gifts, and party supplies.

8.     FF North Canton is an Ohio corporation headquartered in North Canton, Ohio. FF North Canton operates the Retail Store located at 5655 Whipple Avenue, North Canton, Ohio, 44720.

9.     Denbar is an Ohio corporation headquartered in North Canton, Ohio.  Denbar operates the Retail Store located at 4395 Clime Road, Columbus, Ohio, 43228.

10. Mulden is an Ohio corporation headquartered in North Canton, Ohio. Mulden operates the Retail Store located at 480 Miamisburg Centerville Road, Dayton, Ohio, 45459.

11. FF Greenwood is an Ohio corporation headquartered in North Canton, Ohio. FF Greenwood operates the Retail Store located at 7667 S. Shelby Road, Indianapolis, Indiana, 46227.

12. FF Aurora is an Ohio corporation headquartered in North Canton, Ohio. FF Aurora operates the Retail Store located at 18813 N. Market Place, Bainbridge Township, Ohio, 44202.

13. FF Cleveland is an Ohio corporation headquartered in North Canton, Ohio. FF Cleveland operates the Retail Store located at 10830 Brookpark Road, Brooklyn, Ohio, 44130.

14. FF Mansfield is an Ohio corporation headquartered in North Canton, Ohio. FF Mansfield operates the Retail Store located at 929 North Lexington-Springmill Road, Ontario, Ohio, 44906.

15. Alemit is an Ohio limited liability company headquartered in North Canton, Ohio. Alemit is a real estate holding that owns the real property located at 5655 Whipple Avenue, North Canton, Ohio, 44720 (the "**Canton Property**"). Alemit leases the Canton Property to the FF North Canton for its Retail Store and FFI for the cooperate office and warehouse distribution center.

16. M&S is an Ohio limited liability company headquartered in North Canton, Ohio. M&S is a real estate holding company which owns the real estate located at: (1) 10830 Brookpark Road, Brooklyn, Ohio, 44130 (the "**Brooklyn Property**"); (2) 4395 Clime Road, Columbus, Ohio, 43228 (the "**Columbus Property**"); and (3) 480 Miamisburg Centerville Road,

11-60406-rk    Doc 16    FILED 02/15/11    ENTERED 02/15/11 18:31:18    Page 11 of 48

Dayton, Ohio, 45459 (the "**Dayton Property**"). M&S leases the Brooklyn Property, the Columbus Property, and the Dayton Property to FF Cleveland, Denbar, and Mulden respectively.

17.     FF Online is an Ohio corporation headquartered in North Canton, Ohio. FF Online is a retailer engaged in the online sales of merchandise carried in the Retail Stores.

18.     Mulqueen Importers, d/b/a Creative Resources, is an Ohio limited liability company located in Parma, Ohio. Mulqueen Importers is an importer and designer of custom packing for national retailers throughout the United States. Mulqueen Importers sells its custom packing to various retailers including, but not limited to, Mrs. Field's and 1-800 Flowers.

19.     RAM is an Ohio limited liability company headquartered in North Canton, Ohio. RAM provides freight carrier services between the FFI warehouse and the Retail Stores.

20.     Mulqueen Holdings is an Ohio corporation headquartered in North Canton, Ohio. Mulqueen Holdings is the holding company, which owns directly or indirectly, all of the Debtors, with the exception of Alemit.

21.     Dennis E. Mulqueen, Christopher J. Mulqueen, and the Barbara G. Mulqueen Revocable Estate Plan Trusts A & B collectively own all the stock or units, as the case may be, of Mulqueen Holdings. Further, Dennis Mulqueen and the Dennis E. Mulqueen Intentionally Defective Grantor Trust collectively own all the stock or units, as the case may be, of Alemit.

22.     Collectively the Debtors employ approximately 320 hourly and salaried employees.

***Pre-Petition Obligations***

**A.      Obligations to Wells Fargo**

23.     **Pre-Petition Credit Facility**. As of the Petition Date, Debtors, along with certain non-debtor affiliates were parties to a certain Credit and Security Agreement, dated as of

December 28, 2007 (as amended, restated, modified or supplemented from time to time, the "**Pre-Petition Wells Fargo Credit Agreement**"), among the Debtors, as borrowers, and Wells Fargo Bank, National Association, ("**Wells Fargo**"), as lender (the "**Pre-Petition Lender**"). Pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Lender provided Debtors with a revolving credit facility (the "**Revolving Facility**") in the aggregate principal amount of up to $3,900,000 as the same shall amortize in accordance with its terms. As of February 4, 2011 the outstanding unpaid principal balance under the Revolving Facility was at least $3,195,572.68, plus all accrued and unpaid interest, fees, costs and expenses.

24. **Security**. Pursuant to the Pre-Petition Wells Fargo Credit Agreement, Debtors each granted to the Pre-Petition Lender to secure the prompt payment and performance of the Indebtedness (as defined in the Pre-Petition Wells Fargo Credit Agreement), a lien on and continuing security interest in all accounts, chattel paper, deposit accounts, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights and letters of credit (collectively, and as more fully defined in the Pre-Petition Wells Fargo Credit Agreement, the "**Wells Fargo Collateral**"). The liens and security interests granted by the Debtors to the Pre-Petition Lender prior to Petition Date are referred to herein as the "**Wells Fargo Pre-Petition Liens**."

25. **Non-Debtor Guaranties**. Pursuant to a Limited Guaranty, dated as of December 28, 2007 (as amended, restated, modified or supplemented from time to time, the "**Wells Fargo Guaranty Agreement**") executed by Dennis Mulqueen ("**Mulqueen**") in connection with the Pre-Petition Wells Fargo Credit Agreement, Mulqueen has guaranteed the punctual payment when due, whether at stated maturity, by acceleration or otherwise, Indebtedness (as defined in the Pre-Petition Wells Fargo Credit Agreement) to the Pre-Petition

13

Lender under the Pre-Petition Credit Agreement; *provided* that Mr. Mulqueen's maximum liability under the Guaranty Agreement cannot exceed $2,000,000.00.

### B.  Obligations to Huntington National Bank

26.  **Pre-Petition Credit Facility**.  As of the Petition Date, Debtors (other than FF Aurora, FF Greenwood, FF Mansfield and Alemit) (collectively, the "**Huntington Borrowers**") along with certain non-debtor affiliates were party to a certain Business Loan Agreement, dated as of July 14, 2009, (as amended, restated, modified or supplemented from time to time, the "**Huntington Credit Agreement**"), among the Huntington Borrowers, as borrowers, and The Huntington National Bank, ("**Huntington**"), as lender.  Pursuant to the Huntington Credit Agreement, Huntington provided the Huntington Borrowers with a term loan in the original principal amount of $2,574,328.04 (the "**Term Note**").  As of February 4, 2011 the outstanding unpaid principal balance under the Term Note was at least $2,295,728.04.

27.  **Security**.  Pursuant to that certain Open-End Mortgage dated May 12, 2006 from M&S in favor of Huntington and as security for the Huntington Borrowers' obligations under the Term Note, M&S has mortgaged to all of its respective right, title and interest in and to the Brooklyn Property.  As further security for the Term Note, M&S executed an Assignment of Rents with regard to the Brooklyn Property in favor of Huntington.

28.  **Non-Debtor Guaranties**.  Pursuant to a Commercial Guaranty, dated as of July 14, 2009 (as amended, restated, modified or supplemented from time to time, the "**Huntington Guaranty Agreement**") executed by Mulqueen in connection with the Huntington Credit Agreement, Mulqueen has guaranteed the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of the Huntington Borrowers' obligations under the Term Note; *provided* that Mulqueen's maximum liability under the Huntington Guaranty Agreement

14

cannot exceed $1,287,164.02. Pursuant to a Commercial Guaranty, also dated as of July 14, 2009 (as amended, restated, modified or supplemented from time to time, the "**Mulqueen Trust Guaranty Agreement**") executed by The Barbara G. Mulqueen Revocable Estate Plan Trust U/A/D June 26, 1998 (the "**B. Mulqueen Trust**") in connection with the Huntington Credit Agreement, the B. Mulqueen Trust has guaranteed the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of the Huntington Borrowers' obligations under the Term Note; *provided* that the B. Mulqueen Trust's maximum liability under the Mulqueen Trust Guaranty Agreement cannot exceed $1,287,164.02.

C.     **Obligations to American Equity Investment Life Insurance Company**

29.     **Dayton Property**.   In April, 2006, M&S executed and delivered to American Equity Investment Life Insurance Company ("**American Equity**") a certain promissory note payable to American Equity in the amount of $4,000,000 ("**$4 Million Note**"). Pursuant to that certain Open-End Mortgage, Security Agreement, Financing Statement and Assignment of Rents from M&S in favor of American Equities and as security for its obligations under the $4 Million Note, M&S has mortgaged to American Equities all of its respective right, title and interest in and to the Dayton Property.  As of February 4, 2011 the outstanding unpaid principal balance under the $4 Million Note was at least $3,523,599.00.

30.     **Columbus Property.** In April, 2006, M&S executed and delivered to American Equity a certain promissory note payable to American Equity in the amount of $3,400,000 ("**$3.4 Million Note**"). Pursuant to that certain Open-End Mortgage, Security Agreement, Financing Statement and Assignment of Rents from M&S in favor of American Equities and as security for its obligations under the $3.4 Million Note, M&S has mortgaged to American Equities all of its

respective right, title and interest in and to the Columbus Property. As of February 4, 2011 the outstanding unpaid principal balance under the $3.4 Million Note was at least $2,994,999.56.

31. **Non-Debtor Guaranties**. Pursuant to a Guaranty Agreement executed by Mulqueen and B. Mulqueen Trust in connection with the $4 Million Note, Mr. Mulqueen and the B. Mulqueen Trust have guaranteed the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of M&S' indebtedness to American Equities under the $4 Million Note (the "**American Equities Guaranty Agreement**"); *provided* that the guarantors' maximum liability under the American Equities Guaranty Agreement cannot exceed 50% of the principal balance and accrued interest owing under the $4 Million Note.

D. **Obligations to SL Investment Holdings 2008-1, LLC**

32. **North Canton Property**. On April 27, 2006, Alemit executed and delivered to Sun Life Insurance Company of Canada ("**Sun Life**") a certain promissory note in the amount of $10,000,000 ("**Sun Life Note**"). Pursuant to that certain Open-End Mortgage and Security Agreement dated April 27, 2006 in favor of Sun Life and as security for its obligations under the Sun Life Note, Alemit has mortgaged to Sun Life all of its respective right, title and interest in and to the Canton Property. Also in connection with the Sun Life Note, Alemit executed an Assignment of Leases and Rents dated April 27, 2006 with regard to the Canton Property. As of February 4, 2011 the outstanding unpaid principal balance under the Sun Life Note was at least $9,077,804.07.

33. **Non-Debtor Guaranties**. Pursuant to a Guaranty Agreement executed by Mulqueen and B. Mulqueen Trust in connection with the Sun Life Note, Mr. Mulqueen and the B. Mulqueen Trust have guaranteed the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of Alemit's indebtedness under the Sun Life Note (the "**Sun Life**

16

Guaranty Agreement"); *provided* that the guarantors' maximum liability under the Sun Life Guaranty Agreement cannot exceed 35% of the principal balance and accrued interest owing under the Sun Life Note.

### *Events Leading to the Filing of These Chapter 11 Cases*

34.    The Debtors have faced a series of unanticipated operational and market challenges that have adversely affected their operations and cash flows.  These challenges have impaired both the Debtors' suppliers and customers, which in turn have severely affected the Debtors' operations and businesses. Furthermore, the general instability of the retail industry has directly harmed the Debtors' liquidity.

35.    As a result of the most recent economic downturn in the retail industry, the Debtors cut any unnecessary costs in order to remain competitive within the industry, including reducing their number of employees and closing certain of their Retail Stores.  Specifically, the Debtors began the liquidation process of FF Aurora, FF Cleveland and FF Mansfield.  The Debtors anticipate that the aforementioned Retail Stores will be completely liquidated and shut down within sixty (60) to ninety (90) days.  However, even with considerable cost cutting efforts, due to the weak national economy and the weak retail industry, the Debtors cannot continue to operate without the protections of the bankruptcy court.

### REQUEST FOR AUTHORITY TO USE CASH COLLATERAL AND TO INCUR SECURED POSTPETITION FINANCING

36.    The Debtors require money for the operation of their businesses and administration of their bankruptcy estates, including but not limited to the payment of critical pre-and postpetition wages, salaries, and other expenses, which are essential to the preservation of the estates. The continued operation of Debtors is in the best interests of creditors, the estates and all interested parties because it will preserve going concern values and provide the prospect of

greater potential recoveries for creditors and equity holders than would the immediate termination and liquidation of the Debtors' businesses. Accordingly, Debtors have requested that: (i) the Pre-Petition Lender make available to the Debtors, all of Debtors' cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents, whether original collateral or proceeds, products, rents or profits of other Pre-Petition Collateral or the proceeds thereof (the "Cash Collateral") and (ii) the DIP Lender to provide post-petition financing pursuant to the terms and conditions of (a) the proposed Interim Order attached hereto as Exhibit "A" and any Final Order (as defined herein), (b) the DIP Loan Agreement (as defined herein) and all ancillary documents referred to in the Interim Order, the DIP Loan Agreement or any final order and/or required to be executed by the Debtors in connection therewith (collectively, and as more particularly defined in the Ratification Agreement (as defined herein), the "DIP Financing Documents"), and (c) the budget annexed as Exhibit "B" hereto (the "Budget") (collectively, the "DIP Credit Facility"). The ability of the Debtors to continue their business and reorganize under chapter 11 of the Bankruptcy Code depends upon the Debtors obtaining such financing from the Pre-Petition Lender and the DIP Lender. The Pre-Petition Lender is willing to make the Cash Collateral available, and the DIP Lender is willing to make such loans and advances and provide such other financial accommodations on a secured basis, as more particularly described herein, solely in accordance with the proposed Interim Order and pursuant to the terms and conditions of the DIP Credit Facility.

A.   Request to Obtain Secured Post-Petition Financing

37.   By this Motion, the Debtors seek an order authorizing them to obtain secured post-petition financing on an interim basis pending entry of a final order in accordance with the

11-60406-rk    Doc 16    FILED 02/15/11    ENTERED 02/15/11 18:31:18    Page 18 of 48

proposed Budget. The Debtors' request to obtain such financing is authorized pursuant to section 364(c) of the Bankruptcy Code. Section 364 (c) and (d) provides in relevant part:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt--

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

> (3) secured by a junior lien on property of the estate that is subject to a lien.

> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--

> (A) the trustee is unable to obtain such credit otherwise; and

> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C.A. § 364

38. The DIP Lender has indicated a willingness to lend money to the Debtors for the above described purposes upon the terms and conditions set forth in the DIP Credit Facility, subject to the limitations imposed by the Budget.

39. The Debtors have attempted to obtain and presently are unable to borrow additional funds on an unsecured basis under any conditions set forth in section 364(a) or (b) of the Code. The Debtors will be able to borrow additional funds under Section 364(c) and (d) from the DIP Lender, provided that an order containing the following terms is entered by the Court:

   a. <u>Motion Granted</u>. The Motion is Granted as set forth in the Interim Order.

b.    <u>Authorization to Obtain Debtor-in-Possession Financing</u>. The Debtors are hereby authorized and empowered to immediately borrow and obtain Revolving Credit Advances (as defined in the DIP Loan Agreement) and to incur indebtedness and obligations to the DIP Lender up to an aggregate principal amount not to exceed $3,900,000 pursuant to the terms and conditions of this Interim Order and the Debtor in Possession Credit and Security Agreement (the "**DIP Loan Agreement**"). The Debtors are hereby authorized and directed to enter into, execute, deliver, perform and comply with all of the terms, conditions and covenants of the DIP Loan Agreement, the Pre-Petition Loan Agreement and the other Pre-Petition Loan Documents, and all other agreements, documents and instruments executed and/or delivered in connection with or related to the DIP Loan Agreement and the Pre-Petition Loan Documents; *provided, however,* that to the extent that the Pre-Petition Loan Documents require the Debtors to make payments on account of obligations that arose prior to the Petition Date (other than (i) payments in respect of the Pre-Petition Obligations in accordance with the DIP Loan Agreement (as further described herein), and (ii) payments that the Debtors are obligated to make by law, taking into account applicable bankruptcy law) in order to be in compliance therewith, the Debtors are not required to make any such payments and shall not make any such payments except as provided in this Interim Order or the DIP Loan Agreement or, to the extent not provided in this Interim Order or the DIP Loan Agreement, absent an order of this Court permitting such payments. The DIP Loan Agreement and each term, condition and covenant set forth therein are approved and shall be deemed to be incorporated into the terms and conditions of this Interim Order. All of such terms, conditions, and covenants shall be sufficient and conclusive evidence of the

borrowing arrangements by and among the Debtors and the DIP Lender and of the Debtors' assumption and adoption of all of the terms, conditions, and covenants of the DIP Loan Agreement for all purposes, including, without limitation, to the extent applicable, the payment of all Pre-Petition Obligations and Post-Petition Obligations (as defined herein) arising thereunder, including, without limitation, all principal, interest, fees and expenses, including, without limitation, all of the DIP Lender's reasonable attorneys' fees and legal expenses, as more fully set forth in the DIP Loan Agreement. Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of the DIP Loan Documents, this Interim Order, and section 364(e) of the Bankruptcy Code.

c.      Amendment. Subject to the terms and conditions of the DIP Loan Agreement and the other DIP Financing Documents, the Lenders and the Debtors may amend, modify, supplement, or waive any provision of the DIP Loan Agreement (an "**Amendment**") without further approval or order of the Court so long as (i) such Amendment is not material (for purposes hereof, a "material" Amendment shall mean any Amendment that operates to increase the rate of interest other than as currently provided in the DIP Loan Agreement, adds specific new events of default or enlarges the nature and extent of default remedies available to the DIP Lender following an event of default, or otherwise modifies any terms or conditions in any DIP Financing Document in a manner materially less favorable to the Debtors and in the good faith judgment of the DIP Lender and Debtors), (ii) the Debtors provide at least three business days' prior written notice of the Amendment (the "**Amendment Notice**") to the United States

Trustee and counsel for any Committee and file the Amendment Notice with the Court, and (iii) no objection to the Amendment is filed with the Court within two (2) business days after the date the Amendment Notice is filed with the Court. Any material Amendment to the DIP Loan Agreement must be approved by the Court to be effective.

d.    <u>Payment of Pre-Petition Debt</u>.  The Debtors are authorized to pay the Pre-Petition Lender on account of the Pre-Petition Obligations in accordance with the DIP Financing Documents and the provisions of this paragraph.  The Debtors are authorized and directed to make all payments and transfers of property to the Lenders as provided, permitted, or required under the DIP Financing Documents, which payments and transfers shall not be avoidable or recoverable from the Lenders or give rise to any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law, or otherwise, unless such payments or transfers are on account of Pre-Petition Obligations and successfully challenged in accordance with paragraph 14 below; *provided, however* that the roll-up of the Pre-Petition Obligations as authorized under this Interim Order shall not, in and of itself, create a basis upon which a claim, cause of action or objection may be made under paragraph 14 hereof or otherwise.  The Lenders shall apply the proceeds of the Collateral or any other amounts or payments received by the Lenders in respect of the Obligations in accordance with the DIP Financing Documents, including, without limitation, applying all payments, proceeds and other amounts first to the Pre-Petition Obligations, until such Pre-Petition Obligations are indefeasibly paid in full and completely satisfied, and then to the Post-Petition Obligations.  Without limiting the generality of the foregoing, the Debtors are authorized and directed, without further order of this Court, to pay or reimburse the Lenders for all present and future costs and

expenses, including, without limitation, all reasonable professional fees and reasonable legal expenses, paid or incurred by the Lenders in connection with the financing transactions as provided in this Interim Order and the DIP Financing Documents, all of which shall be and are included as part of the principal amount of the Obligations, and shall be secured by the Collateral.

e.     <u>Continuation of Pre-Petition Procedures</u>.   All pre-petition practices and procedures for the payment and collection of proceeds of the Collateral, the turnover of cash, and delivery of property to the Lenders, and the funding pursuant to the DIP Financing Documents, are hereby approved and shall continue without interruption after the commencement of the Cases.

f.     <u>Authorization to Use Cash Collateral</u>.   The Debtors are hereby authorized to use Cash Collateral, in accordance with the terms and conditions of this Interim Order, until the earlier of (a) the Maturity Date (as defined in the DIP Loan Agreement) or (b) the occurrence of a Termination Event (as defined herein), subject to the provisions of paragraph 19(a)(iii) below.   No Cash Collateral shall be utilized for the payment of professional fees, disbursements, costs, or expenses incurred in connection with (i) asserting or preparing for any claims or causes of action against the Pre-Petition Lender or the DIP Lender, (ii) challenging or raising any defenses to the Post-Petition Obligations (as defined herein), the Adequate Protection Claims (as defined below), the Pre-Petition Obligations, or the advances or other obligations under the DIP Credit Facility, or (iii) taking, preparing for, or encouraging any other party to take any action reasonably construed as adverse to the Lender or the Pre-Petition Lenders.

The Pre-Petition Lender is permitting the use of its Cash Collateral and the priming of their Pre-Petition Liens in good faith and in express reliance upon the protections afforded to prepetition lenders pursuant to section 364(e) of the Bankruptcy Code and, accordingly, shall be entitled to the full protections of section 364(e) of the Bankruptcy Code in the event this Interim Order or any provision hereof is vacated, reversed, or modified (including pursuant to a Final Order on the Motion entered after a Final Hearing on the Motion).

g.    Budget Limitations on Revolving Credit Advances and Cash Collateral Usage.  Revolving Credit Advances and Cash Collateral shall be used only to pay those expenditures identified in the Budget. Debtors shall not, without the prior written consent of Lenders, use Revolving Credit Advances or Cash Collateral with respect to any one line item in the Budget in excess of 110% of the amount originally identified in the Budget for that line item in any calendar week.  The Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) acceptable to the Lenders in their sole discretion.

h.    DIP Lender's Superpriority Claim.  For any and all obligations of the Debtors to the DIP Lender under and pursuant to the DIP Credit Facility (as more particularly defined in the DIP Loan Agreement, the "**Post-Petition Obligations**"), and in addition to the rights granted below, subject only to payment of the Carve-Out, the DIP Lender is hereby granted an allowed superpriority administrative claim in accordance with section 364(c)(1) of the Bankruptcy Code, having a priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors (including, but

24

not limited to, the Pre-Petition Obligations, which for avoidance of doubt are not entitled to treatment as an ordinary or superpriority administrative claim except to the extent of any Adequate Protection Claim for diminution in value or as adequate protection for priming by the DIP Credit Facility), now in existence or hereafter incurred by the Debtors and over any and all administrative expenses or priority claims of any kind including as specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 502(d), 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, whether arising in the Cases or in any superseding chapter 7 cases concerning the Debtors (**"Successor Cases"**).

      i.     <u>Post-Petition Lien</u>. Pursuant to Bankruptcy Code sections 362, 363(e), 364(c) and 364(d), as security for the prompt payment and performance of any and all Obligations incurred by the Debtors to the Lenders, of whatever nature or description, the Debtors are hereby authorized to grant to the Lenders, and upon the entry of this Interim Order shall be deemed hereby to have granted to the Lenders, effective as of the Petition Date, valid, binding, enforceable and perfected first priority liens, mortgages and security interests, superior to the liens, mortgages, security interests or other interests or rights of all other creditors of the Debtors' estates (including, but not limited to, the Pre-Petition Liens) on property owned or leased by the Debtors, in and upon all of the Pre-Petition Collateral and in all assets and property of the Debtors and their estates including without limitation, all present and future accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, supporting obligations, real property, interests in real property, books and records, and all proceeds and products

thereof, and all additions and accessions thereto, and all other Collateral described in the DIP Loan Agreement (collectively, the "**Post-Petition Collateral**"), subject only to the payment of the Carve-Out and any validly existing and perfected liens as of the Petition Date. The Pre-Petition Collateral and the Post-Petition Collateral are collectively referred to herein as the "**Collateral**". Lenders acknowledge the Collateral specifically excludes any causes of action under chapter 5 of the Bankruptcy Code and recoveries thereunder, including section 506(c), sections 544 through 550 and section 553 or other applicable law.

The liens and security interest in the Collateral granted to the Lenders herein and in the DIP Loan Agreement shall (a) be deemed effective and perfected as of the Petition Date and without the necessity of the Debtors or the Lenders incurring the expense for the execution, recordation or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or possession or control of applicable assets and (b) extend and attach to all Collateral and any proceeds of Collateral which is presently in existence or is hereafter acquired (whether acquired prior to or subsequent to the Petition Date) and which is owned by the Debtors or in which the Debtors have any interest, whether held by any of the Debtors or by others for any of the Debtors' accounts, wherever located.

j.    <u>Adequate Protection of Pre-Petition Lender's Interests</u>.    As adequate protection for any post-petition diminution in value of the Pre-Petition Lender's interests in the Pre-Petition Collateral, including without limitation for any diminution in value resulting from the use of Cash Collateral, the use, sale or lease of any other Pre-Petition Collateral, subordination to the Carve-Out, or the imposition of the automatic stay, the

Pre-Petition Lender is hereby granted post-petition claims (the "**Adequate Protection Claim**") against the Debtors' estates. In order to secure the Adequate Protection Claim, the Lenders are hereby granted a lien and security interest (the "**Replacement Lien**") in and upon the Collateral and all proceeds thereof, subject only to (i) payment of the Carve-Out, (ii) the liens granted to the Lenders under paragraph 9 hereof, and (iii) the liens and security interests existing on the Petition Date in favor of the Pre-Petition Lender. To further provide adequate protection for the Adequate Protection Claim, the Lenders are granted an allowed superpriority administrative claim in accordance with section 507(b) of the Bankruptcy Code having a priority in right of payment over any and all administrative expenses or priority claims of any kind including as specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 502(d), 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, whether arising in the Cases or any Successor Cases, but subject to the Carve-Out and the superpriority administrative claim granted to the DIP Lender

The Replacement Lien granted to the Lenders herein and in the DIP Loan Agreement shall (a) be deemed effective and perfected as of the Petition Date and without the necessity of the Debtors or the Lenders incurring the expense for the execution, recordation or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or possession or control of applicable assets and (b) extend and attach to all Collateral and any proceeds of Collateral which is presently in existence or is hereafter acquired (whether acquired prior to or subsequent to the Petition Date) and which is owned by the Debtors or in which the

Debtors have any interest, whether held by any of the Debtors or by others for any of the Debtors' accounts, wherever located

k. <u>Carve-Out</u>[3]. Notwithstanding any contrary provision of this Interim Order, the liens and security interests and superpriority claims granted to the Lenders, including the Replacement Lien, shall be subject and subordinate to a carve-out consisting of: (i) allowed professional fees and disbursements incurred by attorneys, accountants, and other professionals retained by the Borrowers and the creditors' committee in the Chapter 11 Case ("<u>Case Professionals</u>"), which fees and expenses have been or subsequently are approved by a final order of the Court pursuant to sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "<u>Professional Fees</u>"), if any, (ii) quarterly fees required to be paid to the Office of the United States Trustee pursuant to 28 U.S.C. Section 1930(a)(6), and (iii) any fees payable to the Clerk of the Bankruptcy Court; <u>provided</u>, <u>however</u>, in no event shall the Carveout exceed as of any date of determination the sum of (1) $250,000 plus (2) an amount, determined as of the Petition Date, equal to the Professional Fees set forth on the Budget which are scheduled to be paid during the month of February, 2011, plus (3) an amount, determined as of Monday of each calendar week (commencing February 28, 2011), equal to the Professional Fees set forth on the Budget which are scheduled to be paid during such calendar week, plus (4) the amount of all Professional Fees which were scheduled to be paid pursuant to the Budget from the Petition Date through the date of determination (to the extent not included in clauses (2) and (3) above), less (5) Professional Fees paid by the Borrowers as of any date of determination, less (6) the unused portion of any retainer, as reported by

---

[3] Capitalized terms not otherwise defined in this paragraph k have the meanings ascribed to them in the DIP Loan Agreement.

28

the Borrowers pursuant to Section 6.1(w) of this Agreement, held by Case Professionals from time to time, which amount as of the Closing Date includes approximately $90,000 held by Brouse McDowell; provided, further, however, that the foregoing reserve for the payment of Professional Fees shall not include any Professional Fees or any related fees or expenses incurred in the prosecution of any litigation or the assertion of any claims raised against or with respect to the Lender or the Collateral. Notwithstanding anything herein to the contrary, to the extent that any of the Case Professionals apply the retainers to accrued and unpaid fees, the Lender shall not be required to replenish such retainers to the extent (i) such fees and expenses are not provided for in the Budget and (ii) the Borrowers do not have sufficient Availability for Lender to increase its reserves by such amount. In the event the Lender is not able to increase its reserves, then the amount of subsection (6) above shall be deemed to be the full amount of all used and unused retainers paid by the Debtors to the Case Professionals without regard to any reductions for portions that were used.

l.      No Surcharge or Marshalling.  Neither the Collateral nor the Lenders shall be subject to surcharge, pursuant to section 506(c) of the Bankruptcy Code or otherwise, by the Debtors or any other party in interest without the prior written consent of the Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by any party, including but not limited to the funding of the Debtors' ongoing operations by the Lenders.  In no event shall the Lenders be subject to the equitable doctrine of marshalling or any similar doctrine, as the case may be, with respect to the DIP Obligations or any of the property comprising the Collateral.

m.    <u>Limits on the Lenders' Liability</u>. Nothing in this Interim Order or in any of the DIP Loan Documents or any other documents related to the financing transactions authorized hereby or the Pre-Petition Obligations shall in any way be construed or interpreted to impose or allow the imposition upon the Lenders of any liability for any claims arising from the prepetition or postpetition activities by the Debtors in the operation of their businesses, or in connection with their restructuring efforts. The Lenders shall not, in any way or manner, be liable, or responsible for (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and all risk of loss, damage, or destruction of the Collateral shall be borne by the Debtors.

n.    <u>Reservation of Committee and Bar of Challenges and Claims</u>. Nothing in this Interim Order shall prejudice the rights of a Committee to object to or challenge the Debtors' Stipulations, provided that the Committee has proper standing and commences a contested matter or adversary proceeding raising such objection or challenge, including, without limitation, any claim against the Pre-Petition Lender in the nature of a setoff, counterclaim or defense to the Pre-Petition Obligations (including, but not limited to, those under sections 506, 544, 547, 548, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Pre-Petition Lender) within 45 days after the entry of this Interim Order (the **"Challenge Period"**, and the date that is the next calendar day after the termination of the Challenge Period, in the event that no contested matter or adversary proceeding is commenced during the Challenge Period shall be referred to as the **"Challenge Period Termination Date"**), then, upon the Challenge Period Termination

Date, any and all such challenges and objections by any party (including, without limitation, any chapter 11 or chapter 7 trustee appointed in the Cases or in any Successor Cases) shall be deemed to be forever waived, barred and discharged and the Debtors' Stipulations shall be binding on all persons, entities, creditors, interest holders and parties in interest in the Cases or any Successor Cases, and upon the Challenge Termination Period the Pre-Petition Obligations shall be deemed to be fully and finally allowed under the Bankruptcy Code for all purposes in connection with the Cases and any Successor Cases. Only if the Committee has properly and with requisite standing initiated an adversary proceeding or contested matter challenging the Debtors' Stipulations prior to the Challenge Period Termination Date shall it be permitted to prosecute such adversary proceeding or contested matter.

      o.    <u>Limitation on Other Authorization for Cash Collateral Use, Obtaining Credit, Granting of Liens</u>. So long as there are any Post-Petition Obligations outstanding to the DIP Lender under the DIP Credit Facility and until the Adequate Protection Claim is satisfied indefeasibly in full, unless the Lenders shall have given their prior written consent, or this Court enters an order, upon proper notice to the Lenders and after hearing, requiring that all the Debtors' obligations to the DIP Lender and the Adequate Protection Claim be immediately satisfied in full, the Debtors shall neither seek any further orders in the Cases, nor support any applications therefore, which authorize: (a) under Bankruptcy Code section 363, the use of Cash Collateral or the sale, use, or lease, other than in the ordinary course of business, of other property of the Debtors in which the Lenders have an interest; or (b) the obtaining of credit or the incurring of indebtedness pursuant to Bankruptcy Code section 364(c) or (d), or any other grant of

11-60406-rk   Doc 16   FILED 02/15/11   ENTERED 02/15/11 18:31:18   Page 31 of 48

rights against the Debtors and/or their estates, secured by a lien, mortgage or security interest in the Pre-Petition Collateral or the Post-Petition Collateral or entitled to priority administrative status which is equal or superior to that granted to the DIP Lender or the Pre-Petition Lender (with respect to the Replacement Liens) herein.

p.     Insurance; Governmental Charges.  The Debtors, at their expense, shall (a) continue to at all times keep the Collateral fully insured against all loss, peril and hazard and make the DIP Lender and the Pre-Petition Lender co-insured and loss payee as their interests appear under such policies, and (b) pay any and all post-petition taxes, assessments and governmental charges with respect to the Collateral, whether or not the Debtors are obligated to do so under the Pre-Petition Loan Documents, and will provide the DIP Lender or the Pre-Petition Lender with proof thereof upon written demand and will give the DIP Lender and the Pre-Petition Lender access to their records in this regard.

q.     Modification of Automatic Stay.  The automatic stay provisions of Bankruptcy Code section 362 are hereby modified to permit (a) the Debtors to implement the terms of the DIP Credit Facility, (b) the Debtors to grant the Replacement Liens as adequate protection to the Pre-Petition Lender and (c) the Debtors to create, and the Lenders to perfect, any and all liens and security interests granted to them hereunder; *provided, however,* that neither the DIP Lender nor the Pre-Petition Lender shall be required to file UCC financing statements or other instruments with any other filing authority to perfect any lien, mortgage or security interest granted by this Interim Order or take any other action to perfect such liens, mortgages and security interests, and such liens, mortgages and security interests are hereby deemed perfected; *provided, however,*

32

that if the Lenders shall, in their sole discretion, elect for any reason to file, record or serve any such financing statements or other documents with respect to such liens and security interests, the Debtors shall execute the same upon request and the filing, recording or service thereof (as the case may be) shall be deemed to have been made at the time and on the date required to implement the priority of such liens and security interests as provided in this Interim Order.

A certified copy of this Interim Order may, in the discretion of the Pre-Petition Lender or the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of any financing statements, mortgages, leasehold mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

r. <u>Termination Events</u>.  The occurrence of any one or more of the following events shall constitute a "**Termination Event**" under this Interim Order:

(a) Default in the payment of any amount owed by the Debtors to the Lender as such Indebtedness becomes due and payable pursuant to the terms of the DIP Loan Documents;

(b) The failure to comply with or default in the performance of any term, covenant or agreement contained in the DIP Loan Documents, including, without limitation, the Budget, the Interim Order, the Final Order, any sale order, or any documents executed in connection with any of the foregoing;

(c) Except as otherwise permitted by the DIP Loan Agreement or otherwise consented to in writing by the Lender, any ownership interest in the assets of a Debtor shall be sold or transferred in any transaction, or shall become subject to any "Lien" (as such term is defined in the DIP Loan Agreement;

(d) The filing by any of the Debtors of any motion or proceeding that could reasonably be expected to result in impairment of the Lenders' rights under the DIP Loan Agreement, including any motion to surcharge the Lenders or the Collateral under 11 U.S.C. § 506(c) or otherwise;

(e)    The filing of a motion by any of the Debtors for entry of an order staying or otherwise prohibiting the prosecution of any enforcement action or any motion or pleading seeking to challenge the Lenders' Liens or otherwise commencing any cause of action against the Lenders;

(f)    The Final Order has not been entered by the Bankruptcy Court on or before March 15, 2011.

(g)    Expiration or termination of the Debtors' exclusive periods to file and confirm a plan of reorganization;

(h)    Any representation or warranty made by any Debtor in the DIP Loan Agreement, by any guarantor in any guaranty delivered to the Lenders, or by any Debtor (or any of its officers) or any guarantor in any agreement, certificate, instrument or financial statement or other statement contemplated by or made or delivered pursuant to or in connection with the DIP Loan Agreement or any such guaranty shall be incorrect in any material respect;

(i)    The rendering against any Debtor of an arbitration award, a final judgment, decree, or order for the payment of money in excess of $10,000 or a postpetition lien on any of the Collateral and the continuance of such arbitration award, judgment, decree, or order unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution;

(j)    Debtors' failure to pay when due, after giving effect to any applicable grace period, postpetition obligations which would materially affect the Debtors' operations;

(k)    A "Change of Control" (as such term is defined in the DIP Loan Agreement) occurs with respect to any Debtor;

(l)    Any guarantor shall repudiate or purport to revoke any obligation under its guaranty in favor of the Lenders or any guarantor shall cease to exist;

(m)    The Debtors shall liquidate, dissolve, terminate, or suspend their business operation or otherwise fail to operate their business in the ordinary course (provided that "operating in the ordinary course" shall be satisfied if a Debtor is operating in substantially the same manner as such Debtor did as of the Petition Date), other than any stores identified as "Going Out of Business Stores" in the DIP Credit Agreement, merge with another person unless the Debtor is the surviving entity, or sell or attempt to sell all or substantially all of their assets (other than a sale of assets at stores identified as

34

"Going Out of Business Stores" in the DIP Credit Agreement), without the Lenders' prior written consent;

(n)     Any impairment of the Collateral that has a "Material Adverse Effect" (as such term is defined in the DIP Loan Agreement);

(o)     The Debtors (except following the Lenders' prior written request or with the Lenders' express prior written consent, which consent shall not be implied from any other action, inaction, or acquiescence of the Lenders) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Interim Order, the Final Order or any of the DIP Loan Documents;

(p)     Any Debtor shall file, or any other person shall obtain Bankruptcy Court approval of, a disclosure statement for a plan of reorganization which does not provide for the full, final, and irrevocable repayment of all of the DIP Obligations and the Pre-Petition Obligations of the Debtors to the Lenders upon the effectiveness of such plan, unless the Lenders have expressly joined in or consented to such plan in writing;

(q)     The Debtors shall file any motion or application, or the Bankruptcy Court grants the motion or application of any other Person, which seeks approval for or allowance of any claim, or Lien ranking equal or senior in priority to the claims and Liens granted to the Lenders under the Interim Order, the Final Order or the DIP Loan Documents or any such equal or prior claim or Lien shall be established in any manner, except, in any case, (i) as expressly permitted under the Interim Order or the Final Order or (ii) the "Permitted Liens" (as such term is defined in the DIP Loan Agreement);

(r)     The Bankruptcy Court shall not have entered the Interim Order and the Final Order or the Interim Order and/or the Final Order shall cease to be in full force and effect after the date of entry thereof (whether due to modification, reversal, revocation, remand, stay, recission, vacation, amendment, or otherwise) without the prior written consent of Lenders (and no such consent shall be implied from any other authorization or acquiescence by Lenders);

(s)     The entry of an order converting a Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or dismissing a Chapter 11 Case or any subsequent chapter 7 case either voluntarily or involuntarily;

(t)      The entry of an order (a) which provides relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code with respect to any material contract, lease, or obligation or against any critical vendor; (b) allowing a third party to proceed against any material assets or contracts of the Debtors; (c) staying or otherwise prohibiting the prosecution of any enforcement action by the Lenders; or (d) otherwise adversely affecting the Lenders' Liens, claims, or rights and remedies;

(u)      If any creditor of the Debtors receives any adequate protection payment which is not specifically set forth in the Budget, other than as set forth in the Interim Order or the Final Order, or any Lien is granted as adequate protection other than as set forth in the Interim Order or the Final Order;

(v)      The Debtors suspend or discontinue, or are enjoined by any court or governmental agency from continuing to conduct, all or any material part of its business (in a manner inconsistent with any sale transaction or such other orderly wind-down, in each case acceptable to the Lenders);

(w)      A custodian or a trustee or examiner with special powers is appointed pursuant to section 1104 of the Bankruptcy Code for the Debtors or any of their properties;

(x)      Cash receipts are less than (1) 80% of the amount set forth on the Budget for the week ending February 18, 2011, (2) 85% of the amount set forth on the Budget on a cumulative basis from the Closing Date through the end of the week ending February 25, 2011, (3) commencing February 26, 2011 and thereafter, 90% of the amount set forth on the Budget on a cumulative basis from the Closing Date through the date of determination, or

(y)      Inventory purchases are less than (1) 75% of the amount set forth on the Budget for the week ending February 18, 2011, (2) 80% of the amount set forth on the Budget on a cumulative basis from the Closing Date through the end of the week ending February 25, 2011, (3) 85% of the amount set forth on the Budget on a cumulative basis from the end of the Closing Date through the end of the week ending March 4, 2011, (4) commencing March 5, 2011 and thereafter, 90% of the amount set forth on the Budget on a cumulative basis from the Closing Date through the date of determination; or

(z)      The occurrence of an "Event of Default" (as such term is defined in the DIP Loan Agreement).

36

s.    Remedies Upon Maturity/Termination.    (a)    Upon the occurrence of the Maturity Date, or subject to paragraph 19(c) below, upon the occurrence of a Termination Event, all stays and injunctions in the Chapter 11 Cases, including, but not limited, to, the automatic stay arising under section 362(a) of the Bankruptcy Code will be terminated automatically and irrevocably as the lenders thereby permitted the Lenders to enforce their rights against the Collateral, without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading in order to, *inter alia*:

(i)    declare the DIP Loan Agreement to be terminated including, without limitation, any obligation of the DIP Lender to make Revolving Credit Advances or other financial accommodations under the DIP Credit Facility, whereupon the same shall forthwith terminate;

(ii)    declare any and all Post-Petition Obligations to be immediately due and payable, whereupon all Obligations shall become and be forthwith due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which the Debtors hereby expressly waive;

(iii)    declare the Debtors' right to use Cash Collateral to be terminated, whereupon the same shall forthwith terminate, provided that (i) with the written agreement of the Lenders or (ii) pursuant to an order of the Court upon emergency motion and upon no less than three (3) full business days' notice to the Lenders, the Debtors may use only that amount of Cash Collateral necessary to preserve and protect the Collateral, which may include ongoing operations for a period not to exceed thirty (30) days or such additional period of time to which Lenders agree in their sole discretion; and

(iv)    Charge the default rate of interest on all Obligations.

(b)    Notwithstanding anything herein to the contrary, and notwithstanding the applicability of section 362 of the Bankruptcy Code (to the extent necessary to exercise such remedies, relief from automatic stay shall be deemed granted), subject to paragraph 19(c) below, the Lenders shall also be entitled to immediately exercise any of the

37

following rights and remedies, without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading in order that:

 (i) Lender may apply any and all money owing by the Lender to the Debtors to the payment of the Obligations, in the Lender's sole discretion, subject to and in accordance with the DIP Loan Agreement;

 (ii) The Lender may exercise and enforce any and all rights and remedies available upon default to a secured party under the UCC, including the right to take possession of Collateral, or any evidence thereof, proceeding without judicial process or by judicial process, and the right to sell, lease or otherwise dispose of any or all of the Collateral (with or without giving any warranties as to the Collateral, title to the Collateral or similar warranties), and, in connection therewith, the Debtors will on demand assemble the Collateral and make it available to the Lenders at a place to be designated by the Lenders;

 (iii) The Lenders may exercise and enforce their rights and remedies under the DIP Loan Documents and the Pre-Petition Loan Documents;

 (iv) The Lenders may without regard to any waste, adequacy of the security or solvency of the Debtors, apply for the appointment of a receiver of the Collateral, to which appointment the Debtors hereby consent, whether or not foreclosure proceedings have been commenced under the DIP Loan Documents and whether or not a foreclosure sale has occurred;

 (v) The Lenders may exercise any other rights and remedies available to them by law or agreement; and/or

 (vi) If the Lenders sell any of the Collateral on credit, the Obligations will be reduced only to the extent of payments actually received. If the purchaser fails to pay for the Collateral, the Lenders may resell the Collateral and shall apply any proceeds actually received to the Obligations.

 (c) Notwithstanding the foregoing, in the event Lender elects to exercise its rights and remedies following the occurrence of an Event of Default under Sections 7.1(b), (g), (h), (i) or (cc) of the DIP Loan Agreement or any similar Termination Event

described herein, and Borrowers believe in good faith that any such Event of Default is curable within a reasonable period of time and will not have a Material Adverse Effect (as such term is defined in the DIP Loan Agreement), Borrowers may request the Bankruptcy Court to hold a hearing on an expedited basis on not more than three (3) Business Days notice, subject to the Bankruptcy Court's calendar, to determine whether or not the automatic stay provided under Section 362 of the Bankruptcy Code shall be deemed lifted or modified to the extent necessary to allow the Lender to take the actions described in this paragraphs 19(a)(i), 19(a)(ii), 19(b)(ii), 19(b)(iii), 19(b)(iv), 19(b)(v) and/or 19(b)(vi) or in Section 7.2 of the DIP Loan Agreement. Pending such hearing, Lender acknowledges that it will forbear from exercising the rights and remedies described in the preceding sentence as a result of any such Event of Default.

(d) The automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit or effectuate the terms of this Interim Order and the documents evidencing the DIP Obligations, including, without limitation, to permit the execution and recordation of documents in the Lenders' discretion to evidence the creation and perfection of the DIP Lender's and Pre-Petition Lender's liens on the Collateral.

t. <u>Lenders' Right to Credit Bid</u>. The Lenders shall have the right to credit bid with respect to any sale of assets or equity under either section 363 of the Bankruptcy Code or a Plan of Reorganization, the amount, (i) with respect to the DIP Lender, such Lender advanced under the Post-Petition Financing, and (ii) with respect to the Pre-Petition Lender, such Lender's portion of the Pre-Petition Obligations, which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in

any manner. For the avoidance of ambiguity, no future order or plan may impair the credit bid rights of the Lenders.

u.    No Limitation on Further Relief. Nothing in this Interim Order shall limit the rights of the Lenders to seek further relief (including additional adequate protection), or modification or termination of the automatic stay in accordance with Bankruptcy Code section 362(d).

v.    Release. In consideration for the Post-Petition Financing, each of the Debtors, on behalf of itself and its successors and assigns (collectively, the "Releasors"), hereof, shall forever release, discharge and acquit the Lenders, and each of their respective officers, directors, employees, agents, attorneys, and predecessors in interest (collectively, the "Releasees") of and from any and all claims, counterclaims, demands, damages, liabilities, responsibilities, disputes, remedies, actions, causes of action, indebtedness, and obligations, of every type, including, without limitation, any so-called "lender liability" claims or defenses, which arose on or prior to the date this Interim Order is entered with respect to the Debtors and/or the DIP Credit Facility; provided, however, the foregoing release shall not release the Lenders from their obligations under this Interim Order.

w.    Allowed Secured Claims. Without the requirement or need to file any proof of claim with respect thereto, (i) the Pre-Petition Obligations shall constitute allowed secured claims for all purposes in the Chapter 11 Cases and any Successor Case, (ii) the Pre-Petition Liens shall be deemed legal, valid, binding, enforceable, perfected liens not subject to recharacterization, subordination (except as expressly specified in this Interim Order as to the Carve-Out, and the Adequate Protection Claims) or avoidance for

11-60406-rk    Doc 16    FILED 02/15/11    ENTERED 02/15/11 18:31:18    Page 40 of 48

all purposes in the Chapter 11 Cases and any Successor Case, and (iii) the Pre-Petition Obligations, the Pre-Petition Liens, and prior payments on account of or with respect to the Pre-Petition Obligations shall not be subject to any other or further claims, cause of action, recharacterization, objection, contest, setoff, defense, or challenge by any party in interest for any reason, including, without limitation, by any successor to or estate representative of any Debtor.

      x.      Section 506(c) Waiver.  Except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any future proceedings or cases related hereto, at any time, shall be charged against the Lenders, their claims, or the Collateral, pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code or otherwise, without the prior written consent of the Lenders, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lenders.

      y.      Retention of Financial Advisor.  The Lenders may immediately hire and retain a financial advisor of its choosing to monitor the orderly operation of the Debtors' business and compliance with the Budget.  The Debtors shall fully cooperate with such financial advisor and its requests and provide complete transparency regarding all financial and operational issues of the Debtors.  The Debtors shall pay the fees and expenses of such financial advisor upon presentment of an invoice, provided such fees and expenses are reasonable in the discretion of the DIP Lender.

      z.      No Limitation on Assignment of Rights.  Nothing in this Interim Order shall limit the rights of the Lenders to assign any or all of their rights, claims and

obligations under the DIP Financing Documents or the Pre-Petition Loan Documents (as applicable).

aa.     Reserved.

bb.     <u>Books and Records</u>.   The Debtors are directed to keep their books and records of original entry current and updated, so that all business activity is posted to them in the ordinary course of the Debtors' business.

cc.     <u>Good Faith</u>.   Pursuant to Bankruptcy Code section 364(e), the validity of the Post-Petition Obligations and the validity or priority of the liens, mortgages and security interests authorized or granted by this Interim Order shall be binding on the Debtors, their estates and their successors and assigns even if this Interim Order is reversed or modified on appeal.

dd.     <u>Additional Documents</u>.   The Debtors are hereby authorized to do and perform all acts and to make, execute and deliver all instruments and documents which may be required or necessary for the performance of their obligations hereunder and under the DIP Credit Facility.

ee.     <u>Conditions to Lending</u>.   Without limiting the availability of the Post-Petition Financing and use of Cash Collateral authorized on an interim basis pursuant to this Interim Order, the Lender's obligation to fund the DIP Credit Facility is conditioned upon and subject to execution of final, definitive DIP Loan Documents, including the DIP Loan Agreement, each in a form acceptable to the Lender in its sole discretion.

ff.     <u>Immediate Effect</u>.   As permitted by Bankruptcy Rule 6004(h), the Court hereby orders that this Interim Order shall become effective immediately.

gg.  <u>Survival After Confirmation, Conversion or Dismissal</u>.  The provisions of this Interim Order and any actions taken pursuant thereto shall survive entry of any orders which may be entered confirming any plan of reorganization or which may be entered converting the Cases from chapter 11 to chapter 7 of the Bankruptcy Code; *provided, further,* that the terms and provisions of this Interim Order, as well as the liens and security interests granted thereunder, shall continue in the Cases or any Successor Cases and such liens, mortgages and security interests and the Adequate Protection Claim shall maintain their priority as provided by this Interim Order.

hh.  <u>No Limitation of Modification of Order</u>.  Nothing in this Interim Order shall limit the Lenders' rights to seek modification of this Interim Order.

ii.  <u>No Prejudice of Rights Against Third Parties</u>.  Nothing in this Interim Order shall in any way prejudice or compromise any rights that the Lenders may have against parties other than the Debtors.

jj.  <u>Service of this Order</u>.  Within three (3) Business Days after the entry of this Interim Order, the Debtors shall serve a copy on all Interim Noticed Parties.

kk.  <u>Objection</u>.  Any objection to the relief requested in the Motion on a permanent basis must: (a) be filed in accordance with the Court's CM/ECF procedures or in writing with the Clerk of the Court, at 401 McKinley Avenue SW, Canton, Ohio 44702 by 4:00 p.m. (Eastern Time) no later than ____, __, 2011 (the "**Objection Deadline**"), and (b) served so as to be actually received by the following parties by the Objection Deadline: (i) the United States Trustee, Howard M. Metzenbaum U.S. Courthouse, 201 Superior Ave., East - Suite 441, Cleveland, OH 44114; (ii) counsel to the Debtors, BROUSE McDOWELL, 388 South Main Street, Suite 500, Akron, OH 44311, Attn:

43

Marc B. Merklin; (iii) counsel to the Lenders, _____; and (iv) counsel to any Committee then appointed in the Cases. The final hearing on the Motion (the "**Final Hearing**") shall be on ___, ____, 2011 at ___:___ ___.M., Eastern Time. This Interim Order shall remain in effect until the Final Hearing.

      ll.    <u>Binding Effect</u>. The provisions of this Interim Order shall be binding upon and inure to the benefit of the Lenders, the Debtors, the Debtors' estates, and all creditors and parties in interest, and their respective successors and assigns (including any trustee appointed as a representative of the Debtors' estate or in any Successor Cases).

      mm.    <u>Controlling Effect</u>. To the extent that any provision of this Interim Order expressly conflicts with any provision of any of the Pre-Petition Loan Documents or any of the DIP Financing Documents, this Interim Order is deemed to control and shall supersede the conflicting provision(s).

B.    <u>Request for Use of Cash Collateral</u>

40.    In addition to the need for DIP financing, Debtors also require the use of cash collateral for the purposes and expenses set forth above. Accordingly, Debtors also seek an order authorizing use of the Cash Collateral on an interim basis pending entry of a final order in accordance with the proposed Budget. As detailed above, the Pre-Petition Lender is adequately protected by virtue of the Replacement Liens and superpriority administrative expense claim and, therefore, the Debtors' use of the Cash Collateral is authorized pursuant to Section 363(c) of the Bankruptcy Code. Section 363(c) provides as follows:

      (1)    If the business of the debtor is authorized to be operated under section 721, 1108, 1203, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without

44

notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2)    The Trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –

    (A)    each entity that has an interest in cash collateral consents; or

    (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provision of this section.

41.    Pursuant to Section 363(a) of the Bankruptcy Code, cash collateral is defined as, *inter alia*, cash, deposit accounts, or other cash equivalents, whenever acquired, in which the estate and an entity other than the estate have an interest, and includes the proceeds, products, offspring, rents or profits of property subject to the security interest as provided under Section 552(b) of the Bankruptcy Code, whether existing before or after the commencement of a case under the Bankruptcy Code.

42.    The cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents, whether original collateral or proceeds, products, rents or profits of other Pre-Petition Collateral or the proceeds thereof constitute "cash collateral," as such term is defined in Bankruptcy Code section 363(a), of the Pre-Petition Lender.

43.    Pursuant to Sections 363(c)(2)(A) and 363(c)(2)(B) of the Bankruptcy Code, a debtor-in-possession may use cash collateral if (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorized such use, sale, or lease in accordance with the provisions of this Section. The Pre-Petition Lender Issuer has agreed to Debtors' use of Cash Collateral in accordance with the Budget and pursuant to the terms set forth in the proposed Interim Order

44.    Accordingly, the Debtors request authority to utilize Cash Collateral on an interim basis. All such funds shall be utilized for costs and expenses incurred in the administration of

the Debtors' chapter 11 case, and shall be utilized for such other costs and expenses that may be approved by the Court. Such expenditures are necessary to avoid immediate and irreparable harm to the Debtors.

## REQUEST FOR FINAL HEARING

45.     Pursuant to Bankruptcy Rule 4001(b) and (c), a final hearing on this Motion to use Cash Collateral and obtain financing may not be commenced earlier than fifteen days after the service of such motion. Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on such motion and authorize use of cash collateral to avoid immediate and irreparable harm to the debtor's estate. *See* Bankruptcy Rule 4001(b)(2) and (c)(2).

46.     The Debtors request that the Court (i) conduct an expedited hearing with respect to this Motion and (ii) schedule the final hearing on the use of cash collateral at the earliest possible date in accordance with Bankruptcy Rule 4001(b) and (c).

47.     Because this Motion presents no novel issues of law and the authorities relied upon are stated herein, the Debtors respectfully request that this Court waive the requirement contained in Local Bankruptcy Rule 9013-1(a) that the Debtors file a separate memorandum of law in support of this Motion.

## NOTICE

48.     As of the date of the filing of this motion, no creditors' committee has been appointed in these Chapter 11 cases. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the United States Trustee, (b) Debtors top twenty (20) creditors as identified on the respective petitions; (c) the Debtors' secured lenders, including the DIP Lender, the Pre-Petition Lender and their counsel; and (d) the

appropriate taxing authorities. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

**NO PRIOR REQUEST**

49. No prior request for the relief sought in this Motion has been made to this or any other court.

**WHEREFORE,** the Debtors respectfully request entry of interim and final orders authorizing: (i) authorizing and approving, pursuant to section 364(c) and (d) of the Bankruptcy Code, the Debtors to obtain debtor-in-possession financing from the DIP Lender ; (ii) authorizing and approving, pursuant to section 363 of the Bankruptcy Code, the Debtors' use of Cash Collateral of the Pre-Petition Lender or the Pre-Petition LC Issuer; (iii) granting the Pre-Petition Lender and the Pre-Petition LC Issuer (a) adequate protection, including, without limitation, adequate protection against the diminution in the value or amount of the Pre-Petition Collateral, (b) Replacement Liens, and (c) a superpriority administrative expense claim under section 507(b) of the Bankruptcy Code, such Replacement Liens and section 507(b) superpriority administrative expense claim to be subject to the Carve-Out and the liens, security interests and superpriority treatment granted to the DIP Lender, as more particularly set forth herein; and (iv) granting any further and related relief as the Court deems just and equitable.

Respectfully submitted,

/s/ Marc B Merklin
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Brouse McDowell LPA
388 S. Main Street, Suite 500
Akron, Ohio 44311
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com

Proposed Counsel for the Debtors and
Debtors in Possession

800396