IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OHIO

IN RE:                                          CASE NO. 11-60406

FLOWER FACTORY INC                              CHAPTER 11

Debtor                                          JUDGE RUSS KENDIG

MOTION FOR RELIEF FROM STAY

Comes now Laurel Ontario Property, LLC, an Ohio Limited Liability Company, through

counsel, and for its Motion states:

1.       It is an Ohio Limited Liability Company having its office at 5200 Cleveland Rd,

Suite G, Wooster, Oh 44691.

JURISDICTION AND VENUE

2.       This Court has subject matter jurisdiction over the within adversary proceeding

pursuant to Title 28, U.S. Code, Sections 1334 and 157, and General Order No. 84 entered in this

District on July 16, 1984.

3.       This is a core proceeding pursuant to Title 28, U.S. Code, Section 157.

BACKGROUND

4.       The Flower Factory Inc is the Debtor and Debtor-in-Possession in the within case,

which case was filed on February 15, 2011.

5.       On or about June 1, 2007, Movant and Flower Factory Inc, an Ohio Corporation

entered into a non-residential lease for real estate for the premises located at 919 N. Lexington-

Springmill Rd, Ontario, Ohio 44691.  This lease was amended on or about February 11, 2009,

January 21, 2010, and July 27, 2010.  Copies of the lease and the three (3) amendments are

attached hereto and incorporated herein as Exhibit "A".

6.      The Debtor is in default for rent for the period of February 1, 2011 and March 1, 2011 in the total amount of $40,000.00. This includes fourteen (14) days of February post-petition, as well as the entire month of March, 2011.

7.      11 U.S. Code Section 365(d)(3) requires that the Debtor-in-Possession timely perform the obligations pursuant to the lease, except those set forth in 11 U.S. Code Section 365(b)(2), which exceptions do not pertain in this case.

8.      The Debtor-in-Possession continues to occupy the premises for its own benefit, and to the detriment of Movant. Movant is entitled to relief from the automatic stay to permit the filing of a forcible entry and detainer action in the appropriate Ohio Court in Richland County.

9.      In addition to the grounds not timely performing its obligations, it is the intention of the Debtor to close the Richland County property.

10.      Therefore, the Debtor has not equity in said property and said property is not necessary to an effective reorganization.

11.      This Motion does not conform to the standard Motion for Relief from Stay as prescribed by Local Rules. It has been completely redrafted because the standard form pertains to secured lending situations, and not to landlord tenant situations.

 /S/ Edwin H. Breyfogle
Edwin H. Breyfogle
Ohio Reg. No. 0000822
Attorney for Movant
108 Third St NE
Massillon, OH 44646
(330) 837-9735
FAX (330) 837-8922

## CERTIFICATE OF SERVICE

The undersigned certifies that on 3rd day of March, 2011, a true and correct copy of the foregoing Motion for Relief from Stay of Loral Ontario Property, LLC, an Ohio Limited Liability Company was served via the Court's electronic case filing system on the following who are listed on the Court's Electronic Mail Notice List:

| | | |
|---|---|---|
| * | Kevin L. Bradford | klbradford@nnblaw.com |
| * | Kate M. Bradley | kbradley@brouse.com |
| * | William P. Coley II | wpcoley@strausstroy.com |
| * | Anthony J. DeGirolamo | ajdlaw@sbcglobal.net |
| * | Bridget Aileen Franklin | bfranklin@brouse.com |
| * | Harry W. Greenfield | bankpleadings@bucklaw.com |
| * | Joseph C. Lucci | jclucci@nnblaw.com |
| * | Marc Merklin | mmerklin@brouse.com |
| * | G. Christopher Meyer | christopher.meyer@ssd.com |
| * | Robert B. Preston III | represton@bmsa.com |
| * | Tim Robinson | trobinson@dinslaw.com |
| * | Sam O. Simmerman | sosimmerman@kwgd.com |
| * | Gregory D. Swope | gswope@kwgd.com |
| * | Linda M. Battisti | Linda.Battisti@usdoj.gov |

 /S/ Edwin H. Breyfogle
Edwin H. Breyfogle
Attorney for Movant

**LEASE**
**LORAL ONTARIO PROPERTY, LLC**
**To**
**The Flower Factory, Inc.**

This Lease made this ___/___ day of ___June___, 2007, between Loral Ontario Property, LLC, an Ohio Limited Liability Company, (herein referred to as the "Lessor"), having its office at 5200 Cleveland Road, Suite G, Wooster, Ohio, 44691 and The Flower Factory, Inc., *an Ohio Corporation*, (hereinafter referred to as the "Lessee"), having its office at 5655 Whipple Ave. Canton, Ohio 44720, jointly and severally.

**WITNESSETH**

WHEREAS, the Lessor owns the real estate in the Village of Ontario, Richland County, Ohio, known as Village Square Shopping Center (" Shopping Center"), and WHEREAS, Lessee desires to lease a portion of such Shopping Center pursuant to and subject to the terms and conditions of the within Lease Agreement.

NOW, THEREFORE, in consideration of the promises and the mutual covenants herein contained, the parties hereto do covenant, agree and bind themselves as follows:


**ARTICLE I**

**LEASE OF PREMISES; TERM OF LEASE; RENTS**

**Section 1.1. Lease of Premises.** Loral Ontario Property, LLC, as Lessor hereunder in consideration of the rents, covenants and agreements herein provided, agrees to and does hereby lease to The Flower Factory, Inc., as Lessee hereunder, and the Lessee agrees to and does hereby lease from the Lessor, that portion of the Shopping Center owned by Lessor and depicted on Exhibit "A" attached hereto which is outlined in red on said Exhibit "A", consisting of 76,287 square feet of leasable area (the "Premises"), to have and to hold unto the Lessee for the term of this lease as set forth herein, entitled to all of the rights of the easements, conditions and restrictions of record, including all rights of ingress, egress, and parking, etc. The square footage of the Premises is calculated by measuring from the outside of the exterior walls, and from the center of the interior walls. Property address for the Premises shall be 919 N. Lexington-Springmill Rd, Ontario, Ohio 44691.

**Section 1.2. Construction of Premises.** Lessor and Lessee agree that the construction of the Premises by Lessor shall be done as described in Exhibit "B", attached hereto and made a part hereof. Lessor represents and warrants that it shall begin and diligently pursue permits, and construction of the Premises. Lessor shall provide Lessee possession of the Premises within 3 days of obtaining the final construction inspection and or occupancy permit, and such first possession date shall be deemed the Turnover Date. Lessee shall perform any

{RSR\K0564835.2}

work in addition to any of the items specifically enumerated in Exhibit "B" at its own cost and expense. All such improvements, fixtures and the like installed by Lessee shall be deemed to be a part of the Premises and shall be the sole property of the Lessor upon the termination of the within lease. Lessee shall pay in full for all improvements made by Lessee to the Premises and shall not allow any Mechanic's or other liens whatsoever to be placed against the Premises.

Lessor is expected to Turnover the Premises by January 2, 2008. In the event that the Premises are not ready on that date, then Lessee will be entitled to two days free rent for each day of delay until the Premises are actually turned over.

Section 1.3. **Term and Possession.** The term of this lease shall be for Ten (10) Lease Years. For the purposes of this Lease, the first Lease Year shall be deemed to begin on the Lease Commencement Date and to end twelve (12) months thereafter; provided, if said first twelve (12) month period does not end on the last day of a calendar month, the first Lease Year shall be extended to the end of said month, and each succeeding twelve (12) month period thereafter shall be deemed a Lease Year. Any partial month shall be pro-rated on a thirty (30) day calendar month. The Lessor agrees to deliver to the Lessee full possession of the Premises at the Turnover Date, and the Lessee agrees to accept such possession upon such delivery, subject to Punchlist items and latent defects 90 days after the Turnover Date.

Section 1.4. **Commencement Dates.** The rent and the lease term shall commence 60 days after the Turnover Date. Lessor and Lessee shall submit to the other a letter confirming the Commencement Date at such time as the date becomes final.

Section 1.5. **Minimum Rent.** The Lessee agrees to and shall pay to the Lessor as rent during years one thru five of the initial term of this lease, without prior demand or right of set off except as specifically permitted under this Lease, an amount equal to Four Hundred Sixty Nine Thousand One Hundred Sixty Five and 00/100 Dollars ($469,165.00) per annum $6.15 psf), to be paid in advance in equal monthly installments of Thirty Nine Thousand Ninety Seven and 08/100 Dollars ($39,097.08) on or before the first day of each calendar month during the term of this lease. The Lessee agrees to and shall pay to the Lessor as rent during years six thru ten of the initial term of this lease, an amount equal to Five Hundred Seven Thousand Three Hundred Eight and 55/100 Dollars ($507,308.55) per annum ($6.65 psf), to be paid in advance in equal monthly installments of Forty Two Thousand Two Hundred Seventy Five and 71/100 Dollars ($42,275.71). The first installment of such rent, together with any additional rent due for any fractional month determined in accordance with Section 1.3 of this Lease shall be paid on or before the deemed commencement date of the term. All payments of rent due hereunder shall be payable at the principal place of business of the Lessor as set forth herein, or at such other address or addresses as may from time to time be determined by the Lessor.

Section 1.6. **Renewal.** Lessee may, at its option, renew and extend the term of this Lease for two (2) successive and separate Five (5) year renewal terms. The option for any renewal term shall be exercised separately by written notice to the Lessor not later than one hundred eighty (180) days prior to the expiration of the original term or the then renewal term as the case may be. The renewal terms shall be upon the same terms and conditions as the initial term of this Lease, provided that for the first renewal term the rent shall be increased to Five Hundred Forty

Five Thousand Four Hundred Fifty Two and 05/100 Dollars ($545,452.05) per annum ($7.15 psf), to be paid in advance in equal monthly installments of Forty Five Thousand Four Hundred Fifty Four and 34/100 Dollars ($45,454.34) on or before the first day of each calendar month, and for the second renewal the rent shall be increased to Five Hundred Eighty Three Thousand Five Hundred Ninety Five and 55/100 Dollars ($600,000.00) per annum ($7.65 psf), to be paid in advance in equal monthly installments of Forty Eight Thousand Six Hundred Thirty Two and 96/100 Dollars ($48,632.96) on or before the first day of each calendar month.

### Section 1.7. Maintenance and Repair.

(a)     Lessee's Obligations. Lessee shall, at its own expense, keep and maintain the Premises in good order, condition and repair and in accordance with all requirements of all laws, orders, ordinances, regulations of federal, state, county and/or local government. Without limiting the generality of the foregoing, Lessee shall be responsible for the maintenance, repair and replacement (as needed) of all interior electrical systems (including interior lighting fixtures) exclusively serving the Premises, interior plumbing systems (including sewage facilities within the Premises), ventilating, and utility systems and equipment located within the Premises, including heating, air conditioning and ventilating facilities ("HVAC" Facilities), all windows, glass, window fittings, interior and exterior doors, door frames and door checks, all fixtures within the Premises, all interior walls, floors and ceilings, water heaters, utility meters, and all of Lessee's improvements and trade fixtures.  Lessee agrees to enter into an HVAC preventative maintenance contract with a licensed HVAC contractor for the duration of the Lease, to service the equipment on a regular basis, and to maintain detailed records evidencing the work performed.  Lessee shall be responsible for the maintenance and repairs for all HVAC equipment.

(b)     Lessor's Obligations. Lessor shall maintain the foundation, the exterior walls, the roof, the roof drainage system, and the structural parts of the Premises in good condition and repair, except that Lessee shall reimburse Lessor for the cost of any repair occasioned by the willful or negligent acts, or acts of omission of Lessee, its agents, employees, customers or invitees. Lessor's liability for its obligations under this Section 1.7 shall be limited to the cost of repair, and Lessor shall not be liable to Lessee for any interruption of Lessee's business or for any inconvenience caused Lessee on account of Lessor's performance of any repair, maintenance or replacement, so long as such work is being conducted by Lessor in accordance with the terms of this Agreement, without negligence, and with reasonable regard for Lessee's business operations.

Lessor agrees that it will give to Lessee the benefit of all guarantees and warranties it may have from its contractors or materialmen, and that Lessor shall assist Lessee in enforcing such guarantees and warranties.

(c)     Right to Correct. If either party fails to perform its replacement, repair or maintenance obligations hereunder, then the nondefaulting party, after thirty (30) days written notice to the defaulting party or upon such shorter notice as may be reasonable (i) in the event of an emergency or (ii) in the event such replacement, repair or maintenance is necessary in order to avoid damage to Lessee's merchandise or interference with Lessee's business, may perform the same at the cost of the defaulting party; provided, however, other than in  the case of an event or

events described in clauses (i) and (ii), above, if such default cannot be cured within thirty (30) days despite diligent efforts and such defaulting party commences to cure within such thirty (30) day period , and thereafter pursues such cure diligently to completion, then the cure period shall be extended for such additional period as shall be necessary to complete such cure, but not to exceed sixty (60) days.

If the defaulting party is Lessee and Lessee fails to reimburse Lessor for the cost of replacements, repairs or maintenance so performed by Lessor within thirty (30) days after Lessee receives from Lessor a statement setting forth such cost, then the cost to Lessor of performing the same shall be deemed additional Rent, and shall become due and payable with the next monthly installment of Annual Rent.

If the defaulting party is Lessor and Lessor fails to reimburse Lessee for the cost of replacements, repairs or maintenance so performed by Lessee within thirty (30) days after Lessor receives a statement setting forth such cost, then Lessee may offset the cost to Lessee of performing the same against the Rent and other charges due from Lessee under this Lease.

### Section 1.8. Common Areas and Common Area Maintenance (CAM) Charges.

(a) Except as provided below or otherwise in this Lease, the Lessor shall make available within and about the Shopping Center such common areas as and to the extent the Lessor shall from time to time in its sole discretion determine to be appropriate. "Common Areas" for purposes of this Lease shall be defined to include, but not to be limited to, parking areas, driveways, ingress and egress roads, accessways and sidewalks. The Lessor shall operate, manage, equip, light, repair and maintain such Common Areas for their intended purposes in such manner as the Lessor shall in its sole discretion from time to time determine. Lessor shall not change the ingress or egress, parking lot size, number of parking spaces or configuration without written consent of the Lessee. The Lessee, its officers, agents, employees, customers and invitees shall have a non-exclusive right in common with the Lessor and with others to whom the Lessor has or may hereafter grant rights to use said Common Area, subject to such rules and regulations as the Lessor, in its sole discretion, may from time to time impose, provided that such rules and regulations are uniformly enforced against all tenants and occupants of the Shopping Center.

(b) Lessee shall pay to Lessor Lessee's proportionate share of the cost and expense to Lessor of operating, maintaining and/or repairing said Common Areas including all sums incurred or expended in a manner deemed by the Lessor to be reasonable and appropriate and in the best interests of the Shopping Center for the operation, maintenance and repair of such Common Areas, and shall include, but not be limited to, costs and expenses for the following:

(1) Snow, ice, garbage and trash removal; maintenance, repair and replacement of all parking lot surfaces, including cleaning, sweeping, painting, striping and repaving; maintenance, repair and replacement of sidewalks, curbs, building identification signs, directional signs, traffic signs, and other traffic markers and signs;

(2) Maintenance, repair and replacement of the exterior lighting systems (including

bulbs, poles and fixtures), also including any utility charges in connection with the foregoing systems.

(3) Exterior planting, replanting and replacing of flowers, shrubbery, plants, trees and other landscaping, fertilizer and weed control;

(4) Premiums or contributions for insurance, including, without limitation, liability insurance for personal injury, death and property damage; insurance against liability for defamation and claims of false arrest occurring in and about the Common Areas; workman's compensation; broad form peril insurance covering the entire Shopping Center which may include flood insurance, earthquake insurance, boiler insurance and/or rent insurance (for the purposes of this provision of Subsection (b) only, Common Areas shall be deemed to include the Premises and Premises leased to other tenants);

(5) In calculating the Lessee's proportionate share of the Common Area maintenance charges such proportionate share shall be computed by multiplying the total amount of the Common Area maintenance costs each year by a fraction, the numerator of which shall be the total square feet of the Premises, and the denominator of which shall be the total square footage of leasable area within the Shopping Center as shown on Exhibit "A". The Lessee's proportionate share of such Common Area maintenance charges for each year shall be paid in equal monthly installments, in advance, in an amount to be estimated from time to time by the Lessor, and adjusted no less often by the Lessor than annually to reflect actual Common Area maintenance costs. Any overpayment shall be a credit against the Lessee's Common Area maintenance account. For the purposes of this Lease the gross leasable area of the Shopping Center is 164,458 Sq Ft, and the area of the Premises is 76,287 Sq Ft, and Lessee's "Proportionate Share" shall be 46.4%. Lessee's Proportionate Share shall be adjusted in the event of any increase or decrease of the gross leasable area of the Premises and/or in the total gross leasable area of the buildings within the Shopping Center.

Lessor shall not charge any management fee as part of the CAM charges, and shall only charge an administrative fee equal to 10% of the total CAM expenses, to be paid monthly along with the Rent and CAM charges.

During the first year of the Initial Term of this Lease, the Lessee's Proportionate Share of charges for CAM, Insurance and Real Estate Taxes shall be the lesser of either (i) the actual charges or (ii) the estimated charges as follow:

| | |
|---|---|
| Real Estate Taxes | $.55 psf annually |
| Insurance | $.15 psf annually |
| CAM | $.50 psf annually |

Thereafter, the Lessee's Proportionate Share of charges for CAM, Insurance and Real Estate Taxes shall be the actual charges.

**Section 1.9. Liability Insurance and Indemnification.** Lessee shall save and hold

11-60406-rk    Doc 87    FILED 03/03/11    ENTERED 03/03/11 15:58:25    Page 8 of 30

Lessor harmless from, and indemnify Lessor against, any and all injury, loss or damage, of whatever nature, to any person or property caused by or resulting from any breach of a covenant of this Lease by Lessee, any act, omission or negligence of Lessee or any employee or agent of Lessee, or any subtenant or concessionaire of Lessee. It is a condition of this save harmless and indemnification that Lessee shall receive prompt notice of any such claim against Lessor.

Lessor shall save and hold Lessee harmless from, and indemnify Lessee against, any and all injury, loss or damage, of whatever nature, to any person or property caused by or resulting from any breach of a covenant of this Lease by Lessor, any act, omission or negligence of Lessor or its employees or agents. It is a condition of this save harmless and indemnification that Lessor shall receive prompt notice of any such claim against Lessor.

During the term of this Lease, and all extensions thereof, the Lessee shall, at its own expense, maintain and provide general public liability insurance for the benefit and protection of the Lessor and the Lessee, in an amount not less than One Million Dollars ($1,000,000.00) for injuries to any one person and not less than Two Million Dollars ($2,000,000.00) for injuries to more than one person, arising out of any one accident or occurrence. Evidence of such insurance policies shall be delivered to the Lessor together with proof of payment of premium therefor within thirty (30) days following execution of this Lease. The Lessee shall deliver to the Lessor evidence of renewals of such insurance policies with proof of payment of premium, not less than twenty (20) days prior to their expiration dates during the term of this Lease. Lessor, and any parties holding a valid mortgage lien in the Premises, shall be named as additional insureds in all such policies, as their respective interests may appear, and the Lessee shall provide the Lessor with a certificate of insurance or other evidence thereof satisfactory to the Lessor.

Section 1.10. **Governmental Requirements.** The Lessee shall comply with all requirements of all laws, orders, ordinances, and regulations of federal, state, county and/or local government, which shall impose any duty upon the owner and/or occupant of the Premises. The Lessee shall not be required to make any capital improvements to the Premises except as required by its specific use.

Section 1.11. **Taxes and Assessments.** Lessor shall pay, as the same respectively become due, all real estate taxes and assessments, both general and special ("Taxes"), which become due and payable during the term of this lease and any extension thereof, and shall bill to Lessee at the time the same are received by Lessor an estimated amount monthly as provided in Section 1.8 commencing on the Rent Commencement Date and continuing throughout this Lease. For purposes of this paragraph, Lessee's Proportionate Share shall be deemed to be the amount of such taxes and assessments multiplied by a fraction, the numerator of which is the total square feet of the Premises, the denominator of which is the total number of leasable square feet in the Shopping Center as depicted in Exhibit "B". The Lessee shall reimburse the Lessor for its proportionate share of such taxes and assessments. Any overpayment shall be a credit against Lessee's tax account.

Section 1.12. **Utilities.** Lessee shall be solely responsible for and shall pay for all utilities or other charges for services provided to or for the direct benefit of the Premises, which accrue during the term of the Lease beginning on the Turnover Date.

**Section 1.13. <u>Subordination to Mortgage.</u>** This Lease shall be subordinate to any mortgage lien from time to time created by the Lessor. The Lessee agrees from time to time upon demand to execute any and all instruments as may be required to evidence such subordination without obligation or expense to the Lessee. Lessor shall obtain and furnish to Lessee a Non-disturbance Agreement form any present Mortgagee, within 30 days of this Lease being signed, and from any future mortgage as a condition of Lessee's subordination.

**Section 1.14. <u>Condemnation.</u>** The parties hereto agree that should the Premises, or such portion thereof as will make the remaining portion unusable for the purposes of this Lease, or twenty five (25%) or more of the parking, building or other Common Areas be appropriated or condemned by competent authority for public or quasi-public use, or should the ingress and egress be materially adversely affected by condemnation, then this Lease shall at the Lessee's option terminate from the date when possession of the part so taken shall be required for the use and purpose for which it shall have been taken. If the Lessee continues the Lease, the rent shall abate proportionately as to the portion of the Premises taken; provided, however, that the Lessor shall not be entitled to any portion of the award made to the Lessee for loss of business and/or for the cost of removal of stock and trade fixtures.

**Section 1.15. <u>Alterations or Modifications.</u>** Lessor agrees that Lessee may, at Lessee's sole cost and expense, from time to time during the term of this Lease, make such alterations, installations and modifications in and to the Premises as are reasonable and necessary for Lessee to operate its business in the Premises, provided that prior to making any such structural alterations or modifications, the Lessee shall first obtain Lessor's written approval thereof.

**Section 1.16. <u>Waiver of Subrogation.</u>** Each of the parties hereto does hereby release the other from all liability for damage due to any act or neglect of the other (except as provided elsewhere in this Lease) occasioned to property owned by said parties which is or might be incident to or the result of any casualty for which either of the parties is now carrying or may hereinafter carry insurance, and for losses which are required to be covered by either Lessor or Lessee, whether or not in fact such insurance is purchased; provided, however the releases herein contained shall not apply to any loss or damage occasioned by the deliberately harmful act or omission of either of the parties hereto, and the parties hereto further agree that any insurance they obtain on their respective properties shall contain an appropriate provision whereby the insurance company, or companies, consents to the mutual release of liability contained in this paragraph and waives all right of recovery by way of subrogation against Lessor or Lessee in connection with any loss or damage covered by any such policies. Neither party shall be liable to the other for any loss or damage caused by fire or any of the risks enumerated in its policies, provided such waiver was obtainable at the time of such loss or damage.

**Section 1.17. <u>Covenant Regarding Proceeds.</u>** If the Premises are damaged by any peril covered by standard policies of fire and extended coverage insurance to an extent which is less than twenty-five percent (25%) of the cost of replacement (as determined by Lessor's insurer) of the Premises, the damage shall, except as hereafter provided, promptly be repaired by Lessor, at Lessor's expense, but that in no event shall Lessor be required to repair or replace Lessee's stock in trade, trade fixtures, furniture, furnishings, equipment, personal property, or leasehold

improvements. If the Premises are damaged by any cause, to the extent of twenty-five percent (25%) or more to the cost of replacement of the Premises, either Lessee or Lessor may elect to terminate this Lease by giving written notice to the other party within thirty (30) days of the event causing the damage. If the buildings in the Shopping Center are damaged by any cause to the extent of fifty percent (50%) or more of the cost of replacement, or any damage by any cause to the Premises occurs during the last two years of the term (including any extensions) of this Lease, Lessor may elect either to repair or rebuild the Premises or the buildings in the Shopping Center, as the case may be, or to terminate this Lease upon giving notice of such election in writing to Lessee within ninety (90) days after the event causing the damage. If the casualty, repairing, or rebuilding shall render the Premises untenantable, in whole or in part, a proportionate abatement of the Rent shall be allowed until the date Lessor completes the repairs or rebuilding. If Lessor is required or elects to repair the Premises, Lessee shall repair or replace its stock in trade, trade fixtures, furniture, furnishings, equipment and personal property in a manner and to at least a condition equal to that prior to its damage or destruction and the proceeds of all insurance carried by Lessee shall be held in trust by Lessee for the purpose of such repair and replacement.

Section 1.18 **Use and Occupancy.** Lessee will covenant to open as a Flower Factory Wholesale Superstore, but will not otherwise be required to continuously operate in the Premises as a craft store or for any other purpose. In the event that Lessee elects to go dark, it shall have the right to use the Premises for any legal purposes not in violation of any easements of record, Shopping Center restrictions, or any exclusive provisions of which it shall then have, or any other exclusive provisions in the Shopping Center of which Lessor has given prior written notice.

Neither the Premises nor the Shopping Center shall be used for any non-retail purposes (repairs, alterations, and offices incidental to retailing, and banks and small loan offices, not being deemed non-retail), or for any entertainment purposes such as a bowling alley, skating rink, cinema, bar, nightclub, discotheque, gentleman's club, amusement gallery, poolroom, massage parlor, sporting event, sports or game facility, or for any establishment which sells or displays pornographic materials.

Section 1.19. **Insurance Against Fire and Other Casualty.** During the entire term of this Lease and all extensions thereof, the Lessor shall obtain and keep in effect fire and extended coverage insurance for the Shopping Center in an amount equal to the full insurable replacement value. Lessee shall reimburse Lessor for Lessee's Proportionate Share (computed in the same manner as Common Area Maintenance Charges Proportionate Share) of the total cost of premiums for such insurance coverage, such reimbursement to be included in the Common Area Maintenance Charges. Such insurance premium reimbursement shall be paid by the Lessee to the Lessor in equal monthly installments on the first day of each calendar month during the term of the Lease based upon Lessor's estimate of the cost of such insurance. The amount due for any partial calendar year shall be pro rated on a per diem basis. Within forty-five (45) days after the end of each calendar year Lessor shall provide Lessee with a statement as to the actual cost of such insurance premiums and Lessee's Proportionate Share thereof. Any deficiency or any overage shall be credited against the next ensuing monthly installment.

Section 1.20. **Assignment and Subletting.** Except as set forth herein, Lessee may assign

or sublet the Premises, or any part thereof, only upon the prior written approval of the Lessor, which shall not be unreasonably withheld, subject to the terms and conditions of any mortgage and/or security agreements between the Lessor and any mortgage lender, which affect the Premises. If Lessee assigns or sublets the Premises, with or without the consent of the Lessor, it shall remain primarily liable for the payment of rent as provided herein and for the performance of all terms, covenants and conditions to be performed by the Lessee during the original term of this lease and during any holdover or renewal period.

Anything to the contrary notwithstanding, any transaction construed as a Permitted Exception under Section 2.1 shall not be deemed to constitute a sublet or assignment which requires the consent of Lessor.

Section 1.21. **Acceptance of Premises.** Lessee has inspected and approved the plans and specifications of the Premises and hereby acknowledges such approval and agrees to accept the Premises when constructed and improved in accordance with said plans and specifications.

Section 1.22. **Signs.** Lessee shall be permitted to install, at Lessee's sole expense, its typical sign on the facade of the Premises. The cost of the signage, its installation and maintenance, shall be paid for by the Lessee, and upon termination of this Lease, the Lessee shall remove the sign and reasonably repair damage to the facade caused by such removal, reasonable wear and tear excepted.

Lessee shall have the right to place, at its sole expense, its typical pylon panel sign on Lessor's existing pylon sign. Lessee will pay for the cost of Lessee's pylon panel and Lessee shall pay its pro-rata share of Lessor's pylon sign maintenance and utility charges.

Lessee shall not erect any signs without first obtaining Lessor's prior approval as to size, color, type, and location. Lessee shall not display any banners, pennants, searchlights, window signs, balloons or similar temporary advertising media without prior written consent of the Lessor. The signs must comply with all local ordinances and zoning resolutions.


**ARTICLE II**

**DEFAULT BY LESSEE: REMEDIES**

Section 2.1. **Events of Default.** The following shall be "events of default" under this Lease and the terms "event of default" or "default" shall mean, whenever they are used in this Lease, any one or more of the following events:

(a) Failure by the Lessee to pay the rents, proportionate Common Area maintenance charge, taxes, utilities, water, sewer, insurance or any other payment due hereunder required to be paid pursuant to various sections hereof on or prior to the date or dates on which payment is required to be made by those sections, for a period of ten business days after notice ("Default Notice"), specifying such failure and requesting that it be remedied, shall have been given to the Lessee by Lessor. Such default shall result in the assessment of a late fee calculated on the basis

of ten percent (10%) per annum, beginning on the date payment is due and continuing until paid.

(b) Failure by the Lessee to observe and perform any covenant, condition or agreement on its part to be observed or performed, other than as referred to in paragraph (a) of this Section, for a period of thirty business days after Default Notice specifying such failure and requesting that it be remedied shall have been given to the Lessee by Lessor. The period shall be extended another thirty days so long as Lessee is diligently pursuing a remedy.

(c) The dissolution or liquidation of the Lessee or failure by the Lessee promptly to satisfy or cause to be set aside any execution, garnishment or attachment of such consequence as will impair its ability to carry out its obligations under this Lease, or the filing by the Lessee of a petition for the appointment of a receiver in liquidation or a trustee with respect to itself or any of its property, or if it makes a voluntary assignment for the benefit of creditors or files a petition in bankruptcy or insolvency or for reorganization, compromise, adjustment or other relief under the laws of the United States or of any state relating to the relief of debtors; or if any party other than the Lessee shall file a petition for the appointment of a receiver in liquidation or a trustee with respect to the Lessee, or shall file a petition against the Lessee in bankruptcy, insolvency, or for reorganization, compromise, adjustment or other relief under the laws of the United States or any state relating to the relief of debtors and such petition shall not be vacated or set aside or stayed within sixty (60) business days from the Lessee's receiving notice thereof. The term "dissolution or liquidation of the Lessee", as used in this subsection and this Lease, shall not be construed to include any one or more of the following (collectively referred to as "Permitted Exceptions"): (i) the cessation of the corporate existence of the Lessee resulting either from a merger or consolidation of the Lessee into or with another corporation or entity, (ii) the sale of all or substantially all of the shares of Lessee, (iii) the sale of all or substantially all of the assets of the Lessee as an entity, whether or not preceded or following a dissolution or liquidation of the Lessee if the resulting or transferee entity assumes in writing all of the obligations of the Lessee hereunder, and consents in writing to the assumption and assignment of the Lease.

Section 2.2. **Remedies on Default.** Whenever any event of default referred to in Section 2.1 hereof shall have happened and be subsisting, any one or more of the following remedial steps may be taken:

(a) Lessor may at its option, declare all installments of rent payable under Section 1.4 hereof for the remainder of the term of this Lease to be immediately due and payable, whereupon the same shall become immediately due and payable.

(b) Lessor may re-enter and take possession of the Premises without terminating this Lease, and sublease the Premises for the account of the Lessee, holding the Lessee liable for the difference in the rent and other amounts payable by such Lessee in such subleasing and the rents and other amounts payable by the Lessee hereunder.

(c) Lessor may terminate the term of this Lease, and exclude the Lessee from the possession of the Premises and use its best efforts to lease the Premises to another, but holding the Lessee liable for all rent and other payments due up to the effective date of such leasing.

(d) Lessor may take whatever action at law or in equity may appear necessary or

11-60406-rk    Doc 87    FILED 03/03/11    ENTERED 03/03/11 15:58:25    Page 13 of 30

desirable to collect the rent then due and thereafter to become due, or to enforce performance and observance of any obligation, agreement, or covenants of the Lessee under this Lease.

Not withstanding the use of any of the above options, in the event of default by Lessee, Lessor shall be obliged to use its best efforts to endeavor to sublet the space for the account of the Lessee.

**Section 2.3. Lessor's Default.** Notwithstanding anything contained herein to the contrary, in the event Lessor fails to fulfill any obligation under this Lease after thirty (30) days written notice from Lessee, then Lessor shall be deemed to be in default of this Lease. In such event, Lessee shall have the option (but not the obligation) to fulfill such obligations itself on behalf of Lessor, and Lessor shall reimburse Lessee for such costs immediately upon written demand therefore from Lessee. In the event Lessor does not reimburse Lessee within thirty (30) days from Lessor's receipt of an invoice from Lessee, Lessee shall be permitted to deduct such amount from rent and all other payments due under this Lease until paid in full.

**Section 2.4. <u>No Additional Waiver Implied by One Waiver.</u>** In the event any agreement contained in this Lease should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

**Section 2.5. <u>Surrender of Premises.</u>** Lessee shall surrender possession of the Premises upon the expiration or earlier termination of the Lease, broom clean and in as good condition and repair as existed on the Commencement Date, ordinary wear and tear and loss by fully insured casualty excepted. Lessee shall provide Lessor with a complete copy of Lessee's HVAC maintenance records, evidencing Lessee's compliance as required under Article 1.7. Lessee shall at its expense remove all property of Lessee, including exterior signage and all alterations, additions and improvements as to which Lessor shall have made the election provided for in Section 1.16, repair all damage to the Premises and/or Building caused by such removal, and restore the Premises to the condition in which they existed prior to the installation of the articles so removed. Lessee shall be deemed to have abandoned any property, which Lessee does not remove and as to which Lessor has made the election. Lessor may, as it shall desire, retain or dispose of such property at Lessee's expense.

# ARTICLE III

# MISCELLANEOUS

**Section 3.1. <u>Access to Premises.</u>** Lessor and Lessor's agents, shall have the right to enter upon the Premises for the purpose of inspecting same, or of making repairs, additions, or alterations to the Premises or any property owned or controlled by Lessor. Except in the event of an emergency, Lessor shall give reasonable notice to Lessee before entering the Premises.

**Section 3.2. <u>Quiet Enjoyment.</u>** Lessor agrees that Lessee, while paying the rents and performing the covenants of this Lease, may quietly have, hold and enjoy the Premises during

11-60406-rk    Doc 87    FILED 03/03/11    ENTERED 03/03/11 15:58:25    Page 14 of 30

the term of this Lease.

**Section 3.3. <u>Notices.</u>** All notices or other communications hereunder shall be sufficiently given and shall be deemed given when mailed by Certified US. Mail, return receipt requested, or by overnight courier service which provides a receipt, addressed to either the Lessor or the Lessee at the addresses set forth in this Agreement, or at such other or further addresses from time to time designated in writing either by Lessor or Lessee by notice in the manner herein set forth.

**Section 3.4. <u>Net Lease.</u>** This Lease shall be deemed and construed to be a "net lease", and the Lessee shall pay absolutely net during the term hereof the rent and all payments required hereunder (except as otherwise provided in Section 1.7), free of any deductions, without abatement, deduction or set-off other than those herein expressly provided.

**Section 3.5. <u>Binding Effect.</u>** This Lease shall inure to the benefit of and shall be binding upon Lessor and Lessee and their respective successors and assigns, as the case may be.

**Section 3.6. <u>Severability.</u>** If any clause, provision or section of this Lease be held illegal or invalid by any court, the invalidity of such clause, provision or section shall not affect any of the remaining clauses, provisions or sections hereof and this Lease shall be construed and enforced as if such illegal or invalid clause, provision or section had not been contained herein. In case any agreement or obligation contained in this Lease is held to be in violation of law, then such agreement or obligation shall be deemed to be the agreement or obligation of Lessor or the Lessee, as the case may be, to the full extent permitted by law.

**Section 3.7. <u>Captions.</u>** The captions or headings in this Lease are for convenience only and in no way define, limit or describe the scope or intent of any provision of any section of this Lease.

**Section 3.8. <u>Miscellaneous.</u>** This Lease and all of its terms, covenants and provisions shall be governed by and construed under the laws of the State of Ohio.

**Section 3.9. <u>Memorandum of Lease.</u>** The parties agree that this Lease shall not be recorded, but a Memorandum of Lease, describing the property herein leased, setting out the terms and renewal rights, and referring to this Lease, may be recorded by either party at or after the actual commencement date hereof.

**Section 3.10. <u>Consents.</u>** Any consent of Lessee or Lessor as required herein shall not be unreasonably withheld, conditioned or delayed. If consent is requested by notice as herein required, and not negatively responded to within thirty (30) days after receipt of the same, then consent shall be deemed conclusively granted.

**Section 3.11. <u>Holdover.</u>** If Lessee or anyone claiming under Lessee shall remain in possession of the lease Premises or any part thereof after the expiration of the term of this Lease without any agreement in writing between Lessor and Lessee in respect thereof, the person remaining in possession shall be deemed a Lessee from month to month, subject to the

11-60406-rk    Doc 87    FILED 03/03/11    ENTERED 03/03/11 15:58:25    Page 15 of 30

provisions of this Lease insofar as the same may be applicable to a tenancy from month to month. All rents due hereunder shall be calculated based upon the next applicable renewal amount as provided in Section 1.6. All other payments due from Lessee hereunder shall be prorated on a one-twelfth (1/12) of the annual amount basis.

**Section 3.12. <u>Relationship Between Lessor and Lessee.</u>** Nothing contained herein shall be deemed or construed by Lessor and Lessee nor by any other third party as creating the relationship of principal and agent or a partnership or a joint venture between Lessor and Lessee, it being understood and agreed that neither any provision contained herein, nor any acts of Lessor and Lessee, shall be deemed to create any relationship between Lessor and Lessee other than the relationship of Lessor and Lessee.

**Section 3.13. <u>Third Party Beneficiaries.</u>** This agreement is made and entered into for the sole protection and benefit of the parties hereto, and no other person, persons, entity or entities shall have the right of action hereon, right to claim any right or benefit from the terms contained herein, or be deemed a third party beneficiary hereunder.

**Section 3.14. <u>Interpretation.</u>** Regardless of any contrary rule of construction, no provision in this Agreement shall be construed in favor of one of the parties to it because the other party drafted it. No alleged ambiguity in this Agreement shall be construed against a party solely because that party drafted it.

**Section 3.15. <u>Force Majeure.</u>** Either party may be excused from performing or doing any act required of it under this Lease for the period of any delay which arises from or through an act of God, explosion, accident, riot or civil commotion; act of war; fire or other casualty; delays caused by the other party, and causes beyond the reasonable control of a party.

**Section 3.16. <u>Accord and Satisfaction.</u>** No payment by Lessee or receipt by Lessor of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment prejudice Lessor's right to recover the balance of such rent or pursue any other remedy in the Lease provided.

**Section 3.17. <u>Non-Disruption.</u>** Neither party shall knowingly take any action or allow any condition to exist which would interfere in any material way with the business of the other, or with any other tenants of the Shopping Center, or with the rights and privileges of any invitees, licensees, employees, or any other persons lawfully in and upon the Shopping Center or Premises, or which would cause any material impairment or reduction of the goodwill and reputation of the Shopping Center, or the Premises.

**Section 3.18. <u>Exclusivity.</u>** During the Term of this Lease and any extension or holdover terms, Lessor grants to Lessee exclusive Craft Store rights in the Shopping Center. Further, the Lessor agrees not to lease space in the Shopping Center to any of the following companies: Hobby Lobby, Jo-Ann Fabrics, Old Tyme Pottery, Pat Catan's, Crafts 2000, Michael's, or Garden Ridge.

**IN WITNESS WHEREOF**, the Lessor and the Lessee, duly authorized in the Premises, have caused this Lease to be executed in their respective names as of the day and year first above written.

Signed and acknowledged in the presence of:

Kenneth DePriest

Robeot E Wiles

By Alan Ratliff, Managing Member
Loral Ontario Property, LLC

By Christopher J. Mulqueen, President
The Flower Factory, Inc.

State of Ohio     )
                   ) SS:
County of Wayne   )

Before me, a notary public in and for said County and State, personally appeared Loral Ontario Property, LLC, an Ohio Limited Liability Company, by Alan Ratliff, its Managing Member, who acknowledged that he did sign the foregoing instrument and that the same is his free act and deed and the free act and deed of such limited liability company.

In Testimony Whereof, I have hereunto set my name and official seal at Wooster, Ohio, this 30 day of May, 2007.

Notary Public

CONNIE E. JORDAN
Notary Public State of Ohio
My Commission Expires July 20, 2008

State of Ohio     )
                   ) SS:
County of Stark )

Before me, a notary public in and for said county, personally appeared The Flower Factory, Inc., an Ohio Corporation, by Christopher J. Mulqueen, its President, who acknowledged that he did sign the foregoing instrument and that the same is his free act and deed and the free act and deed of such corporation.

In Testimony Whereof, I have hereunto set my name and official seal at N. Canton, Ohio, this 1st day of June 2007.

Kimberly A. Coffman
Notary Public

my Commission Expires 4/4/12

# EXHIBIT "A"



76,287 SF

# EXHIBIT "B" - PAGE 1





EXHIBIT "B" - PAGE 2

## IMPROVMENTS by LESSOR

1) Demo the ceiling, floor covering, exterior freezer/cooler
2) Remove unused wiring and electrical panels
3) Cover vent and drain holes in the floor
4) Separate and provide all utility hookups as individually metered
5) Pre-wire for security and fire alarm systems
6) Service all HVAC equipment and provide @ 1 ton per 400 sq ft of sales floor
7) Provide space heaters for dock and storage area
8) Build New Vestibule with sliding doors and cart door, as per drawings
9) Build Exterior Façade as per drawings
10) Construct all interior walls as per drawings
11) Interior Walls dry walled and painted, color choice by Lessee
12) Install Acoustical ceiling 2' x 4' @ 16 feet AFF
13) Lighting 2' x 8' fluorescent @ 1 per 200 square feet
14) Install new 1200 Amp electrical service
15) Install Emergency exit lights and exterior lights
16) Provide Electrical outlets and power strips as per Lessee's needs
17) Install Water heater – 40 gallon electric
18) Provide and install mop sink and water cooler
19) Provide Handicap accessible Restrooms as per drawings
20) Install new dock seals
21) Install VCT in sales area, restrooms, break-room and locker room
22) Install commercial grade carpet in the offices
23) Install Ceramic Tile 48" high on public restroom walls
24) Install glassboard on employee restroom walls
25) Install new fixtures and faucets in all restrooms
26) Provide Occupancy Permit

Lessor warrants and represents to Lessee that as of the Turnover Date, the Premises and the Shopping Center, shall be in compliance with all applicable governmental laws, rules and regulations, including, but not limited to, environmental laws and regulations pertaining to hazardous materials, zoning (including, without limitation, as for the use specified in the Lease and the Americans with Disabilities Act), and that any HVAC, electrical, plumbing or any other systems currently existing in or serving the Premises, shall be in good working order and any HVAC, electrical, plumbing or any other systems to be upgraded, installed in, or to serve the Premises by Lessor shall be new and, in either case shall be of the capacity specified.

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE made and entered into this 11th day of January, 2009 by and between **Loral Ontario Property, LLC**, an Ohio Limited Liability Company, hereinafter "Lessor", and **Flower Factory, Inc.**, an Ohio Corporation, hereinafter "Lessee".

## WITNESSETH:

WHEREAS, Lessor and Lessee have previously entered into that certain Lease dated as June 1, 2007 (the "Lease"); and

WHEREAS, Lessor and Lessee hereby desire to amend and modify the Lease as hereinafter set forth.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Lessor and Lessee agree that for a period of twenty four (24) months, beginning with the monthly Minimum Rent payment due February 1, 2009, and ending with the monthly Minimum Rent payment due January 1, 2011, Lessee shall make monthly Minimum Rent payments of Twenty Nine Thousand Three Hundred Twenty Two and 81/100 Dollars ($29,322.81), and delay the remaining balance of Nine Thousand Seven Hundred Seventy Seven and 27/100 Dollars ($9,774.27) of each of those scheduled monthly Minimum Rent payments for a period of 24 months each. Lessor and Lessee further agree that for a period of twenty four (24) months, beginning with the monthly Minimum Rent payment due February 1, 2011, and ending with the monthly Minimum Rent payment due January 1, 2013, Lessee shall add the delayed portion of the above monthly Minimum Rent payments to the scheduled monthly Minimum Rent payments, and shall make monthly Minimum Rent payments of Forty Eight Thousand Eight Hundred Seventy One and 35/100 Dollars ($48,871.35). Thereafter, Lessee shall make the scheduled Minimum Rent payments as they are due and payable.

2. Section 1.18 Use and Occupancy, shall be modified to allow Lessor to lease space within the Shopping Center to Delta/Miami-Jacobs Career College and its subsidiaries and assigns, for general office use and the operation of a post-secondary school and training facility.

All other terms, provisions, covenants and conditions of the Lease shall continue in full force and effect except as herein modified.

1

IN WITNESS WHEREOF, the Lessor and Lessee have caused this Lease Modification Agreement to be duly executed as of the date first written above.

LESSOR:

Loral Ontario Property, LLC, an Ohio
Limited Liability Company

By: _Alan Ratliff_

Printed Name: _ALAN RATLIFF_

Title: _Managing Member_

LESSEE:

Flower Factory, Inc.,
An Ohio Corporation

By: _____

Printed Name: _Chris Mulqueen_

Title: _VP_

2

# SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE made and entered into this _21_ day of January, 2010 by and between **Loral Ontario Property, LLC**, an Ohio Limited Liability Company, hereinafter "Lessor", and **Flower Factory, Inc.,** an Ohio Corporation, hereinafter "Lessee".

## WITNESSETH:

**WHEREAS,** Lessor and Lessee have previously entered into that certain Lease dated as June 1, 2007 (the "Lease"); and

**WHEREAS,** Lessor and Lessee have previously amended said Lease, dated as February 11, 2009 (the "First Amendment"); and

**WHEREAS,** Lessor and Lessee hereby desire to amend and modify the Lease and First Amendment as hereinafter set forth.

**NOW, THEREFORE,** for and in consideration of the premises and the mutual covenants contained therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Lessor and Lessee agree that for a period of twenty four (24) months, beginning with the monthly Minimum Rent payment due January 1, 2010, and ending with the monthly Minimum Rent payment due December 1, 2011, Lessee shall make monthly Minimum Rent payments of Twenty Two Thousand Nine Hundred Sixteen and 67/100 Dollars ($22,916.67).

2. Lessor and Lessee further agree that during the last sixty (60) months of the Initial Term of the Lease, beginning with the monthly Minimum Rent payment due April 1, 2013, and ending with the monthly Minimum Rent payment due March 1, 2018, Lessee shall add Four Thousand One Hundred Thirty Two and 00/100 Dollars ($4,132.00) to the scheduled monthly Minimum Rent payments, and shall make monthly Minimum Rent payments of Forty Six Thousand Four Hundred Seven and 71/100 Dollars ($46,407.71). Thereafter, for any Renewal Term, Lessee shall make the scheduled Minimum Rent payments as they are due and payable as required by the Lease.

3. Lessor and Lessee agree that the First Amendment to the Lease is hereby voided and no longer valid, and that any rent due to Lessor from the rent reductions made in the First Amendment and Second Amendment to the Lease are hereby resolved with this amendment.

4. Lessor and Lessee agree that Lessor may, at its option, cancel the Lease by providing Lessee written notice not later than 120 days prior to such cancellation.

1

All other terms, provisions, covenants and conditions of the Lease shall continue in full force and effect except as herein modified.

**IN WITNESS WHEREOF,** the Lessor and Lessee have caused this Lease Modification Agreement to be duly executed as of the date first written above.

**LESSOR:**

Loral Ontario Property, LLC, an Ohio Limited Liability Company

By: _Alan Ratliff_

Printed Name: _ALAN RATLIFF_

Title: _MEMBER_

**LESSEE:**

Flower Factory, Inc., An Ohio Corporation

By: _____

Printed Name: _Chris Mulqueen_

Title: _VP._

2

State of Ohio    )
                 ) SS:
County of Wayne  )


    Before me, a notary public in and for said County and State, personally appeared Loral Ontario Property, LLC, an Ohio Limited Liability Company, by Alan Ratliff, its Managing Member, who acknowledged that he did sign the foregoing instrument and that the same is his free act and deed and the free act and deed of such limited liability company and the free act and deed of him personally as said member.

    In Testimony Whereof, I have hereunto set my name and official seal at Wooster, Ohio, this _22nd_ day of _January_ 2010.

                                Notary Public

**CONNIE E. JORDAN**
Notary Public, State of Ohio
My Commission Expires July 20, 2013


State of Ohio    )
                 ) SS:
County of _____ )


    Before me, a notary public in and for said county, personally appeared The Flower Factory, Inc., an Ohio Corporation, by Christopher J. Mulqueen, its Vice-President, who acknowledged that he did sign the foregoing instrument and that the same is his free act and deed and the free act and deed of such corporation and the free act and deed of him personally as said officer.

    In Testimony Whereof, I have hereunto set my name and official seal at_____, Ohio, this _____ day of _____ 2010.

                     _____
                     Notary Public

3

# THIRD AMENDMENT TO LEASE

THIS THIRD AMENDMENT TO LEASE made and entered into this _27_ day of July, 2010 by and between **Loral Ontario Property, LLC**, an Ohio Limited Liability Company, hereinafter "Lessor", and **Flower Factory, Inc.,** an Ohio Corporation, hereinafter "Lessee".

## WITNESSETH:

WHEREAS, Lessor and Lessee have previously entered into that certain Lease dated as June 1, 2007 (the "Lease"); and

WHEREAS, Lessor and Lessee have previously amended said Lease, dated as February 11, 2009 (the "First Amendment"); and January 21, 2010 (the "Second Amendment") and

WHEREAS, Lessor and Lessee hereby desire to amend and modify the Lease and Amendments as hereinafter set forth.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Lessor and Lessee agree that the First and Second Amendments to the Lease are hereby voided and no longer valid, and that any rent due to Lessor from the rent reductions made in the First and Second Amendments to the Lease are hereby resolved with this amendment.

2. Lessor and Lessee agree that as long as Lessee is current with all payments to the Lessor, the rent for August thru December 2010 shall be $20,000 per month, plus Lessee's prorata share of CAM, Insurance and Real Estate Tax payments (collectively "CAM").

3. Lessor and Lessee agree that as long as Lessee is current with all payments to the Lessor, the rent from January 1, 2010 thru March 1, 2013 shall be $22,916.67 per month, plus Lessee's prorata share of CAM.

4. Lessor and Lessee agree that as long as Lessee is current with all payments to the Lessor, the rent from April 1, 2013 thru March 31, 2018 shall be as follows:

   | | |
   |---|---|
   | April 1, 2013 thru March 31, 2014 | $25,000 per month, plus prorata CAM |
   | April 1, 2014 thru March 31, 2015 | $26,500 per month, plus prorata CAM |
   | April 1, 2015 thru March 31, 2016 | $28,000 per month, plus prorata CAM |
   | April 1, 2016 thru March 31, 2017 | $29,000 per month, plus prorata CAM |
   | April 1, 2017 thru March 31, 2018 | $30,000 per month, plus prorata CAM |

1

In addition to the above monthly rental payments of this Article 4, Lessee shall pay monthly to Lessor an additional amount equal to 7% of the store sales above $300,000 of the prior month.

5. Lessor and Lessee further agree that Landlord may, at its option, divide and demise from the Premises up to 30,000 sq ft and Lessee shall continue to lease the remaining space. If Lessor divides the Premises, and as long as Lessee is current with all payments to Lessor, the rental amounts in Articles 3 and 4 of this Amendment shall change and be calculated as follows:

| Premises Size | Rental Rate |
| --- | --- |
| 45,000 sq ft – 50,000 sq ft | $5.50 psf annually |
| 50,001 sq ft – 55,000 sq ft | $5.25 psf annually |
| 55,001 sq ft – 60,000 sq ft | $5.00 psf annually |

6. The renewal options in Section 1.6 of the Lease shall be changed as follows: The rent for the First Renewal of five (5) years shall be 10% higher than the average of the prior two years rent, and the rent for the Second Renewal of five (5) years shall be 10% higher than rent of the First Renewal.

7. Lessor and Lessee agree that Lessor may, at its option, cancel the Lease by providing Lessee written notice not later than 120 days prior to such cancellation.

All other terms, provisions, covenants and conditions of the Lease shall continue in full force and effect except as herein modified.

**IN WITNESS WHEREOF,** the Lessor and Lessee have caused this Lease Modification Agreement to be duly executed as of the date first written above.

**LESSOR:**

Loral Ontario Property, LLC, an Ohio
Limited Liability Company

By: _Alan Ratliff_

Alan Ratliff, Managing Member

**LESSEE:**

Flower Factory, Inc.,
An Ohio Corporation

By: _____

Christopher J. Mulqueen, V.P.

2

State of Ohio     )
                  ) SS:
County of Wayne  )


Before me, a notary public in and for said County and State, personally appeared Loral Ontario Property, LLC, an Ohio Limited Liability Company, by Alan Ratliff, its Managing Member, who acknowledged that he did sign the foregoing instrument and that the same is his free act and deed and the free act and deed of such limited liability company and the free act and deed of him personally as said member.

In Testimony Whereof, I have hereunto set my name and official seal at Wooster, Ohio, this _____ day of _____, 2010.



Notary Public

CONNIE E. JORDAN
Notary Public, State of Ohio
My Commission Expires July 20, 2013


State of Ohio     )
                  ) SS:
County of Stark  )


Before me, a notary public in and for said county, personally appeared The Flower Factory, Inc., an Ohio Corporation, by Christopher J. Mulqueen, its Vice- President, who acknowledged that he did sign the foregoing instrument and that the same is his free act and deed and the free act and deed of such corporation and the free act and deed of him personally as said officer.

In Testimony Whereof, I have hereunto set my name and official seal at N. Canton, Ohio, this 27th day of July 2010.

Notary Public

my Commission Expires
4/4/2012

3