# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Flower Factory, Inc., Flower Factory Online, Inc., | ) | Case Nos. 11-60406, 11-60408, |
| ALEMIT Properties, LLC, Denbar, Inc., | ) | 11-60411, 11-60412, |
| FF North Canton, Inc., F.F. Aurora, Inc. (f/k/a | ) | 11-60414, 11-60415, |
| F.F. Florence, Inc.), F.F./Cleveland, Inc., | ) | 11-60417, 11-60419, |
| FF Greenwood, Inc., F.F. Mansfield, Inc., | ) | 11-60420, 11-60421, |
| Mulqueen Importers, LLC, d/b/a Creative | ) | 11-60423, 11-60424, |
| Resources, Mulqueen & Sons, LLC, | ) | 11-60425, 11-60426 |
| Mulden, Inc., Mulqueen Holdings, Inc., and | ) | |
| RAM Trucking, LLC, | ) | |
| | ) | |
| Debtors and Debtors-in-Possession. | ) | Judge Russ Kendig |

## SECOND AMENDED DISCLOSURE STATEMENT RELATING TO SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION

### PLAN PROPONENTS:

DEBTORS: Flower Factory, Inc., Flower Factory Online, Inc., ALEMIT Properties, LLC, Denbar, Inc., FF North Canton, Inc., F.F. Aurora, Inc., F.F./Cleveland, Inc., FF Greenwood, Inc., F.F. Mansfield, Inc., Mulqueen Importers, LLC, Mulqueen & Sons, LLC, Mulden, Inc., Mulqueen Holdings, Inc., and RAM Trucking, LLC

Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
BROUSE McDOWELL
388 S. Main Street, Suite 500
Akron, Ohio 44311
Telephone: (330) 535-5711
Facsimile: (330) 253-8601

Counsel for the Debtors and
Debtors in Possession

1

# INTRODUCTION

Flower Factory, Inc. ("FFI") and its debtor affiliates FF North Canton, Inc. ("FF North Canton"), F.F. Aurora, Inc. ("FF Aurora"), F.F./Cleveland, Inc. ("FF Cleveland"), FF Greenwood, Inc. ("FF Greenwood"), F.F. Mansfield, Inc. ("FF Mansfield"), Mulden, Inc. ("Mulden"), Denbar, Inc. ("Denbar"), ALEMIT Properties, LLC ("Alemit"), Mulqueen & Sons, LLC ("M&S"), Flower Factory Online, Inc. ("FF Online"), Mulqueen Importers, LLC ("Mulqueen Importers"), RAM Trucking, LLC ("RAM") and Mulqueen Holdings, Inc. ("Mulqueen Holdings"), as debtors and debtors-in-possession (each a "Debtor" and collectively the "Debtors") in chapter 11 cases pending before the United States Bankruptcy Court for the Northern District of Ohio (the "Bankruptcy Court"), jointly administered under Case No. 11-60406 (the "Chapter 11 Cases"), submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes on the Second Amended and Restated Plan of Reorganization, dated July 7, 2011 (the "Plan"), proposed by the Debtors. A copy of the Plan is attached as <u>Exhibit A</u> to this Disclosure Statement.

**Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.** Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the events leading up to the commencement of the Chapter 11 Cases, significant events that have occurred during the Chapter 11 Cases and the anticipated organization, operations and financing of the reorganized Debtors ("Reorganized Debtors") if the Plan is confirmed and becomes effective. This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors associated with the proposals within the Plan, certain alternatives to the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

**This Disclosure Statement (the "Disclosure Statement") is being submitted by the Debtors in connection with the solicitation of votes in favor of the Plan, a copy of which is attached hereto. The Plan represents the means by which Debtors will complete the reorganization of their respective businesses. The Disclosure Statement is intended as a summary document only and is qualified in its entirety by reference to the Plan. In the event of a conflict between the terms of the Plan and the Disclosure Statement, the terms of the Plan govern. You should read the Plan to obtain a full understanding of its provisions. This Disclosure Statement does not constitute financial or legal advice. You should consult your own advisors if you have questions about the Plan or this Disclosure Statement.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE. NO REPRESENTATIONS CONCERNING THE DEBTORS (PARTICULARLY AS TO THE VALUE OF THEIR PROPERTY) ARE**

AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS
DISCLOSURE STATEMENT. THE DEBTORS MAKE NO REPRESENTATIONS
OTHER THAN THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE
STATEMENT IS BELIEVED TO HAVE BEEN CORRECT AT THE TIME OF THE
FILING OF THIS DISCLOSURE STATEMENT. ANY INFORMATION,
REPRESENTATION OR INDUCEMENT MADE TO SECURE OR OBTAIN
ACCEPTANCES OR REJECTIONS OF THE PLAN THAT ARE OTHER THAN, OR
ARE INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS
DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PERSON IN
ARRIVING AT A DECISION TO VOTE FOR OR AGAINST THE PLAN. THIS
DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRAL PACKAGE AND
THEY MUST BE CONSIDERED TOGETHER FOR THE READER TO BE
ADEQUATELY INFORMED.

THE DEBTORS' RESPECTIVE SCHEDULES LISTING THE ASSETS AND
LIABILITIES OF THE APPLICABLE DEBTOR AS OF THE DATE OF THE COMMENCE-
MENT OF THE CHAPTER 11 CASES ARE ON FILE WITH THE CLERK OF THE
BANKRUPTCY COURT AND MAY BE INSPECTED BY INTERESTED PARTIES DURING
REGULAR BUSINESS HOURS OR ONLINE AT HTTPS://ECF.OHNB.USCOURTS.GOV/
TWENTY-FOUR HOURS A DAY, SEVEN DAYS A WEEK. AS TO CONTESTED
MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS, THIS DISCLOSURE
STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF
ANY FACT, LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT
MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL
NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE
DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE
ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION
AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS. YOU
SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS
OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE
PLAN ON HOLDERS OF CLAIMS OR INTERESTS.

Pursuant to the Bankruptcy Code, this Disclosure Statement was filed on July 7,
2011 in support of the Plan dated July 7, 2011. The Debtors are seeking but have not
obtained any order of the Bankruptcy Court determining that this Disclosure Statement
has been approved as containing "adequate information" for creditors and equity security
holders of Debtors in accordance with section 1125 of the Bankruptcy Code. The Debtors
believe, but do not warrant, that this Disclosure Statement contains "adequate
information." The Bankruptcy Code defines "adequate information" as "information of a
kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and
history of the Debtors and the condition of the Debtors' books and records, that would
enable a hypothetical reasonable investor typical of holders of claims or interests of the
relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF
CREDITORS AND EQUITY SECURITY HOLDERS. ALL CREDITORS AND EQUITY
SECURITY HOLDERS ARE URGED TO VOTE IN FAVOR OF THE PLAN.

The requirements for Confirmation, including the vote of creditors to accept the Plan and certain of the statutory findings that must be made by the Bankruptcy Court, are set forth under the caption "VOTING AND CONFIRMATION OF THE PLAN."

IN SOME INSTANCES, PARTIES RECEIVING THIS DISCLOSURE STATEMENT ARE NOT ENTITLED TO VOTE ON THE PROPOSED PLAN AND, ACCORDINGLY, HAVE NOT BEEN PROVIDED WITH BALLOTS. FOR EXAMPLE, IF YOU HAVE FILED A CLAIM AGAINST DEBTORS, BUT THE DEBTORS ARE SEEKING BY OBJECTION THE TOTAL DISALLOWANCE OF YOUR CLAIM, YOU ARE NOT ENTITLED TO VOTE ON THE PLAN UNLESS, PURSUANT TO RULE 3018 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES"), UNLESS THE BANKRUPTCY COURT TEMPORARILY ALLOWS YOUR CLAIM FOR VOTING PURPOSES. **THUS, IF YOU HAVE FILED A CLAIM THAT THE DEBTORS ARE SEEKING TO DISALLOW IN ITS ENTIRETY, YOU WILL NOT BE PERMITTED TO VOTE ON THE PLAN UNLESS (A) YOU FILE A REQUEST WITH THE BANKRUPTCY COURT FOR THE TEMPORARY ALLOWANCE OF YOUR CLAIM FOR VOTING PURPOSES PRIOR TO THE VOTING DEADLINE AND (B) THE BANKRUPTCY COURT RULES ON THAT REQUEST PRIOR TO THE CONFIRMATION HEARING.**

## SUMMARY OF THE PLAN

*The following Plan summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.*

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by the Debtors. The Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

A.      **Overview**

The plan provides for (1) the restructuring of the Debtors into a viable, sustainable business with the ability to succeed outside of chapter 11 protection, (2) the distribution of cash to the Debtors' creditors, and (3) after the restructuring, the assumption by the new enterprises (the "Reorganized Debtors") of new debts to the prepetition secured lenders.

B.      **Classification and Treatment of Claims and Equity Interests Under the Plan**

Administrative Claims, Priority Tax Claims and DIP Claims are not required to be classified under the Plan.

Except for Administrative Claims, Priority Tax Claims and DIP Claims, all Claims and Equity Interests that existed on February 15, 2011 (the "Petition Date") are divided into classes

4

under the Plan. The following summarizes the treatment of the classified Claims and Equity Interests under the Plan.

1. <u>The Secured Claims of Wells Fargo (Class 1 Claims)</u>. Unless otherwise agreed by the Claim holder and the applicable Debtors or Reorganized Debtors, Wells Fargo will receive the following in full satisfaction of all Class 1 Claims: Wells Fargo will provide the Exit Loan in the form of a line of credit, the term of which will be agreed upon among the Debtors and Wells Fargo. The Exit Loan will be in an amount sufficient to fully satisfy the DIP Loan.

2. <u>Secured Claim of the Term Lenders (Class 2)</u>. Unless otherwise agreed by the applicable Debtors and the holder of an Allowed Class 2 Claim and as set forth in further detail below, each holder of an Allowed Class 2 Claim for each Real Estate Debtor will retain its lien on its collateral and be paid interest only payments in accordance with <u>Exhibits F-G</u>. Each holder of an Allowed Class 2 Claim shall be placed in a separate subclass (for a total of two subclasses), and each subclass will be treated as a separate class for voting and distribution purposes.

3. <u>Secured Claims of Huntington (Class 3)</u>. On or as soon as practicable after the Effective Date, the holder of an Allowed Class 3 Claim will receive, in the sole discretion of the Debtors, except to the extent any holder of an Allowed Class 3 Claim agrees to a different treatment, either: (i) the collateral securing such Allowed Class 3 Claim; (ii) Cash in an amount equal to the value of the collateral securing such Allowed Class 3 Claim; or (iii) the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered Unimpaired. Subject to the foregoing, the holder of the Class 3 Claim shall be deemed to have a Claim in Class 6 to the extent that any portion of its Claim is unsecured pursuant to section 502(a)(1) of the Bankruptcy Code.

4. <u>Other Secured Claims (Class 4)</u>. Secured Claims not treated specifically in Classes 1-3 shall be scheduled as Class 4 Claims. On or as soon as practicable after the Effective Date, each holder of an Allowed Other Secured Claim against the Debtors will receive, in the sole discretion of the applicable Reorganized Debtor, except to the extent any holder of an Allowed Other Secured Claim agrees to a different treatment, either: (i) the collateral securing such Allowed Other Secured Claim; (ii) Cash in an amount equal to the value of the collateral securing such Allowed Other Secured Claim; or (iii) the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered Unimpaired.

5. <u>Other Priority Claims</u>. Holders of Allowed Class 5 Claims shall receive, in full satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim (a) on the Effective Date or as soon thereafter as is reasonably practicable, Cash equal to the amount of such Allowed Other Priority Claim, or (b) such other treatment as to which the Reorganized Debtor and such holder shall have agreed in writing. All Disputed Class 5 Claims, if any, shall be reserved for in full on the Effective Date.

6. <u>General Unsecured Claims (Class 6)</u>.  Each holder of an Allowed General Unsecured Claim shall receive in full and final satisfaction of such Claim its Pro Rata share, based upon the principal amount of each holder's Allowed Claim, of the Creditor Trust Assets.

7. <u>Equity Interests (Class 7)</u>.  On the Effective Date, (i) all Equity Interests in the Debtors will be cancelled and extinguished; and (ii) new equity or membership interests in the Reorganized Debtors will be created and issued as set forth on <u>Exhibit D</u>.

## C.    Conditions Precedent to Confirmation

The following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived pursuant to Section VII.C of the Plan:

1.    The Creditor Trustee shall be selected by the Committee;

2.    The Creditor Trust shall be established;

3.    The Exit Financing Agreement will be in form and substance reasonably acceptable to Wells Fargo in its sole discretion;

4.    The American Equity Term Loan Modification Documents and the SL Investment Term Loan Modification Documents will be in form and substance reasonably acceptable to American Equity and SL Investment, respectively, in their respective sole discretion;

5.    The Confirmation Order will be reasonably acceptable to the Debtors, the Creditors' Committee, Wells Fargo and each of the Term Lenders; and

6.    All exhibits to the Plan will be in form and substance reasonably acceptable to the Debtors, the Creditors' Committee, Wells Fargo and the each of the Term Lenders.

## D.    Conditions Precedent to the Effective Date

The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions have been satisfied or duly waived:

1.    The Bankruptcy Court shall have entered the Confirmation Order.

2.    The Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) approving and authorizing the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to implement the Plan, including completion of the Restructuring Transactions and the other transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

3.    No stay of the Confirmation Order shall then be in effect.

6

4. The Plan and all exhibits to the Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section X.A of the Plan.

**E.      Waiver of Conditions to the Confirmation or Effective Date**

The conditions to Confirmation and the conditions to the Effective Date may be waived in whole or in part at any time by the Debtors, (a) with the consent of Wells Fargo as to Articles VII.A.3, 5, and 6 and VII.B. 1, 2, 3 and 4, without an order of the Bankruptcy Court, and (b) with the consent of each of the Term Lenders as to Articles VII.A.4, 5, and 6 and VII.B.1 and 4 of the Plan, without an order of the Bankruptcy Court.

**F.      Effect of Nonoccurrence of Conditions to the Effective Date**

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section VII.C of the Plan, then upon motion by the Debtors made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Section VII.D of the Plan: (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims and termination of Equity Interests pursuant to section 1141 of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section IV.A of the Plan and (c) the releases described in Article VIII of the Plan; and (2) nothing contained in the Plan will (a) constitute a waiver or release of any Claims by or against, or any Equity Interest in, any Debtor or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

**AS DESCRIBED BELOW UNDER THE HEADING "GENERAL INFORMATION REGARDING THE PLAN -- LEGAL EFFECTS OF THE PLAN," CONFIRMATION AND THE OCCURRENCE OF THE EFFECTIVE DATE WILL HAVE A MATERIAL IMPACT ON CERTAIN LEGAL AND EQUITABLE RIGHTS OF THE HOLDERS OF CLAIMS.** Pursuant to Bankruptcy Rule 2002(f)(7), if the Bankruptcy Court confirms the Plan pursuant to section 1129 of the Bankruptcy Code, the Debtors will file and serve on all parties in interest a notice regarding the entry of the Confirmation Order and certain of the legal effects of the Plan described below.

**G.      Modification of the Plan**

Subject to the limitations contained in the Plan: (1) the Debtors reserve the right, in consultation with the Committee, Wells Fargo, and each of the Term Lenders, and in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order and upon order of the Bankruptcy Court, the Debtors may amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any

inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

## H.     Revocation of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, any Debtor; (2) prejudice in any manner the rights of any Debtor or any other party in interest; or (3) constitute an admission of any sort by any Debtor or any other party in interest.

## I.     Determination of Tax Liability

Pursuant to section 505(b) of the Bankruptcy Code, the Debtors intend to request a determination of any unpaid liability of the Estates for any federal income tax incurred during the administration of its chapter 11 case by submitting a tax return for such tax, together with payment of the tax, if any, shown thereon, and a request for such a determination to the Internal Revenue Service. The Debtors reserve the right, to the extent they deem it necessary and appropriate, to request similar determinations of any unpaid liability of the Estate for any other taxes (including, without limitation, any state or local taxes) incurred during the administration of their chapter 11 cases by submitting a tax return for such other tax, together with payment of the tax, if any, shown thereon, and a request for such a determination to the appropriate governmental unit charged with responsibility for collection or determination of such tax.

## GENERAL INFORMATION ABOUT THE DEBTORS

## A.     The Business

The Debtors are Ohio corporations and limited liability companies.  Mulqueen Holdings directly or indirectly owns each of the Debtors except Alemit.  Dennis E. Mulqueen, Christopher J. Mulqueen, and the Barbara G. Mulqueen Revocable Estate Plan Trusts A & B collectively own all the stock or units, as the case may be, of Mulqueen Holdings. Further, Dennis Mulqueen and the Dennis E. Mulqueen Intentionally Defective Grantor Trust collectively own all the stock or units, as the case may be, of Alemit.  Attached hereto and incorporated herein by reference as Exhibit E is a chart which sets forth the ownership interests of each of the Debtors as of the Petition Date.

FFI operates the corporate office and is the central buyer and distributor for retail stores operated by FF North Canton, FF Aurora, FF Cleveland, FF Greenwood, FF Mansfield, Denbar, and Mulden (each a "Retail Store" and collectively the "Retail Stores").  Each of the Retail Stores operates under the trade name "Flower Factory."  FFI orders, transfers and distributes to the Retail Stores various products including, but not limited to, home décor, crafts, gifts, and party supplies. FFI also did business under the name Dencraft.

## B.  Prepetition Debt Structure

### 1.  Obligations to Wells Fargo

Pre-Petition Credit Facility.  As of the Petition Date, Debtors, along with certain non-debtor affiliates were parties to a certain Credit and Security Agreement, dated as of December 28, 2007 (as amended, restated, modified or supplemented from time to time, the "Pre-Petition Wells Fargo Credit Agreement"), among the Debtors, as borrowers, and Wells Fargo, as lender (the "Pre-Petition Lender").  Pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Lender provided Debtors with a revolving credit facility (the "Revolving Facility") in the aggregate principal amount of up to $3,900,000 as the same shall amortize in accordance with its terms.  As of February 4, 2011 the outstanding unpaid principal balance under the Revolving Facility was at least $3,195,572.68, plus all accrued and unpaid interest, fees, costs and expenses.

Security.  Pursuant to the Pre-Petition Wells Fargo Credit Agreement, Debtors each granted to the Pre-Petition Lender to secure the prompt payment and performance of the Indebtedness (as defined in the Pre-Petition Wells Fargo Credit Agreement), a lien on and continuing security interest in all accounts, chattel paper, deposit accounts, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights and letters of credit (collectively, and as more fully defined in the Pre-Petition Wells Fargo Credit Agreement, the "Wells Fargo Collateral").  The liens and security interests granted by the Debtors to the Pre-Petition Lender prior to Petition Date are referred to herein as the "Wells Fargo Pre-Petition Liens."

Non-Debtor Guaranties.  Pursuant to a Limited Guaranty, dated as of December 28, 2007 (as amended, restated, modified or supplemented from time to time, the "Wells Fargo Guaranty Agreement") executed by Dennis Mulqueen ("Mulqueen") in connection with the Pre-Petition Wells Fargo Credit Agreement, Mulqueen has guaranteed the punctual payment when due, whether at stated maturity, by acceleration or otherwise, Indebtedness (as defined in the Pre-Petition Wells Fargo Credit Agreement) to the Pre-Petition Lender under the Pre-Petition Credit Agreement; provided that Mr. Mulqueen's maximum liability under the Guaranty Agreement cannot exceed $2,000,000.00.

### 2.  Obligations to Huntington National Bank

Pre-Petition Credit Facility.  As of the Petition Date, Debtors (other than FF Aurora, FF Greenwood, FF Mansfield and Alemit) (collectively, the "Huntington Borrowers") along with certain non-debtor affiliates were party to a certain Business Loan Agreement, dated as of July 14, 2009, (as amended, restated, modified or supplemented from time to time, the "Huntington Credit Agreement"), among the Huntington Borrowers, as borrowers, and The Huntington National Bank, ("Huntington"), as lender.  Pursuant to the Huntington Credit Agreement, Huntington provided the Huntington Borrowers with a term loan in the original principal amount of $2,574,328.04 (the "Term Note").  As of February 4, 2011 the outstanding unpaid principal balance under the Term Note was at least $2,295,728.04.

Security.  Pursuant to that certain Open-End Mortgage dated May 12, 2006 from M&S in favor of Huntington and as security for the Huntington Borrowers' obligations under the Term

9

Note, M&S has mortgaged to all of its respective right, title and interest in and to the Brooklyn Property. As further security for the Term Note, M&S executed an Assignment of Rents with regard to the Brooklyn Property in favor of Huntington.

Non-Debtor Guaranties. Pursuant to a Commercial Guaranty, dated as of July 14, 2009 (as amended, restated, modified or supplemented from time to time, the "Huntington Guaranty Agreement") executed by Mulqueen in connection with the Huntington Credit Agreement, Mulqueen has guaranteed the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of the Huntington Borrowers' obligations under the Term Note; *provided* that Mulqueen's maximum liability under the Huntington Guaranty Agreement cannot exceed $1,287,164.02. Pursuant to a Commercial Guaranty, also dated as of July 14, 2009 (as amended, restated, modified or supplemented from time to time, the "Mulqueen Trust Guaranty Agreement") executed by The Barbara G. Mulqueen Revocable Estate Plan Trust U/A/D June 26, 1998 (the "B. Mulqueen Trust") in connection with the Huntington Credit Agreement, the B. Mulqueen Trust has guaranteed the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of the Huntington Borrowers' obligations under the Term Note; *provided* that the B. Mulqueen Trust's maximum liability under the Mulqueen Trust Guaranty Agreement cannot exceed $1,287,164.02.

3.    Obligations to American Equity Investment Life Insurance Company

Dayton Property. In April, 2006, M&S executed and delivered to American Equity Investment Life Insurance Company ("American Equity") a certain promissory note payable to American Equity in the amount of $4,000,000 ("$4 Million Note"). Pursuant to that certain Open-End Mortgage, Security Agreement, Financing Statement and Assignment of Rents from M&S in favor of American Equities and as security for its obligations under the $4 Million Note, M&S has mortgaged to American Equities all of its respective right, title and interest in and to the Dayton Property. As of February 4, 2011 the outstanding unpaid principal balance under the $4 Million Note was at least $3,523,599.00.

Columbus Property. In April, 2006, M&S executed and delivered to American Equity a certain promissory note payable to American Equity in the amount of $3,400,000 ("$3.4 Million Note"). Pursuant to that certain Open-End Mortgage, Security Agreement, Financing Statement and Assignment of Rents from M&S in favor of American Equities and as security for its obligations under the $3.4 Million Note, M&S has mortgaged to American Equities all of its respective right, title and interest in and to the Columbus Property. As of February 4, 2011 the outstanding unpaid principal balance under the $3.4 Million Note was at least $2,994,999.56.

Non-Debtor Guaranties. Pursuant to a Guaranty Agreement executed by Mulqueen and B. Mulqueen Trust in connection with the $4 Million Note, Mr. Mulqueen and the B. Mulqueen Trust have guaranteed the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of M&S' indebtedness to American Equities under the $4 Million Note (the "American Equities Guaranty Agreement"); *provided* that the guarantors' maximum liability under the American Equities Guaranty Agreement cannot exceed 50% of the principal balance and accrued interest owing under the $4 Million Note.

10

4.     Obligations to SL Investment Holdings 2008-1, LLC

North Canton Property.  On April 27, 2006, Alemit executed and delivered to Sun Life Insurance Company of Canada ("Sun Life") a certain promissory note in the amount of $10,000,000 ("Sun Life Note"). Pursuant to that certain Open-End Mortgage and Security Agreement dated April 27, 2006 in favor of Sun Life and as security for its obligations under the Sun Life Note, Alemit has mortgaged to Sun Life all of its respective right, title and interest in and to the Canton Property.  Also in connection with the Sun Life Note, Alemit executed an Assignment of Leases and Rents dated April 27, 2006 with regard to the Canton Property.  As of February 4, 2011 the outstanding unpaid principal balance under the Sun Life Note was at least $9,077,804.07.

Non-Debtor Guaranties.  Pursuant to a Guaranty Agreement executed by Mulqueen and B. Mulqueen Trust in connection with the Sun Life Note, Mr. Mulqueen and the B. Mulqueen Trust have guaranteed the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of Alemit's indebtedness under the Sun Life Note (the "Sun Life Guaranty Agreement"); *provided* that the guarantors' maximum liability under the Sun Life Guaranty Agreement cannot exceed 35% of the principal balance and accrued interest owing under the Sun Life Note.

C.     **Events Leading Up to the Commencement of the Chapter 11 Cases**

The Debtors have faced a series of unanticipated operational and market challenges that have adversely affected their operations and cash flows.  These challenges have impaired both the Debtors' suppliers and customers, which in turn have severely affected the Debtors' operations and businesses. Furthermore, the general instability of the retail industry has directly harmed the Debtors' liquidity.

As a result of the most recent economic downturn in the retail industry, the Debtors cut any unnecessary costs in order to remain competitive within the industry, including reducing their number of employees and closing certain of their Retail Stores.  Specifically, prior to the Petition Date the Debtors began the liquidation process of FF Aurora, FF Cleveland and FF Mansfield.  Within sixty (60) to ninety (90) days of the Petition Date, the aforementioned Retail Stores were completely liquidated and shut down.  However, even with considerable cost cutting efforts, due to the weak national economy and the weak retail industry, the Debtors could not continue to operate without the protections of the bankruptcy court.

## THE CHAPTER 11 CASES

A.     **Commencement of the Chapter 11 Case**

On February 15, 2011, the Debtors commenced their Chapter 11 cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors have continued to manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On the Petition Date, or shortly thereafter, the Bankruptcy Court approved certain orders to minimize the disruption caused by the chapter 11 filing of the Debtors' business operations to facilitate their reorganization.

11

## B.    Postpetition Operations

After the filing of their Chapter 11 Cases, the Debtors continued to cut costs and reduce inventories in order to operate within the available revenue stream. The Debtors expended substantial effort to stabilize their business and increase the cash flow.

The Debtors continued to maintain their cash management system. As described herein, the DIP Lender and the Debtors entered into the DIP Loan agreement, which allowed the Debtors to pay their postpetition operating expenses.

The Debtors have prepared the monthly Operating Reports as required by the Bankruptcy Code prior to approval of the sale of their assets.

During the pendency of these Chapter 11 Cases, Debtor FF Greenwood, Inc. will cease operations and commence a liquidation process. For this reason, the Projections (as defined below) provided with this Disclosure Statement do not include information or projections related to FF Greenwood, Inc.

## C.    Postpetition Financing

In order to continue operations postpetition, the Debtors filed a motion with the Bankruptcy Court for authorization to obtain postpetition financing and use cash collateral (the "DIP Financing Motion") [Docket No. 16]. On February 18, 2011, the Bankruptcy Court entered an agreed Interim DIP Financing Order [Docket No. 56], which authorized the Debtors to secure debtor-in-possession financing ("DIP Financing"). The Debtors were in need of DIP Financing in order to continue operations through the pendency of the Cases. The Term Lenders and Huntington objected to the DIP Financing Motion. The final hearing was held on March 10, 2011 and all objections were resolved. The final DIP Financing order was entered on March 18, 2011 (the "DIP Order") [Docket No. 136], authorizing the Debtors to enter into the DIP Loan agreement with the DIP Lender.

## D.    Debtors' Professional Advisors

On March 9, 2011, the Bankruptcy Court authorized the retention and appointment of Brouse McDowell, LPA as counsel to the Debtors *nunc pro tunc* to the Petition Date. On March 23, 2011 the Bankruptcy Court authorized the retention and appointment of ARG Recovery, LLC as financial advisor to the Debtors *nunc pro tunc* to the Petition Date. On March 29, 2011 the Bankruptcy Court authorized the retention and appointment of Hall, Kistler & Company, LLP as accountants to the Debtors *nunc pro tunc* to the Petition Date. Further, on April 18, 2011 the Bankruptcy Court authorized the retention and appointment of Spring Realty Company, Inc. d/b/a NAI Spring as commercial leasing broker to the Debtors.

## E.    Appointment of the Creditors' Committee

On February 28, 2011, the office of the United States Trustee (the "Trustee") filed a notice of appointment of the Official Committee of Unsecured Creditors of the Debtors. Official committees appointed under Section 1102 of the Bankruptcy Code have, among other rights, the

12

right (a) to consult with the Trustee concerning the administration of a debtor's estate, (b) to investigate the acts, conducts, assets, liabilities, and financial condition of a debtor, the operation of a debtor's business, and any other matter relevant to a debtor's bankruptcy case or to the formulation of a plan; and (c) to participate in the formulation and acceptance or rejection of a plan. The Committee's members are:

**LORAL ONTARIO PROPERTY, LLC**
c/o Alan Ratliff
2363 Eagle Pass, Suite D
Wooster, OH 44691

**ALLSTATE FLORAL & CRAFT, INC.**
c/o Wendy Zhao
14038 Park Place
Cerritos, CA 90703

**AMSCAN, INC.**
c/o Vita S. Spano
80 Grasslands Rd.
Elmsford, NY 10523

**COX OHIO MEDIA GROUP**
c/o Charles Daker
1611 S. Main St
Dayton, OH 45409

**V&V LAKESHORE, LTD.**
c/o Vincent Fond, Jr.
130 Churchill Rd.
Hubbard, OH 44505

On March 31, 2011, the Bankruptcy Court authorized the Creditors' Committee's retention of Calfee Halter & Griswold, LLP as counsel *nunc pro tunc* as of March 4, 2011. On April 19, 2011 the Bankruptcy Court authorized the Creditors' Committee's retention of BBP Partners, LLC as financial advisors *nunc pro tunc* as of March 17, 2011.

F.    **Bar Dates**

On March 25, 2011, the Bankruptcy Court entered an the Bar Date Order establishing the Bar Date for filing the General and Government proofs of claims and interests. The Court also approved the form and manner of notice of the Bar Date. Pursuant to the Bar Date Order, general proofs of claims and interests incurred, including 503(b)(9) administrative claims, were required to be filed no later than April 29, 2011. Government proofs of claims and interests were required to be filed no later than August 15, 2011. Any entity who is required to file a proof of claim and fails to timely file such proof of claim shall be forever barred, estopped and enjoined from asserting such Claim against the Debtors and the Debtors' Estates.

13

G.     **Debtors' Unpaid Tax Obligations**

The Debtors' unpaid tax obligations are being treated as set forth below in the Payment of Priority Tax Claims.

## THE CREDITOR TRUST AND PLAN IMPLEMENTATION

THE FOLLOWING DISCUSSION OF THE PLAN CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN ITSELF. YOU SHOULD READ THE PLAN BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. CHANGES MAY BE MADE TO THE PLAN. ANY SUCH CHANGES MADE TO THE PLAN WILL BE DESCRIBED AT THE CONFIRMATION HEARING. A copy of the Plan is attached as Exhibit A to this Disclosure Statement.

A.     **Purpose of the Plan**

The plan is being proposed by the Debtors for the purpose of (1) restructuring the Debtors into a viable, sustainable business with the ability to succeed outside of chapter 11 protection, (2) making distributions to the Debtors' creditors, and (3) completing the restructuring for the assumption by the newly consolidated enterprise of new debts to prepetition secured creditors.

B.     **Vesting of the Creditor Trust Assets**

1.      On the Effective Date, automatically and without further action, all Assets of the Debtors, other than the Creditor Trust Assets (and any proceeds thereof) shall vest in the Reorganized Debtors.  Furthermore, on the Effective Date, automatically and without further action, the Creditor Trust Assets (and any proceeds thereof) shall vest in the Creditor Trust for the sole and express purpose of making Distributions to Trust Beneficiaries.

2.      The Debtors have not conducted an investigation of any Recovery Actions or Causes of Action of the Estates. However, according to the Debtors' business records, within the 90 days prior to the Petition Date, transfers were made by the Debtors to various parties (including Insiders) in the approximate total amount of $4,538,585.76. Attached hereto as Exhibit B1 is a list showing the parties, dates and amounts of the specific transfers based upon the Debtors' current business records.[1] These Transfers may be subject to avoidance and recovery under applicable law, including Chapter 5 of the Bankruptcy Code. Any Recovery Actions (or any additional Cause of Action) resulting from these transfers will be reserved and transferred to the Creditor Trust.

---

[1] The actual amounts of these transfers may differ from the amounts identified in the Debtors' business records.  It is the intent of the Debtors and the parties in interest to retain and reserve any Recovery Actions or Causes of Action that arise from these transfers, whether the actual amount of the transfers is the same or different from the amount identified in Exhibit B1, for the benefit of the Creditor Trust to the greatest extent available.  Therefore, all parties that received transfers within the 90 day period referenced are hereby put on notice that those transfers are potentially subject to avoidance and recovery.

3.       Additionally, any Recovery Actions (or any additional Causes of Action) resulting from transfers to any non-Debtor Insiders will be reserved and transferred to the Creditor Trust.  The foregoing includes, but is not limited to, any Recovery Actions to recover transfers made to the non-Debtor Insiders within the period that is four years prior to the Petition Date.  Attached hereto as Exhibit B2 is a list showing the identity of the non-Debtor Insiders and the amounts of the specific transfer received by the non-Debtor Insiders within the period that is four years prior to the Petition Date based upon the Debtors' current business records.[2]  These transfers may be subject to avoidance and recovery under applicable law, including Chapter 5 of the Bankruptcy Code.

4.       Notwithstanding anything contained herein, no release or waiver as to the Debtors or the Reorganized Debtors shall prevent a recovery from a third party, including, but not limited to non-Debtor Insiders, pursuant to 11 U.S.C. § 550.

### C.       Creation of Creditor Trust

On the Effective Date, the Creditor Trust shall be established for the limited purpose of: (i) administering the Creditor Trust Assets, (ii) resolving all Disputed Class 6 Claims as of the Effective Date, and (iii) making all Distributions provided for under the Plan in respect of Class 6 Allowed Claims and all other Claims that may become Class 6 Allowed Claims subsequent to the Effective Date.  The Creditor Trust Agreement is incorporated into the Plan by reference, and it is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation section 301.7701-4(d).  The Creditor Trust shall be governed under the laws of the State of Ohio and the Bankruptcy Court will retain exclusive jurisdiction of the Creditor Trust.

### D.       The Creditor Trustee

The Creditor Trustee shall be designated by the Creditors' Committee, subject to the approval of the Court.  The Creditor Trustee shall be independent of the Debtors. The Creditors' Committee shall file a notice not less than ten (10) days prior to the Confirmation Hearing designating the person who has been selected as the Creditor Trustee, and shall include an affidavit from the proposed Creditor Trustee demonstrating that such individual is "disinterested" (within the meaning of section 101(14) of the Bankruptcy Code). For purposes of this paragraph, no person shall be deemed not "disinterested" merely as a consequence of serving as a Professional retained by the Creditors' Committee in the Chapter 11 Cases.  If approved by the Bankruptcy Court, the person so designated shall become the Creditor Trustee on the Effective Date. The Creditor Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Creditor Trust Agreement.  The Creditor Trustee may be removed by the Bankruptcy Court for cause shown or pursuant to the terms of the Creditor Trust Agreement.

---

[2] The actual amounts of these transfers may differ from the amounts identified in the Debtors' business records.  It is the intent of the Debtors and the parties in interest to retain and reserve any Recovery Actions or Causes of Action that arise from these transfers, whether the actual amount of the transfers is the same or different from the amount identified in Exhibit B2, for the benefit of the Creditor Trust to the greatest extent available.  Therefore, all non-Debtor Insiders that received transfers within the four year day period referenced are hereby put on notice that those transfers are potentially subject to avoidance and recovery.

## E.     Funding of Creditor Trust

1.     On the Effective Date, the Debtors shall transfer, convey and/or grant all right, title, interest and control in the Creditor Trust Assets to the Creditor Trust, and all Creditor Trust Assets shall automatically and irrevocably vest in the Creditor Trust without further action on the part of the Debtors, the Creditor Trustee, or the Bankruptcy Court, and with no reversionary interest in the Debtors.

2.     On the Effective Date, the Creditor Trust will be established by the Plan and funded with Creditor Trust Cash. The Creditor Trust Cash shall be paid to the Creditor Trust in the following manner. On the Effective Date, the Reorganized Debtors will make an initial Cash payment in the amount of $225,000 to the Creditor Trust. The balance of the Creditor Trust Cash, $1,664,000, shall be paid to the Creditor Trust by the Reorganized Debtors, jointly and severally, in quarterly payments (the "Trust Payments") amortized over five (5) years with no interest as set forth on Exhibit C and incorporated herein. Further, on the Effective Date, Flower Factory, Inc. will execute the Creditor Trust Note.

3.     The transfer of the Creditor Trust Assets to the Creditor Trust shall be made for the benefit and on behalf of all Trust Beneficiaries entitled to receive Distributions directly from the Creditor Trust and as incorporated herein. The Creditor Trust Assets will be treated for tax purposes as being transferred by the Debtors to the Trust Beneficiaries entitled to receive Distributions from the Creditor Trust in exchange for their Allowed Class 6 Claims, and then by the Trust Beneficiaries entitled to receive Distributions from the Creditor Trust under the Plan to the Creditor Trust in exchange for a beneficial interest in the Creditor Trust. Such Trust Beneficiaries shall be treated as the grantors and owners of the Creditor Trust. Upon the transfer of the Creditor Trust Assets, the Creditor Trust shall succeed to all of the Debtors' rights, title, control and interest in the Creditor Trust Assets, and the Debtors will not have any further interest in or with respect to the Creditor Trust Assets.

4.     Upon the transfer of the Creditor Trust Assets to the Creditor Trust, the Debtors and their Estates shall have no other or further rights or obligations with respect to the Creditor Trust except as specifically set forth in the Plan; provided, however, that the Reorganized Debtors will make reasonable efforts to cooperate with the Creditor Trustee in achieving and effectuating the intent and purpose of the Creditor Trust, including but not limited to, providing documents and information relating to the Creditor Trust Assets.

## F.     The Trust Advisory Board

1.     An advisory board (the "Trust Advisory Board") shall be created for the Creditor Trust and shall be comprised of at least two (2) members, each of whom shall be designated by the Creditors' Committee. The Creditors' Committee shall file notice of the identities of such members with the Bankruptcy Court not less than ten (10) days prior to the Confirmation Hearing.

2.     The Trust Advisory Board shall adopt such bylaws as it may deem appropriate. The Creditor Trustee shall consult regularly with the Trust Advisory Board when carrying out the purpose and intent of the Creditor Trust. In the event of the resignation or removal of the

16

Creditor Trustee, the Trust Advisory Board shall, by majority vote, designate a person to serve as successor Creditor Trustee.

3.     The members of the Trust Advisory Board shall be entitled to reimbursement of the reasonable and necessary expenses incurred by them in carrying out the purpose of the Creditor Trust in accordance with the Creditor Trust Agreement. Such reimbursement shall be payable solely from the Creditor Trust Assets.

4.     Upon the certification by the Creditor Trustee that the Creditor Trust Assets have been liquidated, distributed, abandoned, or otherwise disposed of, the members of the Trust Advisory Board shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

## G.     Responsibilities of Creditor Trustee

1.     The Creditor Trustee will be in control of and authorized and empowered to carry out the terms and conditions of this Plan and the Creditor Trust and will have those responsibilities created by this Plan and the Creditor Trust upon the terms and conditions summarized therein, and will, for the benefit of the Trust Beneficiaries, exercise the rights and powers vested in it by this Plan and the Creditor Trust in the same manner, and use the same degree of care and skill in their exercise as a prudent person would exercise and use under the circumstances in the conduct of its/his own affairs, and further agrees to receive and disburse all of the Creditor Trust Assets in accordance with the terms thereof and this Plan.  More specifically, Creditor Trustee shall have the right, control, power, authority, standing and approval and shall be empowered to:

(a)  perform all of the obligations and agreements, including the Creditor Trust Agreement and the Creditor Trust Note provided for and incorporated herein;

(b)  keep and maintain in a trust account for the benefit of the Creditor Trust into which Creditor Trust Cash and Recovery Action Proceeds resulting from all or any part of the liquidation of Creditor Trust Assets;

(c)  keep and maintain trust accounts for the benefit of the Creditor Trust into which accounts the Trustee may place the Disputed Reserves;

(d)  commence, continue, prosecute, litigate and/or settle and compromise Recovery Actions on behalf of the Creditor Trust and for the benefit of the Trust Beneficiaries thereof;

(e)  to object to any Class 6 Claims (disputed or otherwise), and to compromise or settle any Claims prior to, during or after objection and/or to seek Bankruptcy Court approval for any settlements of Class 6 Claims;

(f)  make Distributions in respect of Allowed Class 6 Claims and all other Claims that become Allowed Class 6 Claims subsequent to the Effective Date in accordance with the Plan;

17

(g) retain and/or terminate professional persons, in his sole discretion, to assist in the duties and responsibilities ascribed to him under this Plan and the Creditor Trust. Creditor Trust Expenses, including the reasonable fees and expenses of all professionals retained by the Creditor Trustee shall be paid first from the Creditor Trust Assets. Professionals of the Creditor Trustee may reserve in their client trust accounts amounts sufficient to pay such fees and expenses from the Creditor Trust Assets;

(h) satisfy all reporting requirements for the Creditor Trust, and all assets held by or on behalf of the Creditor Trust, to the relevant reporting authority;

(i) file with the Bankruptcy Court semi-annual reports regarding the liquidation or other administration of property comprising the Creditor Trust Assets, the Distributions made by it, and other matters required to be included in such report; and

(j) except as otherwise ordered by the Bankruptcy Court, and subject to the terms of the Plan, pay any fees and expenses incurred by the Creditor Trust on or after the Effective Date in accordance with the Creditor Trust Agreement.

2.      Subject to the other terms of the Plan and the Creditor Trust, the Creditor Trustee shall also have the right, control, power, authority, standing and approval to commence, continue, prosecute, litigate and/or settle and compromise Recovery Actions. The Creditor Trustee shall also have the right, standing and approval to object to the allowance of any Class 6 Claim.

3.      The Creditor Trustee may, in his sole discretion, and without order of the Bankruptcy Court, allow the Trust Advisory Board to commence, continue, prosecute, litigate and/or settle and compromise any Recovery Actions against third parties (including, but not limited to, Insiders and the Barbara Mulqueen Trust) on behalf of the Creditor Trust.

## H.      Claims Against Creditor Trust

All persons having any Claim against the Creditor Trust or its Professionals (which for purposes of this Article 3, the term "Professionals" shall also include the Trust Advisory Board and the Professionals employed by the Creditor Trustee) in connection with its performance of its rights, powers and duties as such shall only look to the Creditor Trust and the Creditor Trust Assets for payment or satisfaction thereof.

## I.      Commingling of Assets and Creditor Trust Proceeds

The Creditor Trustee shall not commingle any of the Debtors' Assets or the Creditor Trust Assets with its own property or the property of any other person.

## J.      Reliance on Others

The Creditor Trustee may rely upon and shall be protected in acting or refraining from acting upon any certificates, opinions, statements, instruments or reports believed by it to be genuine and to have been signed or presented by the proper person or persons, provided,

18

however, that the Creditor Trustee shall be under a duty to have examined the same to determine whether or not such writings conform to the requirements of this Plan.

**K.     Liability for Errors and Omissions**

The Creditor Trust, Creditor Trustee, the Trust Advisory Board and all Professionals, and agents of same, shall not be liable for any error of business judgment or with respect to any action taken or omitted to be taken by it, unless it shall be proved that they or their agents shall have been grossly negligent or shall have acted with willful misconduct in ascertaining the pertinent facts or in performing any of their rights, powers or duties according to this Plan and the Creditor Trust. In the event gross negligence and willful misconduct is proven, the Trust Beneficiaries shall be entitled to reimbursement of their reasonable costs, including attorneys' fees. Neither the Creditor Trustee, nor the Trust Advisory Board, make any representations as to: (i) the value or condition of the Creditor Trust Assets or any part thereof, (ii) the dollar amount, if any, which may be collected as a result of pursuing Recovery Actions (iii) the amount at which Liabilities may be settled, (iv) the amount of any Distributions to be made in accordance with this Plan from the Creditor Trust Assets and (v) the security afforded by this Plan, or as to the validity, execution (except its own execution), enforceability, legality or sufficiency of this Plan, and the Creditor Trustee, the Trust Advisory Board and all Professionals shall incur no liability or responsibility in respect of such matters.

**L.     Indemnification**

The Creditor Trustee, Trust Advisory Board, their Professionals and agents shall be indemnified by and receive reimbursement from the Creditor Trust Assets (whether or not Distributed to the Trust Beneficiaries) against and from any and all loss, liability, cost, damage or expense which it may incur or sustain in the exercise and performance of any of its powers and duties pursuant to this Plan and Creditor Trust unless such loss, liability, cost, damage or expense shall be incurred or sustained as a result of the gross negligence or willful misconduct of the Creditor Trustee, Trust Advisory Board, or their Professionals and agents. All Claims of Creditor Trustee, Trust Advisory Board, their Professionals or agents for indemnification or reimbursement under this Article 3 shall be first offset against any portion of the Creditor Trust and the Assets of the Debtors including, but not limited to, the Creditor Trust Proceeds or, at Creditor Trustee's discretion, against any payment or Distribution made or to be made in accordance with this Plan.

**M.     Tax Treatment of the Creditor Trust**

Creditor Trustee may pay taxes from the Creditor Trust Assets as appropriate. In addition, the Creditor Trust shall require consistent valuation of the property contributed to the Creditor Trust by the Creditor Trustee and the Beneficiaries for all federal income tax purposes. The Creditor Trust is intended to be treated for federal income tax purposes as a liquidating trust for the benefit of creditors or claimants within the meaning of Treasury Regulations section 301.7701-4(d) and in accordance with IRS Revenue Procedure 94-45, and, as a grantor trust under Section 677 of the Internal Revenue Code of 1986, as amended. Accordingly, the Creditor Trust Assets in respect of holders of Class 6 Claims shall be treated for all purposes of the Internal Revenue Code as (i) a transfer of such Distribution to such Class 6 creditors who are the

Trust Beneficiaries of the Creditor Trust; and (ii) a transfer to the Creditor Trust by the Beneficiaries, who will be treated as the grantors and deemed owners of the Creditor Trust Assets. The Creditor Trustee shall be responsible for filing all federal, state, and local tax returns for the Creditor Trust as a grantor trust pursuant to applicable Treasury Regulations, including Treasury Regulation Section 1.671-4(a), and any income of the Creditor Trust will be treated as subject to tax on a current basis. Subject to the receipt of any definitive guidance of the IRS or the Bankruptcy Court, any claims reserve is intended to qualify and be treated as a disputed ownership fund pursuant to Proposed Treasury Regulation Section 1.468B-9. As such, any disputed claims reserve shall report and pay any taxes on its income, the Creditor Trustee shall act as the "administrator" of the disputed ownership fund, and the disputed claims reserve shall be subject to the continuing jurisdiction of the Bankruptcy Court. Currently, no money or other property shall be Distributed to any Person holding a Disputed Claim except to the extent that such Disputed Claim becomes an Allowed Claim pursuant to the Plan.

**N.    Investment Authority**

The Creditor Trustee shall have investment powers which are limited to those powers reasonably necessary to maintain the value of the Creditor Trust assets and to further the liquidating purpose of the trust as further described in IRS Revenue Procedure 94-45.  The Creditor Trustee may only invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury Bills as specified in Revenue Procedure 94-45. Income earned on investments shall be deemed a part of the Creditor Trust Assets.  Further, the Creditor Trustee shall be required to distribute at least annually to the Trust Beneficiaries (as such may have been determined at such time) its net income (net of Taxes paid, if any), except for amounts retained as reasonably necessary to maintain the value of the Creditor Trust Assets or to meet claims and contingent liabilities.

**O.    Exemption from Certain Transfer Taxes**

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers from the Debtors, Reorganized Debtors, or the Creditor Trust to any Entity pursuant to the Plan in the United States shall not be taxed under any law imposing a stamp tax or other similar tax.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan.

**P.    Termination**

Termination of the Creditor Trust shall occur no later than five (5) years after the Effective Date, unless the Bankruptcy Court shall approve an extension based upon a finding that such an extension is necessary for the Creditor Trust to complete its purpose.

**Q.    Privileges**

The Debtors shall irrevocably transfer to the Creditor Trustee, all rights of the Debtors' Estates to exercise or waive any privilege, including the attorney-client privilege, accountant-client privilege, work-product privilege or other privilege or immunity attaching to any document or

20

communication (whether written or oral) relating to the Recovery Actions (collectively, the "Privileges"), and the Debtors' Estates and the Creditor Trustee are authorized to take all necessary actions to effectuate the transfer of the Privileges. All such Privileges also shall vest in the Creditor Trust and its representatives, to the full extent permitted under law. This transfer is self-executing as of the Effective Date. Additionally, the Creditor Trustee and the Debtors' Estates are authorized and directed to take any and all actions to effectuate the transfer of such Privileges. Notwithstanding the foregoing, the Debtors are not waiving or transferring, and nothing in this paragraph shall be deemed to waive or transfer to the Creditor Trust, any privilege not directly relating to the Recovery Actions.

### R. Cooperation

The Debtors and the Reorganized Debtors shall provide the Creditor Trustee and the Creditor Trust with any information reasonably requested by the Creditor Trustee or the Creditor Trust; provided however, that the actual expenses incurred by the Debtors or the Reorganized Debtors in providing such information shall be reimbursed by the Creditor Trustee from the Creditor Trust. Moreover, neither the Debtors nor the Reorganized Debtors shall destroy or dispose of any documents or information relating to the debtors' pre-petition financial transactions, payments or accounts for a period of 2 years after the Effective Date.

### S. Substantive Consolidation

#### 1. Consolidation for Plan Purposes Only

Pursuant to the Confirmation Order, the Bankruptcy Court shall approve the substantive consolidation of the Debtors, subject to the provisions below. Pursuant to the Confirmation Order; (1) all Assets and Liabilities of the Debtors will be deemed merged; (2) all guaranties by one Debtor of the obligations of any other Debtor will be deemed eliminated so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor and any joint or several Liability of any of the Debtors will be deemed to be one obligation of the Debtors; (3) each and every Claim filed or to be filed in the Chapter 11 Case of any of the Debtors (other than the Chapter 11 Case of a Real Estate Debtor) will be deemed filed against the Consolidated Estates and will be deemed one Claim against and a single obligation of the Consolidated Estates; and (4) all intercompany claims among the Debtors will be eliminated and extinguished. Notwithstanding the foregoing, (a) on the Effective Date, the Debtors, other than the Dissolved Debtors, shall emerge as distinct and separate Reorganized Debtors, and (b) such substantive consolidation (or any other term or provision of this Plan or the Confirmation Order) shall not, and shall not be deemed, determined or interpreted to, (a) make any Real Estate Debtor (including as a Reorganized Debtor) or its Assets liable for any Administrative Claim or other Claim now or hereafter owed by any other Debtor or Reorganized Debtor, (b) cause the Assets of a Real Estate Debtor (including as a Reorganized Debtor) to become encumbered by or subject to any lien, mortgage, assignment of rents, security interest, or other encumbrance, whether now existing or hereafter arising, against or granted by any other Debtor or Reorganized Debtor, or (c) alter, limit, or otherwise affect in any manner or to any degree whatsoever the Secured Claims, liens, assignments of leases and rents, and security interests of either of the Term Lenders against its respective Real Estate Debtor.

21

The Filing of this Plan serves as a motion seeking entry of an order consolidating the Estates of the Debtors to the extent, and subject to the provisions, set forth above. Unless an objection to such consolidation is made in writing by any creditor affected by the Plan, filed with the Bankruptcy Court and served on the parties listed in Section X.E of the Plan on or before five days before either the Voting Deadline or such other date as may be fixed by the Bankruptcy Court, the consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto shall occur at or before the Confirmation Hearing. Any such consolidation order must be in form and substance reasonably acceptable to each of the Term Lenders.

2. Post-Effective Date Status

Except as otherwise provided herein (including with respect to the Restructuring Transactions described herein): (1) on the Effective Date, each Debtor, other than the Dissolved Debtors, will, re-emerge as separate legal entities; and (2) on the Effective Date, all property of the Estates of each Debtor, and any property acquired by a Debtor or a Reorganized Debtor under the Plan will vest in the applicable Reorganized Debtor free and clear of all Claims, liens, charges, other encumbrances, Equity Interests and other interests, other than the liens, claims and encumbrances specifically provided for in the Plan. On the Effective Date, the Debtors' Estates, other than Flower Factory, Inc., shall be closed without further order of this Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

3. Dissolution of the Dissolved Debtors

On the Effective Date, the Dissolved Debtors shall be deemed dissolved.

**T.     Restructuring Transactions**

1.     Restructuring Transactions Generally

On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into the following Restructuring Transactions, in accordance with applicable non-bankruptcy law: (1) the dissolution of the Dissolved Debtors; (2) the cancelation and extinguishment of the existing Equity Interests in ALEMIT Properties, LLC and the reissuance of all equity interests to Mulqueen Holdings, Inc; and (3) the cancelation and extinguishment of the existing equity interests in Mulqueen Holdings, Inc. and the reissuance of such equity interests in accordance with Exhibit D.

2.     Exit Loan and Term Loan Modification Documents

On the Effective Date, the Reorganized Debtors shall enter into the Exit Financing Agreement, shall execute and deliver to American Equity the American Equity Term Loan Modification Documents, and shall execute and deliver to SL Investment the SL Investment Term Loan Modification Documents. Debtors anticipate that the Exit Financing Facility will be

22

a $3,500,000 line of credit with advances at 85% of eligible accounts receivable and 56% of eligible inventory.

3. Obligations of the Reorganized Debtors

The Restructuring Transactions will result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of the Debtors vesting in the Reorganized Debtors, save for those for which specific provisions to the contrary are made in the Plan or as the applicable parties shall agree.

**U. Retirement and Other Related Agreements; Cessation of Retiree Benefits; Workers' Compensation Programs**

As of the Effective Date, the Reorganized Debtors will have authority to: (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active employees.

**V. Corporate Action**

The Restructuring Transactions; the adoption of new or amended and restated certificates of incorporation and bylaws (or comparable constituent documents) for the Reorganized Debtors and the certificate of designations for the Reorganized Debtors; the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; the adoption, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, retirement income plans, welfare benefit plans and other employee plans and related agreements, if any, and the other matters provided for under the Plan involving the corporate structure of the Debtors and Reorganized Debtors or corporate action to be taken by or required of a Debtor or Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the owners or directors of the Debtors or the Reorganized Debtors.

**W. Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, including the Exit Financing Agreement, the American Equity Term Loan Documents (including as modified by the American Equity Term Loan Modification Documents), and the SL Investment Term Loan Documents (including as modified by the SL Investment Term Loan Modification Documents), on the Effective Date (and except as specified in the treatment provided for Claims and Equity Interests in Article II), all mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns. As of the Effective Date, and subject to the provisions hereof, the

Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement the provisions of this section.

### X.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

Christopher J. Mulqueen will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp tax, real estate transfer tax, mortgage recording tax, sales or use tax or similar tax: (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to the Plan.

### Y.    Exit Facility

The Exit Facility is the revolving secured lending facility with Wells Fargo that will be entered into by the Reorganized Debtors on the Effective Date. The Reorganized Debtors will enter into the Exit Facility and receive the proceeds thereof. The Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility and to take all actions contemplated thereby.

### Z.    Preservation of Rights of Action

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, pursuant to section 1123(b) of the Bankruptcy Code, the Reorganized Debtors may retain and may enforce any claims, rights, and causes of action that any Debtors or the Estates may hold against any entity, and any other claim or cause of action, of any kind or nature, arising under state or federal law, whether or not filed prior to the Effective Date.

### RELEASE, INJUNCTIVE AND RELATED PROVISIONS

### A.    Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable, and in the best interests of the Debtors, Estates, and holders of Claims.

B.      **Discharge of Claims and Termination of Equity Interests**

1.      **Complete Satisfaction, Discharge and Release**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Equity Interests arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date: (i) discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (A) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (C) the holder of a Claim based on such debt has accepted the Plan; and (ii) terminate all Equity Interests and other rights of holders of Equity Interests in the Debtors.

2.      **Discharge and Termination**

In accordance with the foregoing, except as provided in the Plan, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and Liabilities against the Debtors and a termination of all Equity Interests and other rights of the holders of Equity Interests in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Equity Interest.

C.      **Releases**

1.      **Release of Debtors by Other Debtors**

**As of the Effective Date, each of the Debtors, individually and in their capacity as a Reorganized Debtor, shall release each other from any and all Liabilities that they are entitled to assert against each other, in any way relating to obligations by and between the Debtors, their Chapter 11 Estates, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any Plan, or the property to be distributed under the Plan, the Disclosure Statement, any contract, employee pension or other benefit plan, instrument, release or other agreement or document related to any Debtor, the Chapter 11 Cases or the Estates created, modified, amended, terminated or entered into in connection with the Plan.**

2.      **General Releases by Holders of Claims or Interests**

**Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim will be deemed to forever release, waive**

25

and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, or the Disclosure Statement that such entity has, had or may have against any Released Party in any derivative capacity (which release will be in addition to the discharge of Claims and termination of Equity Interests provided herein and under the Confirmation Order and the Bankruptcy Code). For avoidance of doubt, this provision does not operate to release the individual non-derivative claims of individual creditors against Released Parties nor claims of any of the Term Lenders against non-debtor parties on account of guaranties or indemnity agreements in connection with the American Equity Term Loan Documents or the SL Investment Term Loan Documents.

3.    Exculpation

From and after the Effective Date, the Released Parties, the Committee, Wells Fargo, each of the Term Lenders and the Creditor Trustee and its members and Representatives, acting in such capacity, shall neither have nor incur any liability to any Person for any act taken or omitted in connection with the Debtors' restructuring, including the formulation, preparation, dissemination, implementation, confirmation or approval of the Chapter 11 Cases, Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that this section shall not apply to the obligations arising under the Plan and *provided further, however*, that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent that act or omission is determined in a Final Order to have constituted fraud, bad faith, gross negligence or willful misconduct. Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

D.    Injunction

On the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order,

1.    All Persons who have been, are or may be holders of Claims against or Equity Interests in a Debtor shall be enjoined from taking any of the following actions against or affecting a Debtor, its Estate or its Assets (including, but not limited to the Purchased Assets) with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):

a.    commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against a Debtor, its Estate, its Assets or any direct or indirect successor in interest to a Debtor, or any assets or property of such successor (including, without limitation, all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

b.    enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against

a Debtor, its Estate or its Assets or any direct or indirect successor in interest to a Debtor, or any assets or property of such successor;

        c.       creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien against a Debtor, its Estate or its Assets, or any direct or indirect successor in interest to a Debtor, or any assets or property of such successor other than as contemplated by the Plan;

        d.       except as provided herein, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Debtor, its Estate or its Assets, or any direct or indirect successor in interest to a Debtor, or any assets or property of such successor; and

        e.       proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan.

        2.       All Persons that have held, currently hold or may hold any Liabilities released or exculpated, will be permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) except as provided herein, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

## RISK FACTORS

The implementation of the Plan on the Effective Date is subject to a number of material risks, including (1) those enumerated below and (2) risks and uncertainties not presently known to the Debtors. Prior to voting on the Plan, each party entitled to vote should carefully consider these risks, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto.

1.      **Projections**

The Projections (as defined below) attached to this Disclosure Statement are inherently uncertain and are dependent upon the successful implementation of the Debtors' business plan and the reliability of the assumptions contained in the business plan. The Projections reflect numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions and other matters, most of which are beyond the control of the Reorganized Debtors and some of which may not materialize. Unanticipated events and circumstances occurring subsequent to the preparation of the

Projections may affect the actual financial results of the Reorganized Debtors. Therefore, the actual results achieved throughout the periods covered by the Projections may vary from the projected results. These variations may be material and adverse.

## 2. Treatment of Claims

The estimates of Allowed Claims in this Disclosure Statement are based on the Debtors' preliminary review of Claims filed in the Cases and their books and records. Upon the passage of all applicable bar dates, the further analyses of the proofs of Claim, the completion of Claims litigation and related matters, the total Claims that ultimately become Allowed Claims in the Cases may differ from the Debtors' estimates, and such difference could be material.

## 3. Non-Confirmation of Plan

Certain parties in interest may file objections to the Plan in an effort to persuade the Bankruptcy Court that the Debtors have not satisfied the confirmation requirements under sections 1129(a) and (b) of the Bankruptcy Code. However, even if (a) no objections are filed or (b) all impaired Classes of Claims and Equity Interests accept or are deemed to have accepted the Plan, the Bankruptcy Court, which can exercise substantial discretion, may determine that the Plan does not meet the requirements for confirmation under sections 1129(a) and (b) of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code requires, among other things, (a) a demonstration that the Confirmation of the Plan will not be followed by liquidation or need for further financial reorganization of the Debtors, except as contemplated by the Plan, and (b) that the value of distributions to parties entitled to vote on the Plan who vote to reject the Plan not be less than the value of distributions such creditors and equity security holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan meets the requirements for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## DISTRIBUTIONS UNDER THE PLAN

### A. General

Except as otherwise provided herein or as may be ordered by the Bankruptcy Court, the Creditor Trustee and the Reorganized Debtors, as the case may be, shall make Distributions on the Effective Date or as soon as reasonably practicable thereafter on account of all Allowed Claims that are entitled to receive Distributions under the Plan, and, from time to time, shall make further Distributions to holders of Claims that subsequently are determined to be Allowed Claims.

### B. Means of Cash Payments

Cash payments made pursuant to the Plan will be in U.S. dollars by checks drawn on a domestic bank selected by the Creditor Trustee or the Reorganized Debtors, as the case may be, or by wire transfer from a domestic bank, at the option of the Creditor Trustee or the Reorganized Debtors, as the case may be.

### C. Method of Distributions to Holders of Claims and Equity Interests

#### 1. Distributions to Secured Creditors

The Reorganized Debtors will make all Distributions of Cash and other instruments or documents to holders of Claims in Classes 1 through 5 required by the Plan.

#### 2. Distributions to Unsecured Creditors

The Creditor Trustee will make all Distributions of Cash and other instruments or documents to holders of Allowed Claims in Class 6 required by the Plan.

#### 3. Distributions to Holders of Allowed Interests

No Distributions will be made to the holders of Class 7 Interests.

#### 4. Distributions to Unclassified Creditors

The Reorganized Debtors will make all Distributions of Cash and other instruments or documents to holders of Allowed Administrative Claims, DIP Claims, and Allowed Priority Tax Claims required by the Plan.

#### 5. Address of Record

The address of the holder of a Claim shall be, for purposes of Distributions made pursuant to the Plan, the address set forth in any proof of Claim filed by such holder, or, in the absence of such a proof of Claim, the address set forth in the Debtors' books and records.

#### 6. Undeliverable Distributions

In the event that the Distribution to any holder of an Allowed Claim is returned as undeliverable, the Creditor Trustee or Reorganized Debtors will: (i) hold such Distribution for a period of six months after the date upon which Distribution was first attempted, or such other period as may be ordered by the Bankruptcy Court on application by the Creditor Trustee or (ii) if the six-month period expires more than 90 days after the final Distribution has been made on Allowed Claims, the Creditor Trustee or the Reorganized Debtors, as the case may be and in their sole discretion, may stop payment on any Distribution check remaining unpaid, and any such monies shall be donated to a nationally recognized charitable organization and disposed of under chapter 129 of Title 28. If the Creditor Trustee or Reorganized Debtors receive written notice within such six-month or 90-day period of such holder's then current address, then the undelivered Distribution, without interest, will be made to that address. Any and all Distributions that remain undelivered after such six month or 90-day period, as the case may be, shall be made available for further Distribution or abandonment and any Claims represented thereby shall be discharged and forever barred.

29

### 7. Distributions Withheld for Disputed Claims

Other than as provided herein, the Reorganized Debtors or Creditor Trustee shall reserve Cash from Distributions to holders of Allowed Claims equal to the Distributions to which holders of Disputed Claims would be entitled if such Disputed Claims become Allowed Claims.

### 8. Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Reorganized Debtors or Creditor Trustee shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements. For tax purposes, Distributions received by holders in full or partial satisfaction of Allowed Claims will be allocated first to unpaid interest that accrued on such Claims, with any excess allocated to the principal amount of Allowed Claims.

### D. Minimum Distribution

Any other provision of the Plan notwithstanding, the Reorganized Debtors or Creditor Trustee will not be required to make Distributions of Cash less than $25 in value, and each such Claim to which this limitation applies shall be discharged and its holder forever barred from asserting that Claim against the Debtors' Estates or the Reorganized Debtors.

### E. Setoffs

The Debtors, Reorganized Debtors or Creditor Trustee may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant hereto on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), the Equity Interests, rights and Causes of Action of any nature that the Debtors, Reorganized Debtors or Creditor Trustee may hold against the holder of any such Allowed Claim; *provided that* neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, Reorganized Debtors or Creditor Trustee of any such Equity Interests, rights and Causes of Action that the Debtors, Reorganized Debtors or Creditor Trustee may possess against any such holder, except as specifically provided herein.

### F. Resolution of Disputed Claims

### 1. Objections to Claims

All objections to Claims must be filed and served on the holders of such Claims, and any amendment to the Schedules to reduce the scheduled Claim of such holder, must be made by the Debtors or the Reorganized Debtors by the Claims Objection Bar Date. If an objection has not been filed to a Claim or an amendment has not been made to the Schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the particular Claim will be treated as an Allowed Claim if such Claim has not been allowed earlier.

### 2. Authority to Prosecute Objections

#### a. Objections Filed Prior to the Effective Date

After the Confirmation Date, but prior to the Effective Date, the Debtors and the Creditors' Committee will have the authority to file, settle, compromise, withdraw or litigate to judgment objections to Claims.

#### b. Objections Filed On or After the Effective Date

On or after the Effective Date, the Creditor Trustee will have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment objections to Class 6 Claims and Debtors, Reorganized Debtors or the Creditor Trustee will each have authority to file, settle, compromise, withdraw or litigate to judgment objections to Administrative Claims, Priority Tax Claims or Other Priority Claims.

#### c. Settlement or Compromise of Disputed Claims On or After the Effective Date

From and after the Effective Date, the Creditor Trustee may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim of $50,000 (in the aggregate) or less without approval of the Bankruptcy Court. Reorganized Debtors shall provide Wells Fargo with monthly reports detailing any settlements or compromises relating to Administrative Expenses, Priority Tax Claims or Other Priority Claims.

### 3. Authority to Amend Schedules

The Debtors or Reorganized Debtors, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make Distributions based on such amended Schedules without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor or Reorganized Debtors will provide (a) the holder of such Claim and the Creditor Trustee with notice of such amendment and such parties will have 21 days to file an objection to such amendment with the Bankruptcy Court. If no such objection is filed, the Creditor Trustee or Reorganized Debtors may proceed with Distributions based on such amended Schedules without approval of the Bankruptcy Court.

## G. Distributions on Account of Disputed Claims Once Allowed

Distributions on account of Disputed Claims that become Allowed Claims after the Effective Date shall be made in accordance with Article V of the Plan.

## H. Claims Estimation

The Reorganized Debtors or Creditor Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will

retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtors or Creditor Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## I.      Payments and Distributions on Disputed Claims

Notwithstanding any provision herein to the contrary no partial payments and no partial Distributions will be made with respect to a Disputed Claim until the resolution of any such disputes by settlement or Final Order. On the date or, if such date is not a Business Day, on the next successive Business Day that is twenty (20) calendar days after the end of the calendar quarter in which a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim will receive all payments and Distributions to which that holder is then entitled under the Plan. Notwithstanding the foregoing, any holder of both an Allowed Claim and a Disputed Claim in the same Class of Claims will not receive payment or Distribution in satisfaction of any such Allowed Claim, except as otherwise decided by the Reorganized Debtors or the Creditor Trustee, as the case may be and in their sole discretion or ordered by the Bankruptcy Court, until all such Disputed Claims are resolved by settlement or Final Order. In the event that there are Claims that require adjudication or other resolution, the Reorganized Debtors and the Creditor Trustee reserve the right to, or shall upon an order of the Bankruptcy Court, establish appropriate reserves for potential payment of any such Claims.

## J.      Claims Allowance

Except as expressly provided herein or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim. Except as expressly provided in the Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors and the Creditor Trustee will have and shall retain after the Effective Date any and all rights and defenses that the Debtors had with respect to any Claim as of the Petition Date. All Claims of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed disallowed as of the Effective Date unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as the case may be.

32

## GENERAL INFORMATION REGARDING THE PLAN

### A.  Classification and Treatment of Claims and Equity Interests

#### 1.  In General

All Claims and Equity Interests, except DIP Claims, Administrative Claims and Priority Tax Claims, are placed in the following Classes.  In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the following Classes.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest is also classified in a particular Class only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

### UNCLASSIFIED CLAIMS

### B.  Administrative Claims

Administrative Claims include Claims for costs and expenses of administration allowed under sections 503(b) and 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Debtors' Petition Date of preserving the Estate and operating the business of the Debtors (such as wages, salaries, commissions for services, and payments for inventories, leased equipment, and premises); (b) claims under section 507(b) of the Bankruptcy Code arising from Debtors' failure to provide a secured lender with adequate protection  for Debtors' cash collateral; (c) compensation for legal, financial, and business advisory, accounting, and other services and reimbursement of expenses awarded or allowed under section 330(a) or 331 of the Bankruptcy Code; (d) claims under section 503(b)(9) of the Bankruptcy Code arising from a claim for the value of goods received by the Debtors within twenty (20) days prior to February 15, 2011; and (e) all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930. The United States Trustee fees, if any exist, will be paid in full on the Effective Date.

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each holder of an Allowed Administrative Claim will receive, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim on (a) the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (b) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (c) at such time and upon such terms as may be agreed upon by such holder and the Reorganized Debtor; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided*, *however*, that Administrative Claims do not include Claims filed after the Administrative Bar Date, unless otherwise provided by a separate Final Order of the Bankruptcy Court.

Allowed Administrative Claims based on Liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtors business and Administrative Claims of governmental units for taxes (including tax audit Claims related to tax years or portions thereof ending after the Petition Date) will be paid by the Reorganized Debtors, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.

The administrative expenses of the Debtors which will have to be paid in cash on or about the Effective Date, excluding Priority Tax Claims, are primarily for Professional Fees. The Debtors believe that administrative expenses, exclusive of the DIP Claims, will not exceed approximately $1,403,654.41. The Administrative Claims include the estimate of the Allowed Section 503(b)(9) claims in the approximate amount of $642,021.00.

Further, the Debtors anticipate that the DIP Claims will be paid in full through the Exit Facility. As of May 5, 2011, the DIP Claims was an amount not less than $1,922,937.07. On the Effective Date, or as soon as practicable thereafter, Wells Fargo will receive, in full satisfaction of the DIP Claims, Cash equal to the amount of the DIP Claims payable from the Exit Loan.

The Debtors estimate the Professional Fees will be approximately $761,663.41 based upon the following estimations:

| Professional | Estimated Fees/Expenses |
|---|---|
| Brouse McDowell, LPA | $325,003.05[3] |
| ARG Recovery, LLC | $140,857.00 |
| Hall, Kistler & Company, LLP | $52,211.00 |
| Calfee Halter & Griswold, LLP | $166,690.89 |
| BBP Partners, LLC | $76,901.47 |

## C.     Priority Tax Claims

1.     *Value of Priority Tax Claims.* As of the date hereof, the Claims Bar Date for governmental units has not passed and is set for August 15, 2011. As of the date hereof, the value of Priority Tax Claims filed against the Debtors is approximately $386,718.98. Upon a preliminary review of the Priority Tax Claims, the Debtors believe the value of the Allowed Priority Tax Claims, if any, to be less than $80,000.

2.     *Payments.*     Each holder of an Allowed Priority Tax Claim against a Debtor due and payable on or prior to the Effective Date will receive on account of such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, regular installment payments in Cash: (a) of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (b) which total value shall include, if applicable, simple interest to accrue on any outstanding

---

[3] As of filing this Disclosure Statement, Brouse McDowell has a retainer of approximately $85,224.00. Brouse McDowell intends to apply this retainer to compensation as granted by a final fee application order of the Bankruptcy Court.

balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code; and (c) over a period ending not later than 5 years after the Petition Date.

3. *Tax Claims Becoming Due After the Effective Date.* The amount of any Priority Tax Claim that is not otherwise due and payable on or prior to the Effective Date, and the rights of the holder of such Claim, if any, to payment in respect thereof shall: (a) be determined in the manner in which the amount of such Claim and the rights of the holder of such Claim would have been resolved or adjudicated if the Chapter 11 Case had not been commenced; (b) survive after the Effective Date as if the Chapter 11 Case had not been commenced; and (c) not be discharged pursuant to section 1141 of the Bankruptcy Code.

4. *Other Provisions Concerning Treatment of Priority Tax Claims.* In accordance with section 1124 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Plan shall not alter or otherwise impair the legal, equitable, and contractual rights of any holder of a Priority Tax Claim that is not otherwise due and payable on or prior to the Effective Date. Notwithstanding the provisions herein, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be disallowed. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Reorganized Debtors or their respective property.

## CLASSIFIED CLAIMS AND EQUITY INTERESTS

### A. Summary

The following table classifies Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

| Class | Estimated Value of Claims[2] | Percentage Distribution | Classification | Voting |
|---|---|---|---|---|
| Class 1 | Unknown | 100% | Unimpaired | Deemed to Accept |
| Class 2-A | $6,569,843.58 | 100% | Impaired | Entitled to Vote |
| Class 2-B | $9,142,821.33 | 100% | Impaired | Entitled to Vote |
| Class 3 | $2,295,728.04 | Up to 100% | Impaired | Entitled to Vote |
| Class 4 | $14,728.24 to $31,538.74 | 100% | Unimpaired | Deemed to Accept |
| Class 5 | Unknown | 100% | Unimpaired | Deemed to Accept |
| Class 6 | $6,103,867.66 | Up to 29% | Impaired | Entitled to Vote |
| Class 7 | Unknown | 0% | Impaired | Deemed to Reject |

**B.     Classification and Treatment of Claims and Equity Interests**

1.   *Class 1 – The Secured Claims of Wells Fargo*

(a) *Classification*: Class 1 consists of the Secured Claim of Wells Fargo.

(b) *Treatment*:  Unless otherwise agreed by the Claim holder and the applicable Debtors or Reorganized Debtors, Wells Fargo will receive the following in full satisfaction of all Class 1 Claims:  Wells Fargo will provide the Exit Loan in the form of a line of credit, the term of which will be agreed upon among the Debtors and Wells.  The Exit Loan will be in an amount sufficient to fully satisfy the DIP Loan.

(c) *Voting*:  Class 1 is classified for convenience only and not for voting purposes. Class 1 Claims will not vote on the Plan.

2.   *Class 2 - Secured Claims of the Term Lenders*

(a) *Classification*:  Class 2 consists of the Secured Claims of American Equity and the Secured Claim of SL Investment, respectively.  Each holder of a Class 2 Secured Claim hereby is placed in a separate subclass (for a total of two subclasses), denominated as Class 2-A (American Equity) and Class 2-B (SL Investment) and each subclass is and shall be treated as a separate Class for all purposes, including for voting and distribution, under this Plan.

(b) *Compromise and Settlement*:  In consideration of each of the Term Lenders' waiver of Administrative Claims against the Estates under sections 507(b) and 365(d)(3) of the Bankruptcy Code and General Unsecured Claims against the Estates under sections 365(g) and/or 502(b)(6) of the Bankruptcy Code relating to, among other things, rejection (pursuant to Article IV of the Plan) of unexpired leases between a Real Estate Debtor, as landlord, and any other Debtor, as tenant, the Class

---

[2]   The Value of Claims, as filed and set forth herein, is subject to adjustment through the claims administration process and does not include intercompany claims.

36

2 Secured Claims of American Equity and the Class 2 Secured Claim of SL Investment shall be treated as set forth herein. Entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of a settlement and compromise between the Debtors, Reorganized Debtors, the Estates and each of the Term Lenders pursuant to Bankruptcy Rule 9019.

(c)  *Subclass 2-A*:  Allowed Secured Claim sof American Equity.

(i)  American Equity holds Allowed Class 2-A Secured Claims against Debtor Mulqueen & Sons, LLC:

(A), with respect to the Dayton Property, in an aggregate Allowed amount equal to, as of the Effective Date, (i) the unpaid principal balance of approximately $3,523,529.00, plus (ii) all accrued but unpaid interest, late charges, legal fees and other charges as provided for in the American Equity Term Loan Documents, and

(B), with respect to the Columbus Property, in an aggregate Allowed amount equal to, as of the Effective Date, (i) the unpaid principal balance of approximately $2,994,999.57, plus (ii) all accrued but unpaid interest, late charges, legal fees and other charges as provided for in the American Equity Term Loan Documents.

(ii)  American Equity shall retain its liens, assignments of leases and rents, and security interests on all property and collateral described in the American Equity Term Loan Documents, and such liens, assignments of leases and rents, and security interests are hereby deemed and determined to be valid, enforceable, duly perfected, first priority (subject only to the valid lien of real estate taxes and assessments) liens, assignments of leases and rents, and security interests in and to all such property and collateral to the extent as existed on the Petition Date, and are not capable of being subordinated, avoided, set aside, or recovered pursuant to the Bankruptcy Code or otherwise.

(iii)  The American Equity Term Loan Documents shall be reinstated as modified by the American Equity Term Loan Modification Documents to provide, *inter alia*, for interest-only monthly payments through July 31, 2012.  Commencing August 1, 2012, monthly payments of interest (at the contract rate set forth in the American Equity Term Loan Documents) and principal shall thereafter be made to American Equity and amortized as set forth on <u>Exhibit F</u> attached hereto.  The unpaid balance of the Allowed Class 2-A Secured Claims shall be due and payable, in full, not later than May 31, 2016.  In addition to the payments described above, on the Effective Date American Equity shall be paid $33,454.53 in interest that accrued in respect of the American Equity Term Loan Documents for the month of February 2011, but that American Equity was not heretofore paid.  Further, within thirty (30) days after the Effective Date, an amount sufficient to cure any shortfall in the real estate tax escrow in respect of the Dayton Property and Columbus Property shall be

37

remitted to American Equity, in accordance with the American Equity Term Loan Documents.

(d) *Subclass 2-B*: Allowed Secured Claim of SL Investment.

(i)     SL Investment holds an Allowed Class 2-B Secured Claim against Debtor ALEMIT Properties, LLC in an aggregate Allowed amount equal to, as of the Effective Date, (i) the unpaid principal balance of approximately $9,077,804.08, plus (ii) all accrued but unpaid interest, late charges, legal fees and other charges as provided for in the SL Investment Term Loan Documents.

(ii)     SL Investment shall retain its liens, assignments of leases and rents, and security interests on all property and collateral described in the SL Investment Term Loan Documents, and such liens, assignments of leases and rents, and security interests are hereby deemed and determined to be valid, enforceable, duly perfected, first priority (subject only to the valid lien of real estate taxes and assessments) liens, assignments of leases and rents, and security interests in and to all such property and collateral to the extent as existed on the Petition Date, and are not capable of being subordinated, avoided, set aside, or recovered pursuant to the Bankruptcy Code or otherwise.

(iii)     The SL Investment Term Loan Documents shall be reinstated as modified by the SL Investment Term Loan Modification Documents to provide, *inter alia*, for interest-only monthly payments through July 31, 2012. Commencing August 1, 2012, monthly payments of interest (at the contract rate set forth in the SL Investment Term Loan Documents) and principal shall thereafter be made to SL Investment and amortized as set forth on <u>Exhibit G</u> attached hereto.  The unpaid balance of the Allowed Class 2-B Secured Claim shall be due and payable, in full, not later than May 31, 2016.  In addition to the payments described above, on the Effective Date SL Investment shall be paid $44,329.94 in interest that accrued in respect of the SL Investment Term Loan Documents for the month of February 2011, but that SL Investment was not heretofore paid.  Further, within thirty (30) days after the Effective Date, an amount sufficient to cure any shortfall in the real estate tax escrow in respect of the Canton Property shall be remitted to SL Investment, in accordance with the SL Investment Term Loan Documents.

(e) *No Reconsideration, etc.*:  Notwithstanding any other term or provision of this Plan or the Confirmation Order, from and after the Effective Date each of the Allowed Class 2-A Secured Claims and the Allowed Class 2-B Secured Claim shall be and hereby are Allowed Secured Claims for all purposes in the Chapter 11 Cases and under this Plan and shall not be subject to disallowance, reconsideration (whether pursuant to Bankruptcy Code section 502(j) or otherwise), disgorgement, avoidance, recovery, recharacterization, subordination, reclassification, rights of set-off or recoupment, reduction or challenge in any manner whatsoever.  **The Term Lenders, all of their respective officers, directors, employees, agents, representatives, successors and assigns, and any of them, are hereby finally and fully released**

38

**and discharged in all respects from any and all Causes of Action or Recovery Actions.**

(f) *No stay of enforcement*:   Notwithstanding any other term or provision of the Plan or the Confirmation Order, from and after the Effective Date the automatic stay of section 362(a) of the Bankruptcy Code, section 524 of the Bankruptcy Code, and the injunctive provisions set forth in Article VIII. D of this Plan shall not enjoin, bar, stay, impede, limit or otherwise affect the ability of (i) American Equity to invoke or enforce its rights and remedies under the American Equity Term Loan Documents (as modified by the American Equity Term Loan Modification Documents) or (ii) SL Investment to invoke or enforce its rights and remedies under the SL Investment Term Loan Documents (as modified by the SL Investment Term Loan Modification Documents).

(g) *Voting*: Class 2 Allowed Secured Claims are Impaired.  Each holder of an Allowed Class 2 Secured Claim is entitled to vote on the Plan.

(h) *Amount*: The Term Lenders filed proofs of claims as follows:

| Lender | Debtor | Filed Secured Claim |
|---|---|---|
| SL Investment | ALEMIT Properties, LLC | $9,142,821.33 |
| American Equity | Mulqueen & Sons, LLC | $3,551,266.82 $3,018,576.76 |

3.  *Class 3 – The Secured Claim of the Huntington National Bank*

(a) *Classification*: Class 3 consists of the Secured Claim against Debtor Mulqueen & Sons, LLC held by Huntington National Bank.

(b) *Treatment*:  The parties intend to conduct a public auction sale of the Cleveland Property pursuant to section 363 of the Bankruptcy Code.  The holder of an Allowed Class 3 Claim will receive the net proceeds of the sale of the Cleveland Property, less all sale, advertising and Carrying Costs, in full satisfaction of its Class 3 Claim.

Subject to the foregoing, the holder of the Class 3 Claim shall be deemed to have a Claim in Class 6 to the extent that any portion of its Claim is unsecured pursuant to section 502(a)(1) of the Bankruptcy Code

(c) *Voting*:  The Class 3 Claim is Unimpaired, and holder of an Allowed Class 3 Claim is deemed to accept the Plan.

(d) *Amount*: Huntington has filed a proof of claim for its secured claim against Mulqueen & Sons, LLC in the amount of $2,295,728.04.  The Debtors anticipate that the amount of Huntington's unsecured claim will be approximately $1,295,728.00.

4. *Class 4 – Other Secured Claims*

   (a) *Classification*: Class 4 Claims consist of Secured Claims held by parties other than the Term Lenders or Wells Fargo.

   (b) *Treatment*:  On or as soon as practicable after the Effective Date, each holder of an Allowed Other Secured Claim against the Debtors will receive, in the sole discretion of the applicable Reorganized Debtor, except to the extent any holder of an Allowed Other Secured Claim agrees to a different treatment, either:

   (i) the collateral securing such Allowed Other Secured Claim;

   (ii) Cash in an amount equal to the value of the collateral securing such Allowed Other Secured Claim; or

   (iii) the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered Unimpaired.

   (c) *Voting*: Class 4 is Unimpaired, and holders of Allowed Other Secured Claims are conclusively deemed to have accepted the Plan.

   (d) *Amount*:

| Lender | Debtor | Filed Claim | Scheduled Claim |
|---|---|---|---|
| Toyota Motor Credit Corp. | Flower Factory, Inc. | $1,171.93 | |
| Ford Motor Credit Co. | Flower Factory Online, Inc. | $13,546.31 | |
| Lexus Financial Services | Flower Factory, Inc. | | $9,236.44 |
| Ford Credit | Flower Factory, Inc. | | $22,302.30 |

5. *Class 5 – Other Priority Claims*

   (a) *Classification*: Class 5 consists of Other Priority Claims, to the extent that such claims exist.

   (b) *Treatment*: Holders of Allowed Class 5 Claims shall receive, in full satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim (a) on the Effective Date or as soon thereafter as is reasonably practicable, Cash equal to the amount of such Allowed Other Priority Claim, or (b) such other treatment as to which the Reorganized Debtor and such holder shall have agreed in writing.  All Disputed Class 5 Claims, if any, shall be reserved for in full on the Effective Date.

   (c) *Voting*: Class 5 is Unimpaired, and holders of Allowed Class 5 Claims are deemed to have accepted the plan.

40

(d) *Amount*: $0.00

6. *Class 6 – General Unsecured Claims*

    (a) *Classification*: Class 6 consists of General Unsecured Creditors.

    (b) *Treatment*: Each holder of an Allowed General Unsecured Claim shall receive in full and final satisfaction of such Claim its Pro Rata share, based upon the principal amount of each holder's Allowed Claim, of the Creditor Trust Assets.

    (c) *Voting*: Class 6 is Impaired, and holders of Class 6 Claims are entitled to vote on the Plan.

    (d) *Amount*: The following is a list of the approximate amount of Unsecured Claims, both scheduled and filed, including insider claims, as well as disputed, contingent and unliquidated claims against each Debtors' Estate:

| Debtor | Scheduled Claims | Filed Claims |
| --- | --- | --- |
| Flower Factory, Inc. | $15,277,604.77 | $5,858,542.32 |
| Flower Factory Online, Inc. | $2,312,843.80 | $0.00 |
| ALEMIT Properties, LLC | $67,530.69 | $0.00 |
| Denbar, Inc. | $2,315,533.80 | $1,825.20 |
| FF North Canton, Inc. | $2,308,244.89 | $63,468.80 |
| F.F. Aurora, Inc. | $65,015.58 | $48,667.84 |
| F.F./Cleveland, Inc. | $2,305,858.77 | $0.00 |
| FF Greenwood, Inc. | $45,403.50 | $2,489.20 |
| F.F. Mansfield, Inc. | $39,484.14 | $0.00 |
| Mulqueen Importers, LLC | $2,409,428.08 | $125,481.72 |
| Mulqueen & Sons, LLC | $53,835.02 | $1,965.69 |
| Mulden, Inc. | $2,376,608.94 | $1,426.89 |
| Mulqueen Holdings, Inc. | $2,295,728.04 | $0.00 |
| RAM Trucking, LLC | $2,295,901.76 | $0.00 |

41

7. *Class 7 – Equity Interests*

   (a) *Classification*: Class 7 consists of all equity, membership interests and similar interests in the Debtors.

   (b) *Treatment*:  On the Effective Date, (i) all Equity Interests in the Debtors will be cancelled and extinguished; and (ii) new equity or membership interests in the Reorganized Debtors will be created and issued as set forth on <u>Exhibit D</u>.

   The Holders of Class 7 Equity Interests shall not be entitled to distributions of any kind on account of such interests.

   (c) *Voting*:  Class 7 is Impaired and is deemed to have rejected the Plan.

**C.    Subordination**

The treatment of Claims and Equity Interests conforms to contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

**D.    U.S. Trustee Fees**

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash equal to the amount of such Administrative Claims. All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

**E.    No Accrual of Postpetition Interest**

Except as otherwise provided in the Plan, no holder of an Allowed Unsecured Claim will be entitled to the accrual of postpetition interest or the payment of postpetition interest on account of such Claim for any purpose.

<u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>

**A.    Assumption and Rejection of Executory Contracts and Unexpired Leases**

Any Executory Contracts and Unexpired Leases that have not expired by their own terms on or prior to the Effective Date, which have not been assumed or rejected during the pendency of the Chapter 11 Cases and that are not the subject of a motion pending as of the Effective Date to assume, shall be deemed rejected on the Effective Date by the Debtors as of immediately prior to the Petition Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  All unexpired leases between a Debtor, as tenant, and a Real Estate Debtor,

as landlord, shall be rejected as of the Effective Date, and the applicable Reorganized Debtor shall enter into new, replacement leases with the applicable Reorganized Real Estate Debtor in form and substance reasonably acceptable to the applicable Term Lender and substantially conforming to the replacement leases in the supplement to the Plan to be filed with the Bankruptcy Court on or before the Confirmation Date.

**B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

All proofs of claim arising from the rejection of Executory Contracts or Unexpired Leases must be filed within thirty (30) days after the earlier of: (1) the date of entry of an order of the Bankruptcy Court approving any such rejection; and (2) the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which proofs of claim are not timely filed within that time period will be forever barred from assertion against the Debtors and their Estates, the Reorganized Debtors and their respective successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in the Plan.

**C.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan**

Any monetary amounts by which any Executory Contract and Unexpired Lease to be assumed pursuant to the Plan or otherwise shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on or as soon as practicable after the Effective Date or on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree. In the event of a dispute regarding the amount of a cure payment, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or any other matter pertaining to assumption: (1) the Debtors or Reorganized Debtors, as the case may be, retain the right to reject the applicable Executory Contract or Unexpired Lease at any time prior to the resolution of the dispute; (2) cure payments shall only be made following the entry of a Final Order resolving the dispute.

## LIQUIDATION ANALYSIS

The Bankruptcy Court is required to make an independent determination that the Plan is in the best interest of creditors and Equity Interest holders impaired by the Plan before the Plan can be confirmed.  The "best interests" test requires the Bankruptcy Court to find either that all members of an impaired class of claims or interests have accepted the Plan or that the Plan will provide members of such impaired Class with a recovery that has a value at least equal to the value of the distribution that each such member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code and the Debtors' remaining assets liquidated pursuant to that chapter. The Debtors believe that, under the Plan, each holder of Impaired Claims and Equity Interests will receive property of a value not less than the value such holders would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Because of the numerous

43

uncertainties and time delays associated with liquidations of assets, it is not possible to predict with certainty the outcome of any chapter 7 liquidation. However, the conversion of these cases to cases under chapter 7 of the Bankruptcy Code would require the retention of new professionals. Further, a new bar date would arise upon conversion of the Chapter 11 Cases to cases under chapter 7, thereby further delaying distributions to creditors. Finally, any proceeds realized from such administration and liquidation would first be used to pay all costs and expenses incurred from and after the date of the conversion to chapter 7, including chapter 7 trustee fees and the fees and costs of any professionals retained by the chapter 7 trustee. Because of this additional layer of administrative expenses, the Debtors believe that in a chapter 7 liquidation, creditors holding impaired Allowed Claims would receive a distribution less than the distribution contemplated under the Plan. Accordingly, the Debtors believe that creditors will receive greater and prompter distributions under the Plan than they would receive through a chapter 7 liquidation.

The Debtors project that the liquidated value of their assets is $16,049,000.00. All assets of the Debtors are secured by at least one lien. The Debtors therefore project that no creditors other than administrative and secured creditors would receive any distribution in a liquidation scenario. Furthermore, the Debtors project that no secured creditor would receive any distribution on account of any deficiency balance following the liquidation of its collateral. The projected percentage recovery for secured creditors in a liquidation scenario, 81%, is an average; some secured creditors would receive more and some less, based on the size of their proof of claim and the value of the underlying collateral. However, the Debtors do not project that any secured creditor would receive more in a liquidation scenario than that creditor would receive under the Plan. Further, the Debtors project that in a liquidation scenario no unsecured creditor would receive any distribution on account of its unsecured claims. A copy of the Liquidation Analysis is attached hereto and incorporated herein as Exhibit H.

**THE LIQUIDATION VALUATIONS HAVE BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DO NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THIS ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.**

## VOTING AND CONFIRMATION OF THE PLAN

The Bankruptcy Code requires, to confirm the Plan, that the Bankruptcy Court makes a series of findings concerning the Plan and Debtors, including that:

(a)     the Plan complies with applicable provisions of the Bankruptcy Code including: (1) the Plan has classified Claims and Equity Interests in a permissible manner; and (2) the disclosure required by section 1125 of the Bankruptcy Code has been made;

(b)     the Debtors have complied with applicable provisions of the Bankruptcy Code;

(c)     the Debtors have proposed the Plan in good faith and not by any means forbidden by law;

44

(d)     any payment made, or to be made, by the Plan proponent or any person issuing securities acquiring property under the Plan, for services, costs, and expenses in Debtors' case, or in connection with Debtors' case, has been approved, or is subject to approval by the Bankruptcy Court as reasonable;

(e)     the disclosures required under section 1129(a)(5) have been made;

(f)     the Plan has been accepted by the requisite votes of creditors;

(g)     the Plan is in the "best interests" of all holders of Claims or Equity Interests in an impaired Class by providing to creditors and Equity Interest holders on account of such Claims or Equity Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Equity Interest in such Class has accepted the Plan;

(h)     if a Class of claims is Impaired under the Plan, at least one class of Impaired claims has voted to accept the Plan;

(i)     the Plan is feasible, and Confirmation will likely not be followed by the liquidation under chapter 7 or the need for further financial reorganization of Debtors;

(j)     all fees and expenses payable under 28 U.S.C. §1930, as determined by the Bankruptcy Court at the hearing on Confirmation, have been paid (or the Plan provides for the payment of such fees on the Effective Date).

The Debtors anticipate that the Court will make such findings.

A.      **Voting Procedures and Requirements**

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in the Debtors that are "impaired" under the terms and provisions of a plan of reorganization are entitled to vote to accept or reject a plan. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or interests of that class are modified, other than by curing default and reinstating maturity. Under the Plan, Classes of Claims that are not impaired are *not* entitled to vote on the Plan and are deemed to have accepted the Plan. In addition, Classes of Claims and Equity Interests that receive no distributions under the Plan are *not* entitled to vote on the Plan and are deemed to have rejected the Plan, unless such Class otherwise indicates acceptance. The classification of Claims and Equity Interests is summarized, together with notations as to whether each Class of Claims or Equity Interests is impaired or unimpaired, under the caption "CLASSIFIED CLAIMS AND EQUITY INTERESTS."

The amount of a Claim that will be used to determine votes for or against the Plan will be: (a) the Claim amount listed on the schedules of liabilities filed with the Bankruptcy Court unless such Claim is listed on the schedules of liabilities as contingent, unliquidated, or disputed;

45

(b) the liquidated amount specified in a Proof of Claim timely filed with the Bankruptcy Court that is not the subject of an objection; or (c) the liquidated amount specified in a Final Order. If the holder of a Claim submits a ballot, but such holder has not timely filed a Proof of Claim *and:* (a) such holder's Claim is listed on the schedules of liabilities as contingent, unliquidated or disputed; or (b) such holder's Claim is the subject of an objection, the ballot will not be counted for purposes of determining acceptances or rejections of the Plan, in accordance with Bankruptcy Rule 3018, unless the Bankruptcy Court has temporarily allowed the Claim for the purpose of accepting or rejecting the Plan in accordance with Bankruptcy Rule 3018.

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for voting or other purposes. Debtors may seek an order of the Bankruptcy Court temporarily allowing, for voting purposes only, certain Disputed Claims.

In addition, the following voting procedures and standard assumptions will be used for purposes of tabulating ballots:

        (a)     Whenever a holder of a claim casts more than one Ballot voting the same claim prior to the Voting Deadline, the latest dated Ballot received prior to the Voting Deadline will be deemed to supersede and revoke any prior Ballots.

        (b)     Holders of Claims must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split their votes. Accordingly, the Debtors will treat as an acceptance any ballot (or multiple ballots with respect to multiple Claims within a single Class) that partially rejects and partially accepts the Plan.

        (c)     Ballots that fail to indicate an acceptance or rejection of the Plan, but which are otherwise properly executed and received prior to the Voting Deadline, will be tabulated as an acceptance.

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT. IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU MAY RECEIVE MORE THAN ONE BALLOT. YOU SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE. PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY.**

Votes cannot be transmitted orally. Accordingly, you are urged to return your signed and completed ballot promptly.

**IF YOU HAVE A CLAIM THAT IS IMPAIRED UNDER THE PLAN ENTITLING YOU TO VOTE AND YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT OR LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS DISCLOSURE STATEMENT OR THE PLAN, PLEASE CALL MARC B. MERKLIN, COUNSEL FOR THE DEBTORS.**

## B.  Confirmation Hearing

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on whether the Debtors have fulfilled the Confirmation requirements of section 1129 of the Bankruptcy Code.  The Confirmation hearing has been scheduled for August 11, 2011 at 10:00 a.m. Eastern Time, before the Honorable Russ Kendig, United States Bankruptcy Court, Northern District of Ohio, Eastern Division, Ralph Regula Federal Building and U.S. Courthouse, 401 McKinley Avenue, S.W., Canton, Ohio 44702.  The Confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation hearing.  Any objection to Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Equity Interest held by the objector.  Any such objections must be filed and served upon the persons designated in the notice of the Confirmation hearing.

## C.  Confirmation

At the Confirmation hearing, the Bankruptcy Court will confirm the Plan only if the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for Confirmation are that the Plan: (a) is accepted by the requisite holders of Claims and Equity Interests in impaired Classes or, if not so accepted, is "fair and equitable" and "does not discriminate unfairly" as to the nonaccepting Class, (b) is in the "best interests" of each holder of a Claim or Equity Interest in each impaired Class, (c) is feasible, and (d) complies with the applicable provisions of the Bankruptcy Code.

## D.  Acceptance or Cramdown

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept the Plan.  Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.  A plan is accepted by an impaired class of interests if holders of at least two-thirds of the number of shares in such class vote to accept the plan.  As with Claims, only those holders of Equity Interests who actually return a ballot count in this tabulation.  In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Bankruptcy Court to be in the best interests of each holder of a claim or interest in an impaired Class.  In addition, the impaired Classes must accept the Plan for the Plan to be confirmed without application of the fair and equitable test in section 1129(b) of the Bankruptcy Code discussed below.

The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.  As indicated above, the Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 1129 of the Bankruptcy Code, it (a) is "fair and equitable" and (b) "does not discriminate unfairly" with respect to each Class of Claims or

Equity Interests that is impaired under, and has not accepted, the Plan. The Debtors are not attempting to cramdown under the Plan.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless either (a) a dissenting Class of Unsecured Claims or Class of Equity Interests receives full compensation for its Allowed Claims or Allowed Equity Interests, or (b) a holder of a junior Class of Equity Interests provides new value for the Plan, no holder of Allowed Claims or Equity Interests in any junior Class may receive or retain any property on account of such Claims or Equity Interests. The Debtors are not attempting to cramdown under the Plan and, therefore, Debtors need not comply with the absolute priority rule. Accordingly, holders of Equity Interests are not putting in any new value in exchange for retaining said Equity Interests. Debtors make no assertion that the Plan complies with the "absolute priority rule.

The requirement that the Plan not "discriminate unfairly" means, among other things, that a dissenting Class must be afforded substantially similar and equal to the treatment provided to other Classes of equal rank. The Debtors do not believe that the Plan discriminates unfairly against any Class that may not accept or otherwise consent to the Plan.

Subject to the conditions set forth in the Plan, a determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code will not limit or affect the Debtors' ability to modify the Plan to satisfy the provision of section 1129(b) of the Bankruptcy Code.

E.    **Best Interests Test**

Each holder of a Claim or Equity Interest in an impaired class must either (i) accept the Plan or (ii) receive or retain under the Plan either Cash or property of a value, as of the Effective Date of the Plan, that is not less than the value that holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the Cash to be issued under the Plan to each holder equals or exceeds the value that would be allocated to the holder in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan meets this requirement.

F.    **Feasibility**

The Debtors believe that the Reorganized Debtors will be able to perform their obligations under the Plan and continue to operate its business without further financial reorganization or liquidation. In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which requires that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. To support their belief in the Plan's feasibility, the Debtors' management has developed a five year business plan and prepared (1) Consolidated Forecasted Profit and Loss Statement for April 2011 through 2016; (2) Consolidated Forecasted Statements of Cash Flows for April 2011 through 2016; and (3) Consolidated Forecasted Borrowing Base Calculations for April 2011 through 2016 (collectively, the "Projections"). The Projections are set forth in Exhibit I attached to this Disclosure Statement. The Projections demonstrate that for April 2011 through 2016 the

48

Reorganized Debtor will have sufficient cash flow to maintain its operations and service the assumed debt of the Reorganized Debtor, the Plan is therefore feasible.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS ("AICPA"), THE FINANCIAL ACCOUNTING STANDARDS BOARD (THE "FASB"), OR THE RULES AND REGULATIONS OF THE SEC. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED, REVIEWED OR SUBJECTED TO ANY PROCEDURES DESIGNED TO PROVIDE ANY LEVEL OF ASSURANCE BY ANY INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT.  WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, WHILE CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS MANAGEMENT. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE PROJECTIONS, OR THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THESE PROJECTIONS.

## FEDERAL INCOME TAX CONSIDERATIONS OF CONSUMMATION OF THE PLAN

### A.    General

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE (THE "CODE"), TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT.  CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN IMPORTANT RESPECTS, UNCERTAIN.  NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS"); NO OPINION HAS BEEN REQUESTED FROM DEBTORS' COUNSEL CONCERNING ANY TAX CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL

INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND NON-U.S. TAXPAYERS. IN
ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL OR NON-U.S.
TAX CONSEQUENCES.

**B.      U.S. Federal Income Tax Consequences to the Debtors**

**1.      Cancellation of Debt Income - Mulqueen Holdings, Inc. and Its Subsidiaries**

Generally, the discharge of a debt obligation by a debtor for an amount less than the
adjusted issue price (in most cases, the amount the debtor received on incurring the obligation,
with certain adjustments) creates cancellation of the indebtedness ("COD") income, which must
be included in the debtor's income. However, COD income is not recognized by a taxpayer that
is a debtor in a reorganization case if the discharge is granted by the court or pursuant to a plan
of reorganization approved by the court. Mulqueen Holdings, Inc. has made an election to be
subject to Subchapter S of the Code. In addition, each of the Debtors that is a direct or indirect
subsidiary of Mulqueen Holdings, Inc. is either a single member limited liability company or a
corporate entity that has elected to be treated as a qualified subchapter S subsidiary.
Consequently, each such subsidiary is a "disregarded entity" for Federal income tax purposes
and its operations are treated, for such purposes, as operations of a separate unincorporated
division of Mulqueen Holdings, Inc. Although S corporations are generally not taxable entities,
the application of the exclusion from COD income for a debtor in a reorganization is determined
at the S corporation level. Thus, because Mulqueen Holdings, Inc. is a Debtor in this case, the
Plan, if approved, would enable Mulqueen Holdings, Inc. to qualify for the bankruptcy exclusion
rule with respect to any COD income triggered by the Plan. Accordingly, no COD income will
be recognized by Mulqueen Holdings, Inc. and no COD income will be recognized by the
shareholders of the entity.

If debt is discharged in a reorganization case, however, certain income tax attributes
otherwise available and of value to the debtor or its shareholders are reduced, in most cases by
the amount of the indebtedness forgiven. In the case of an S corporation, the following tax
attributes are subject to reduction in the following order of priority: (a) suspended losses at the
shareholder level due to basis limitations; and (b) the tax basis of the debtor's depreciable and
nondepreciable assets. A debtor may elect to avoid the prescribed order of attribute reduction
and instead apply any portion of the reduction to reduce the basis of the debtor's depreciable
property first; but not in an amount greater than the excess of the aggregate tax bases of the
property held by the debtor immediately after the discharge over the aggregate of the debtor's
liabilities immediately after the discharge.

**2.      Cancellation of Debt Income - ALEMIT Properties, LLC**

Although ALEMIT Properties, LLC has two members for state law purposes, because the
members of the entity are treated as a single person for Federal income tax purposes, ALEMIT
Properties, LLC is considered a "disregarded entity" for Federal income tax purposes. A
disregarded entity is not separately taxed for Federal income tax purposes, rather the income
recognized from the operations of the entity is reported on owner's tax returns as a sole
proprietorship. Thus, regardless of whether COD income is recognized upon the approval and
execution of the Plan, there will be no tax consequences to ALEMIT Properties, LLC as a result

50

of the Plan, however, there may be tax consequences to its members. In the case of disregarded entities, for purposes of applying the statutory exclusions for COD income, qualification for the exclusions is determined at the owner level and not the entity level. Because the members of ALEMIT Properties, LLC are not Debtors in this case, the exclusion from COD income for a debtor in a reorganization is not applicable to any COD income recognized by the members as a result of the approval of the Plan. Whether or not any other statutory exclusions to COD income would be applicable to the members is dependent upon the particular financial situation of the members.

### 3.     Restructuring Transaction

The Restructuring Transactions will not have any direct adverse tax consequences to ALEMIT Properties, LLC or Mulqueen Holdings, Inc., or any of its subsidiaries, however, such Transactions may have tax consequences to one or more shareholders of Mulqueen Holdings, Inc. and/or to the members of ALEMIT Properties, LLC.

### C.     U.S. Federal Income Tax Consequences to Holders of Claims

In general, the Federal income tax consequences of the Plan to a holder of a Claim will depend, in part, on what type of consideration was received in exchange for the Claim, whether the holder reports income on the accrual or cash basis, whether the holder has taken a bad debt deduction with respect to the Claim and whether the holder receives distributions under the Plan in more than one taxable year. A holder's particular tax situation may also affect the federal income tax consequences of the Plan to such holder.

### 1.     Direct Payments to Holders of Claims

A holder of an Allowed Claim who receives cash and/or an interest in the Creditor Trust (a "Contingent Interest") in exchange for such holder's Claim would recognize gain or loss in an amount equal to the difference between (a) the amount of cash received by the holder with respect to its Allowed Claim and (b) the holder's adjusted tax basis in its Claim. In the case of holders who receive Contingent Interests, because additional distributions may be made to such holders after the initial distribution, any loss and a portion of any gain realized by a holder in satisfaction of its Claim may be deferred until the holder has received its final distribution in respect of its Contingent Interest. All holders are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the "installment method" of reporting gain that may be recognized in respect of a Claim. To the extent any portion of a claimholder's recovery is allocable to interest on the Claim, such portion would be treated as income to such holder.

Any gain or loss recognized would be capital or ordinary, depending on the status of the Claim in the holder's hands, including whether the Claim constitutes a market discount bond in the holder's hands. Generally, any gain or loss recognized by a holder of a Claim would be a long-term capital gain or loss if the Claim is a capital asset in the hands of the holder and the holder has held such Claim for more than one year, unless the holder had previously claimed a bad debt deduction or the holder had accrued market discount with respect to such Claim. See

51

"Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount.

### 2. Payments from Creditor Trust

The Creditor Trust is intended to be treated, for U.S. federal income tax purposes, as a disputed ownership fund within the meaning of Treasury Regulations section 1.468B-9(b)(1). If any payment is to be made out of the Creditor Trust, such payment will not be deemed to have been made to any recipient until, and to the extent that, the amount to which the payee is entitled has been determined and distributed. Whether a distribution to a claimant is includable in the claimant's gross income is generally determined by reference to the claim in respect of which the distribution is made and as if the distribution were made directly by the Debtors.

Any income realized by the Creditor Trust prior to the time of the distributions of the assets of the reserve will be reported by the Creditor Trustee as income of and taxable to the Creditor Trustee.

### 3. Accrued but Unpaid Interest

In general, a Claim holder that was not previously required to include in taxable income any accrued but unpaid interest on the Claim may be required to take such amount into income as taxable interest. A Claim holder that was previously required to include in taxable income any accrued but unpaid interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that distributions received by holders in full or partial satisfaction of Allowed Claims will be allocated first to unpaid interest that accrued on such Claims, with any excess allocated to the principal amount of Allowed Claims. Each holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purposes.

### 4. Post-Effective Date Distributions

Holders of Claims may receive distributions subsequent to the Effective Date. The imputed interest provisions of the Code may apply to treat a portion of any post-Effective Date distribution as imputed interest. Imputed interest may, with respect to certain holders, accrue over time using the constant interest method, in which event the holder may, under some circumstances, be required to include imputed interest in income prior to receipt of a distribution.

In addition, because additional distributions may be made to holders of Claims and holders of Interests after the initial distribution, any loss and a portion of any gain realized by a holder may be deferred until the holder has received its final distribution. All holders are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the "installment method" of reporting gain that may be recognized in respect of a Claim.

5.      **Bad Debt Deduction**

A holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the Code. The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

6.      **Market Discount**

A holder that purchased its Claim from a prior holder with market discount will be subject to the market discount rules of the Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent to the accrued market discount on such a Claim as of the date of the exchange.

7.      **Installment Method**

A holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of section 453B of the Code.

8.      **Information Reporting and Backup Withholding**

All distributions under the Plan will be subject to applicable federal income tax reporting and withholding. The Code imposes "backup withholding" (currently at a rate of 28%) on certain "reportable" payments to certain taxpayers, including payments of interest. Under these rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

D.      **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE

ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

A.     Except as provided in this Plan, allow, disallow, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims or Equity Interests;

B.     Either grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan;

C.     Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or any Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims or cure amounts arising therefrom;

D.     Ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

E.     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and either grant or deny any applications involving any Debtor or any Reorganized Debtor that may be pending on the Effective Date) or brought thereafter;

F.     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any entity's rights arising from or obligations incurred in connection with the Plan and such documents;

H.     Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with

54

the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

I.     Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

K.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

L.     Grant or deny any request by the Debtors for the sale or auction of the Cleveland Property and the retention of any broker or auctioneer in connection with such proposed sale;

M.     Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

N.     Enter a final decree or decrees closing the Chapter 11 Cases; and

O.     Determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for taxes.

## MISCELLANEOUS PROVISIONS

### A.     Bar Date for Administrative Expense and Professional Compensation Claims

The deadline for submission by (i) Professionals of an application for Bankruptcy Court approval of accrued Professional Compensation incurred prior to the entry of the Confirmation Order and (ii) the holders of Administrative Expense Claims incurred prior to the Effective Date shall be sixty (60) days after the Effective Date.

### B.     Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been

55

altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### C.     Service of Documents

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the Debtors and the Reorganized Debtor; or (2) the Creditors' Committee; must be served on:

**1.     The Debtors and Reorganized Debtor**

Marc B. Merklin, Esq.
Kate M. Bradley, Esq.
Brouse McDowell
388 S. Main Street, Suite 500
Akron, Ohio 44311

**2.     The Committee**

Jean R. Robertson
Gus Kallergis
Nathan A. Wheatley
Calfee, Halter & Griswold LLP
1400 KeyBank Center
800 Superior Avenue
Cleveland, Ohio 44114

**3.     The Exit Lender**

Wells Fargo Capital Finance
100 Park Avenue, 2nd Floor
New York, New York 10017
Attn: Stephen R. Santini

With a copy to:

Jeffrey M. Rosenthal
Burke A. Dunphy
Greenberg Traurig, LLP
200 Park Avenue
Florham Park, New Jersey 07932

**4.     The Term Lenders**

American Equity Investment Life Insurance Company
P.O. Box 71216
Des Moines, Iowa 50325
Attn: Ben Garrett

56

With a copy to:

Jeffrey C. Toole
Buckley King LPA
1400 Fifth Third Center
600 Superior Avenue, E.
Cleveland, Ohio 44114

SL Investment Holdings 2008-1, LLC
One Sun Life Executive Park SC1307
Wellesley Hills, MA  02481
Attn:  Matthew Sargent

With a copy to:

Tim J. Robinson
Dinsmore & Shohl, LLP
191 W. Nationwide Blvd., Suite 300
Columbus, Ohio 43215

**D.      Further Documents**

On or before the Effective Date, the Debtors, at their option, may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**E.      No Stay of Confirmation Order**

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Fed.R.Bankr.P. 3020(e) and 7062.

<u>**RECOMMENDATION AND CONCLUSION**</u>

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all holders of Claims to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received.

Dated: July 8, 2011                    Respectfully submitted,

                                       Flower Factory, Inc., on its own behalf and on behalf of
                                       each affiliate Debtor


                                       By: /s/ Christopher J. Mulqueen
811538.3                               Name: Christopher J. Mulqueen
                                       Title: Vice President